WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
PROTECT LAKE PLEASANT, LLC,   )
an Arizona limited liability )
company, et al.,             )        No. CIV 07-454 PHX RCB
                             )
     Plaintiffs,             )              O R D E R
                             )
          vs.                )
                             )
ROBERT W. JOHNSON, in his    )
official capacity as         )
Commissioner, United States  )
Bureau of Reclamation, et al.,)
                             )
     Defendants.             )
_____)
```

In this action for declaratory and injunctive relief, Plaintiffs allege that the United States Bureau of Reclamation ("BOR"), by authorizing Maricopa County (the "County") to proceed with the development and construction of the proposed Scorpion Bay Marina & Yacht Club ("Scorpion Bay Marina") at Lake Pleasant Regional Park ("LPRP"), violated, <u>inter alia</u>, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 <u>et seq.</u>, and the Clean Air Act, 42 U.S.C. §§ 7401 <u>et seq.</u>  Am. Compl. (doc. # 4) ¶¶ 57-117.

. . .

Currently before the Court is Plaintiffs' motion for preliminary injunction (doc. # 12) seeking to enjoin BOR from issuing or implementing a Finding of No Significant Impact ("FONSI") that would authorize the County's construction of the Marina until such time as BOR has complied with its obligations under NEPA.  BOR and Intervenor-Defendant Lake Pleasant Marina Partners, LLC ("Marina Partners") oppose the motion.  BOR's Resp. (doc. # 25); MP's Resp. (doc. # 32).  Plaintiffs filed their reply memorandum (doc. # 34) on April 30, 2007.  Also before the Court is Marina Partners' motion in limine (doc. # 35), filed on May 4, 2007, seeking to exclude the extra-record testimony of Glen Haas, Ph.D..  Plaintiffs filed a responsive memorandum (doc. # 36) opposing Marina Partners' motion on May 7, 2007, and the Court heard oral argument on both motions on May 8, 2007.  (doc. # 38). Having carefully reviewed the record and considered the arguments raised, the Court now rules.

**I.   BACKGROUND**

Lake Pleasant was originally formed in the 1920s when the Waddell Dam was built by a company that is now the Maricopa Municipal Water Conservation District ("Water District").  In 1969, the Water District and the County entered into an operating agreement requiring the County to manage Lake Pleasant as a regional park.

Under the Colorado River Basin Project Act of 1968, Congress authorized BOR to develop and build the Central Arizona Project. Pursuant to this authority, BOR proposed the construction of a new dam in the 1980s.  In 1984, BOR prepared a final environmental impact statement ("EIS") for the CAP storage division which

1   included the New Waddell Dam.  Because water levels were to
2   increase significantly with the construction of the New Waddell
3   Dam, submerging the then existing public marina, the 1984 EIS
4   included a recreational development plan for the enlarged lake
5   resulting from the new dam.

6   Construction of the New Waddell Dam was commenced in 1985 and
7   completed in 1992.  In 1990, BOR and Maricopa County entered into a
8   50-year Recreation Management Agreement ("RMA") under which the
9   County, through its Parks and Recreation Department, would manage
10  recreation in LPRP.  Under the RMA, the County is authorized to
11  enter into third-party concession agreements for recreational
12  services and facilities subject to BOR approval.  The County
13  subsequently developed a Master Recreational Plan ("MRP") based on
14  the conceptual plan described in the 1984 EIS.  In 1997, BOR
15  prepared an environmental assessment ("EA") comparing the impacts
16  of the MRP with the impacts of the recreational plan discussed in
17  the 1984 EIS.  The 1997 EA determined that a FONSI was appropriate
18  for the MRP.  However, the 1997 EA stipulated that any proposed
19  concession and recreational development at LPRP was required to be
20  consistent with the overall recreational management plans and goals
21  for Lake Pleasant identified in Appendix C of the 1984 Final EIS,
22  and would be subject to BOR review for site-specific NEPA
23  compliance.

24  In 2005, the County issued a request for proposals ("RFP") for
25  development of the marina project on Lake Pleasant.  The RFP
26  expressly precluded any party possessing any commercial interest
27  adjacent to or near the lake from bidding.  Marina Partners
28  submitted the only bid for the project, and BOR subsequently

1  approved the Proposed Use Management Agreement between Marina
2  Partners and the County.  The County then entered into a final Use
3  Management Agreement with Marina Partners.

4      On March 1, 2006, BOR issued a notice of public scoping for
5  the proposed marina, and, on July 28, 2006, issued a draft EA for
6  public comment.  After public comment, a revised draft EA was
7  released for further comment in October of 2006.  Plaintiffs Maule-
8  Ffinch and Pensus Group, LLC submitted comments on the draft EA.

9      On February 27, 2007, BOR issued the final EA and FONSI,
10 determining that the construction and operation of the proposed
11 Scorpion Bay Marina would not significantly impact the environment.
12 Plaintiffs filed this action and motion for preliminary injunction
13 shortly thereafter.

14 **II.  JURISDICTION**

15     Before proceeding to the merits of the pending motions, the
16 Court notes that it has jurisdiction to review BOR's administrative
17 decisions and to issue the injunctive relief sought by Plaintiffs
18 pursuant to 5 U.S.C. §§ 701-06 and 28 U.S.C. §§ 1331, 2201-02.

19     The constitutional limitations on the Court's jurisdiction are
20 satisfied as well.  In order to establish Article III standing, a
21 party must show the following:

22         (1) it has suffered an injury in fact that is
           (a) concrete and particularized and (b) actual
23         and imminent, not conjectural or hypothetical;
           (2) the injury is fairly traceable to the
24         challenged action of the defendant; and (3) it
           is likely, as opposed to merely speculative,
25         that the injury will be redressed by a
           favorable decision.
26
27 Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S.
   167, 180-81 (2000) (internal quotation omitted).  In addition to
28

1  these constitutional requirements, standing to bring suit for
2  judicial review of federal agency action under the Administrative
3  Procedure Act, 5 U.S.C. §§ 500 et seq., requires a showing that the
4  interest to be vindicated is arguably within the "zone of
5  interests" to be protected or regulated by the statute in question.
6  Cantrell v. City of Long Beach, 241 F.3d 674, 679 (9th Cir. 2001).
7  "[T]he relevant statute . . . is the statute whose violation is the
8  gravamen of the complaint." Lujan v. Nat'l Wildlife Fed'n, 497
9  U.S. 871, 886 (1990).  Thus, "a plaintiff claiming injury from
10 environmental damage," as in this case, "must use the area affected
11 by the challenged activity."  Lujan v. Defenders of Wildlife, 504
12 U.S. 555, 565-66 (1992) (citations omitted).

13     This requirements are met with respect to individual
14 Plaintiffs David Maule-Ffinch and Michael Viscuis, as well Pensus
15 Group, LLC, all of whom have alleged their regular use of Lake
16 Pleasant for "wildlife viewing and education, photography, boating,
17 fishing, recreational, social and other water-related activities."
18 See Am. Compl. (doc. # 4) ¶¶ 5-7.  As such, their injuries are
19 neither conjectural nor hypothetical, and it is beyond reasonable
20 dispute that their alleged injuries, which are fairly traceable to
21 BOR's administrative actions, are likely to be redressed if the
22 Court were to issue a favorable decision. See Friends of the Earth,
23 Inc., 528 U.S. at 180-81.

24     Plaintiff Protect Lake Pleasant, LLC also has standing.  An
25 association has standing to sue in a representational capacity for
26 its members "when [1] its members would otherwise have standing to
27 sue in their own right, [2] the interests at stake are germane to
28 the organization's purpose, and [3] neither the claim asserted nor

1  the relief requested requires the participation of individual

2  members in the lawsuit." _Id._ at 181.  Individual Plaintiffs

3  Maule-Ffinch and Viscuis are members of Protect Lake Pleasant, LLC,

4  and, as explained above, have standing to sue in their own right

5  based on their regular use of the lake.  Moreover, the

6  environmental interests at stake in this litigation are germane to

7  the purpose of the organization, "an Arizona non-profit limited

8  liability company formed to protect the natural environment,

9  wildlife and resources at Lake Pleasant." _See_ Am. Compl. (doc. #

10  4) ¶ 4.  Finally, while the individual plaintiffs are participants

11  in this suit, their participation is not necessary for the claims

12  asserted or the relief sought.  _See_ _Friends of the Earth, Inc._, 528

13  U.S. at 181.

14      BOR raises two potential challenges to Plaintiffs' standing.

15  First, BOR hastens to point out that Plaintiffs Maule-Ffinch and

16  Pensus Group, LLC own and operate Pleasant Harbor Marina, which is

17  currently the only marina operating on the lake.  BOR's Resp. (doc.

18  # 25) at 2.  BOR states that "[P]laintiffs [lawsuit] attempt[s] to

19  characterize primarily economic arguments as environmental

20  arguments." _Id._  Marina Partners raises similar concerns in its

21  response, albeit in more dramatic language.  _See_ MP's Resp. (doc. #

22  32) at 2.  BOR and Marina Partners seem to suggest that Plaintiffs'

23  economic interests are not within the zone of interests to be

24  protected or regulated by NEPA.  However, as discussed above,

25  Plaintiffs have sufficiently pled environmental injury.  Moreover,

26  Marina Partners should already be aware from the Court's April 13,

27  2007 order granting its motion to intervene that economic interests

28  can be sufficient to confer standing in environmental litigation.

1   See Order (doc. # 24) at 8 ("Marina Partners' economic interest in

2   the development and operation of the proposed Scorpion Bay Marina

3   qualifies as a legal interest within the zone of interests to be

4   regulated or protected by [NEPA].").[1]

5        Second, BOR states that "[p]ersons challenging an agency's

6   compliance with NEPA should participate in the process so the

7   agency has an opportunity to give their issues meaningful

8   consideration," and suggests that Plaintiffs have not done so here.

9   BOR's Resp. (doc. # 25) at 2.  For this proposition, BOR relies on

10  Department of Transportation v. Public Citizen, 541 U.S. 752

11  (2004).  However, that case did not establish a rule so broad as

12  that for which it is cited by BOR; rather, the Supreme Court held

13  that the respondents, by failing to urge the agency to evaluate

14  specific alternatives during the comment period, could not

15  subsequently complain about the agency's failure to consider those

16  alternatives in the EA.  DOT, 541 U.S. at 764-65.  The case did not

17  address any issues related to standing.

18       The statutory and constitutional bases for the Court's

19  jurisdiction being satisfied, the Court now turns to the merits of

20

21       [1]  Plaintiffs have asked for what they characterize as personal
     attacks be stricken from the opposition briefs.  Reply (doc. # 34) at
22   1 n.1.  While the Court agrees that BOR and Marina Partners have not
     illuminated any of the legal issues controlling this case by their
23   immaterial and excessive remarks, the Court will not strike the
     offending matter as it appears only in their opposition briefs, and
24   not in any pleading to which Rule 12(f) would apply.  See Fed. R.
     Civ. P. 12(f) ("[T]he court may order stricken from any pleading . .
25   . any redundant, immaterial, impertinent, or scandalous matter.")
     (emphasis added).   To the extent that the Court has the inherent
26   authority to strike inappropriate matter in briefs, it declines to do
     so here.  In the future, however, Marina Partners would do well not
27   to stretch its intervenor status and focus instead on the legal
     issues as it had promised.

28

1  the pending motions.

2  **III. DISCUSSION**

3     **A. Marina Partners' Motion in Limine**

4     Marina Partners has filed a motion in limine (doc. # 35)

5  seeking to preclude Plaintiffs from introducing the pre-recorded

6  video testimony or declaration of Glenn A. Haas, Ph.D.[2] at the

7  preliminary injunction hearing.  Marina Partners argues that such

8  extra-record evidence cannot be considered under the Administrative

9  Procedure Act, and that the foundation for such evidence is lacking

10 due to Dr. Haas' lack of familiarity with parts of the

11 administrative record.  Mot. (doc. # 35) at 1-8.  Plaintiffs

12 believe that Dr. Haas' testimony is necessary to help the Court

13 understand what is involved in a Water Recreation Opportunity

14 Spectrum study, see Mot. (doc. # 35), Ex. 1 at 2, and contend that

15 his testimony should be admitted under any of the four exceptions

16 to the general rule against extra-record evidence.  Resp. (doc. #

17 36) at 1-8.

18    Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§

19 500 et seq., judicial review of an agency decision typically

20 focuses on the administrative record in existence at the time of

21 the decision and does not encompass any part of the record made

22 initially in the reviewing court.  5 U.S.C. § 706; Southwest Ctr.

23 for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450

24 (9th Cir. 1996).  The Ninth Circuit has allowed the consideration

25 of extra-record materials only in the following circumstances:

26

27    _____

28    [2] Dr. Haas co-authored the Water Recreation Opportunity Spectrum
   Users' Guidebook for BOR.  See Admin. R., Vol. 12.

> (1) if necessary to determine whether the
> agency has considered all relevant factors and
> has explained its decision, (2) when the agency
> has relied on documents not in the record, or
> (3) when supplementing the record is necessary
> to explain technical terms or complex subject
> matter.

Id. (internal quotations omitted).  Extra-record documents may also be admitted when plaintiffs make a showing of agency bad faith. Id.  For this exception to apply, "normally there must be a strong showing of bad faith or improper behavior before the court may inquire into the thought processes of administrative decisionmakers."  Pub. Power Council v. Johnson, 674 F.2d 791, 795 (9th Cir. 1982).

Having reviewed the record, the Court concludes that the first exception does not apply.  Much of the information provided by Dr. Haas' testimony "can either be extracted from the record or is not necessary to this court's review" of BOR's decision.  See Southwest Ctr. for Biological Diversity, 100 F.3d at 1451.  The information necessary for the Court's review is set forth in the guidebook co-authored by Dr. Haas, which appears at volume 12 of the administrative record.  Moreover, the extra-record testimony Plaintiffs seek to introduce was not relied upon by BOR in reaching its decision.  See id. at 1450.  Likewise, the Court does not perceive Dr. Haas' testimony as being particularly relevant to any possible claim of bad faith by BOR.  See id.  However, the Court does believe that some of Dr. Haas' testimony may be helpful in explaining the technical terms and complex subject matter involved in this case.  See id.  For these limited purposes, the Court does not believe that Marina Partners has sufficiently demonstrated that the testimony should not be considered for lack of foundation.

1    Therefore, Marina Partners' motion in limine (doc. # 35) will

2    be granted in part and denied in part.  In reviewing Plaintiffs'

3    motion for preliminary injunction, the Court will consider Dr.

4    Haas' testimony for the limited purpose of explaining technical

5    terms and complex subject matter relating to the Water Recreation

6    Opportunity Spectrum, but not for any other purpose, including his

7    opinions regarding the NEPA planning process.

8         **B. Plaintiffs' Motion for Preliminary Injunction**

9         The purpose of a preliminary injunction is to preserve the

10   status quo among the parties pending a final decision on the merits

11   of the action.  See Fed. R. Civ. P. 65; Dep't of Parks & Recreation

12   v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir. 2006).

13   The Court may grant a preliminary injunction if the moving party

14   demonstrates (1) a probability of success on the merits and the

15   possibility of irreparable harm, or (2) that the lawsuit raises

16   serious questions and the balance of hardship tips sharply in the

17   movant's favor.  Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113,

18   1120 (9th Cir. 2005).  "These two formulations represent two points

19   on a sliding scale in which the required degree of irreparable harm

20   increases as the probability of success decreases.  They are not

21   separate tests but outer reaches of a single continuum."  Id.

22   (internal quotation and citation omitted).

23        **1. Probability of Success on the Merits**

24        Plaintiffs principal contentions are that BOR violated NEPA by

25   failing to prepare an EIS for the proposed Scorpion Bay Marina, and

26   by failing to adequately consider the potential environmental

27   impact of the project before issuing a FONSI.

28        Under NEPA all federal agencies must prepare an EIS for all

- 10 -

1   "major Federal actions significantly affecting the quality of the
2   human environment."   42 U.S.C. § 4332(2)(C).   Procedurally, the
3   decision as to whether an EIS is required is made by evaluating the
4   collected data, analysis, and discussion in the agency's EA.   See
5   40 C.F.R. §§ 6.105(d), 1508.9.   If the EA establishes that a
6   proposed action will not have a significant effect on the
7   environment, the agency may issue a FONSI presenting convincing
8   reasons "why an action . . . will not have a significant effect on
9   the human environment and for which an environmental impact
10  statement therefore will not be prepared."   Native Ecosystems
11  Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005)
12  (quoting 40 C.F.R. § 1508.3); Nat'l Parks & Conservation Ass'n v.
13  Babbitt, 241 F.3d 722, 730 (9th Cir. 2001) (citation omitted).

14       "NEPA 'does not mandate particular results,' but 'simply
15  provides the necessary process' to ensure that federal agencies
16  take a 'hard look' at the environmental consequences of their
17  actions."   Navajo Nation v. U.S. Forest Serv., 479 F.3d 1024, 1050
18  (9th Cir. 2007) (quoting Robertson v. Methow Valley Citizens
19  Council, 490 U.S. 332, 350 (1989)).   The "hard look" requires an
20  agency to "undertake a thorough environmental analysis before
21  concluding that no significant environmental impact exists."
22  Native Ecosystems Council, 428 F.3d at 1239 (internal quotation
23  omitted).   In determining whether an agency undertook the requisite
24  "hard look," courts apply the arbitrary and capricious standard of
25  review.   Id.   In making this factual inquiry, the court may not
26  substitute its judgment for that of the agency.   Navajo Nation, 479
27  F.3d at 1050.   Rather, the purpose of the court's narrow review is
28  to consider whether the agency's decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment. Id.; see also Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1177 (9th Cir. 1990).

With respect to the threshold decision of whether a proposed federal action will so significantly affect the quality of the human environment as to require an EIS, the implementing regulations promulgated by the Council on Environmental Quality identify two broad factors: "context and intensity."[3] 40 C.F.R. §

---

[3]   The regulations set forth a number of additional factors relevant to determining the intensity or severity of impact contemplated by a proposed action:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
>
> (2) The degree to which the proposed action affects public health or safety.
>
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
>
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
>
> . . .
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it

1508.27.

Plaintiffs contend that BOR violated NEPA by (1) failing to conduct a study of Lake Pleasant's carrying capacity, Mot. (doc. # 12) at 8-14, (2) overestimating the lake's usable surface area and underestimating daily watercraft counts, id. at 14-17, and (3) not adequately considering alternatives to the Marina.  Id. at 17-19.[4]

_____

down into small component parts.

. . .

. . .

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

[4]  In a footnote to the introduction to their motion, Plaintiffs allege that BOR also failed to comply with the Clean Air Act, 42 U.S.C. §§ 7401 et seq. Mot. (doc. # 12) at 2 n.2.  However, Plaintiffs' motion does not argue for the issuance of a preliminary injunction based on any alleged Clean Air Act violations.  See id. at 7-20.  Rather, Plaintiffs explicitly state that for purposes of their motion for preliminary injunction they would "focus on BOR's most glaring failures," and that the air quality issues and other alleged NEPA violations would be addressed at the summary judgment stage. See id. at 2-3, n.2, 7 n.4.

Plaintiffs elaborate on the air quality issues in their reply memorandum, apparently to rebut a passing reference in Marina Partners' response regarding BOR's findings on air quality.   See Resp. (doc. # 32) at 15 ("[T]he impact on air quality will not exceed de minimis thresholds."); Reply (doc. # 34) at 12.  However, contrary to earlier representations regarding the scope of their motion, Plaintiffs also argue for the first time in their reply memorandum that a preliminary injunction should issue on the basis of the alleged Clean Air Act violations.  See Reply (doc. # 34) at 12-15.

Because Plaintiffs originally decided to focus their arguments on BOR's alleged NEPA violations to the exclusion of other issues reserved for summary judgment, the Court will limit its analysis accordingly.  Therefore, this decision addresses only those NEPA violations on which Plaintiffs' motion is actually based.  Cf. Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (holding that where a party introduces new evidence in its reply brief, the

**i. Carrying Capacity**

Plaintiffs' chief argument is that BOR violated NEPA by issuing a FONSI without first conducting a carrying capacity[5] study to inform its decision with respect to the potential impacts of the proposed Scorpion Bay Marina.  Mot. (doc. # 12) at 8-10.

Prior to the construction of New Waddell Dam, which substantially increased the water level and surface area of Lake Pleasant, BOR prepared an EIS in 1984 to evaluate a proposed recreation plan.  Admin. R., Vol. 7 ("1984 EIS").  In addition to reviewing the results expected to flow from the proposed plan, the 1984 EIS set forth mitigation measures to ameliorate the anticipated environmental consequences of recreational development.  Id. at 253-86.  To ensure that those mitigation measures would be fulfilled, BOR's RMA contract with the County required, inter alia, that "any concessionaire and subsequent development w[ould be] be subject to compliance with procedural requirements of [NEPA] with the condition that the proposed facility [would be] consistent with the overall recreation management plans and goals for New Waddell Reservoir identified in Appendix C of the [1984 EIS]."  Admin. R., Vol. 6 ("1997 EA") at 40-41; accord Admin. R., Vol. 1 ("RMA") at 16.  The Water Control Study and Appendix C used to develop those

---

district court should not consider the new evidence without giving the non-movant an opportunity to respond); Corson & Gruman Co. v. NLRB, 283 U.S. App. D.C. 239, 899 F.2d 47, 50 (D.C. Cir. 1990) (requiring moving party to raise all arguments in its opening brief to prevent "sandbagging" of opposing party).

[5]  BOR's guidelines define carrying capacity as "the ability of a resource to accommodate a user population at a reasonable threshold without the user population negatively affecting the resource sustainability . . . ."  Mot. (doc. # 12), Ex. 3 at IV-13 n.1.

recreation and management plans established Lake Pleasant's average carrying capacity at 546 boats subject to variation based on the seasonal drawdown of water during the peak season.  See Admin. R., Vol. 8 ("Appendix C") at 80; accord Admin. R., Vol. 9 ("Water Control Study") at 12.[6]

On the one hand, Plaintiffs contend that a new marina cannot be approved because the lake's carrying capacity may already be exceeded, Mot. (doc. # 12) at 9, and, on the other hand, argue that BOR's decision to issue the FONSI for the proposed marina was arbitrary and capricious on account of its failure to conduct a new carrying capacity study for Lake Pleasant.  Both arguments fail.

**a. Carrying Capacity Has Not Clearly Been Exceeded**

Prior to this litigation, Plaintiff Pensus Group, LLC had expressed concern during the public comment stage for the 2007 EA as to whether the lake has the carrying capacity to accommodate the proposed marina.  Admin. R., Vol. 3 ("2007 Final EA") at H-74-76.  Applying a turnover rate of 2 to BOR's estimated daily watercraft count of 1,660 for peak weekends, i.e., dividing 1,660 by 2 to arrive at a boats-at-one-time figure of 830, and relying on the 1984 Water Control Study's estimated average carrying capacity of 546 boats, Plaintiffs suggest that the lake is already over capacity, and therefore cannot accommodate another marina.  Mot. (doc. # 12) at 9, 15.  This reasoning is flawed for two reasons.

_____

[6]  It is difficult to locate page 12 of the Water Control Study, because the copy of the study provided in the administrative record appears to have been inadvertently merged with over twenty-three pages of a separate unidentified document.  See Admin. R., Vol. 9 ("Water Control Study") at 10-11 (twenty-three pages of unidentified document separating pages 10 and 11 of the Water Control Study).

1    First, Plaintiffs assume that the turnover rate of 2 that was

2  used in Appendix C to the 1984 EIS is accurate and binding on BOR,

3  see id. at 15, even though the 2007 EA neither uses that formula

4  nor suggests the existence of any other way to reliably calculate

5  the number of boats present on the lake at any one time.  See

6  Admin. R., Vol. 3 ("2007 Final EA") at 33-34.  Instead, the EA

7  explains that the number of boats present on the lake at any moment

8  would be less than the total daily watercraft count depending on

9  the length of time associated with different types of boats and

10 boating activities.  Id.  Although a similar rationale was used to

11 explain the turnover rate formula on which Plaintiffs rely, the

12 Court cannot say that BOR acted in an arbitrary and capricious

13 manner simply by failing to use that or any other formula to give

14 its findings the appearance of mathematical certainty.

15    Second, BOR makes clear in the EA that the 546 boat figure on

16 which Plaintiffs rely was never intended to be "an absolute cap" so

17 much as it was intended to be "a planning and management tool."

18 See Admin. R., Vol. 3 ("2007 Final EA") at H-99-100.  Moreover, in

19 Appendix C of the 1984 EIS, BOR similarly stated:

20        Management of the lake and operation of the
          boating facilities must insure that the number
21        of boats on the lake does not exceed its
          capacity.  The lake capacity that has been
22        presented here is an average; it should be
          remembered that the lake can safely accommodate
23        more boats early in the recreation season and
          fewer boats as autumn approaches and the
24        combined CAP-MCMWCD drawdown becomes greater.

25 Admin. R., Vol. 8 ("Appendix C") at 80 (emphasis added); accord

26 Admin. R., Vol. 9 ("Water Control Study") at 12.  In other words,

27 by the terms of the management plans developed around the 1984 EIS,

28 it is clear that the concept of carrying capacity allowed for more

- 16 -

flexibility than Plaintiffs would imply.  More importantly, in light of that flexibility, it is not clear that carrying capacity has already been exceeded.  Finally, Plaintiffs argument weighs <u>peak weekend</u> daily watercraft counts against an <u>average</u> carrying capacity figure; however, applying the turnover rate of 2 to the <u>daily average</u> watercraft count of 645, <u>see</u> Admin. R., Vol. 3 ("2007 Final EA") at 32, would lead to a boats-at-one-time figure of 323. In other words, using average figures on boths sides of the equation, Plaintiffs' rationale suggests that current usage is still below the average carrying capacity of 546 boats established in 1984.  This hardly conveys the impression of arbitrary or capricious decision-making by BOR.

Ultimately, by the terms of the EA, the issue of carrying capacity will be addressed in the future, as it is currently, by the County's management of the lake.  In sum, Plaintiffs have not demonstrated any reason to believe that the lake's carrying capacity has already been exceeded so as to render BOR's decision arbitrary and capricious.

**b. BOR Was Not Obligated to Conduct a Carrying Capacity Study**

Plaintiffs make much the fact that a table in the 2007 EA comparing major recreational reservoirs in Maricopa County reflects Lake Pleasant's maximum watercraft capacity as "N/A," and the fact that BOR only estimated average daily watercraft counts but did not quantify the lake's usage in terms of boats-at-one-time.  <u>See</u> Admin. R., Vol. 3 ("2007 Final EA") at 30-33.  Plaintiffs believe that, because BOR did not conduct a carrying capacity study for the lake prior to the issuance of the EA, or obtain a boats-at-one-time figure, it did not take a "hard look" at the environmental

1  consequences of the proposed marina, and therefore acted in

2  arbitrary and capricious manner.

3       At the outset, the Court notes that the final EA for the

4  proposed Scorpion Bay Marina is tiered to the 1984 EIS, which

5  analyzes the issue of Lake Pleasant's carrying capacity.  (doc. #

6  38).  NEPA's implementing regulations define "tiering" as follows:

7            The coverage of general matters in broader
             environmental impact statements (such as
8            national program or policy statements) with
             subsequent narrower statements or environmental
9            analyses (such as regional or basinwide program
             statements or ultimately site-specific
10           statements) incorporating by reference the
             general discussions and concentrating solely on
11           the issues specific to the statement
             subsequently prepared.
12
13  40 C.F.R. § 1508.28; see also 40 C.F.R. § 1502.20.  An examination

14  of Appendix C to the 1984 EIS reveals carrying capacity to be a

15  flexible concept intended to assist the County in its management of

16  the lake.  See Admin. R., Vol. 8 ("Appendix C") at 80.  Although

17  the size and scope of the proposed Scorpion Bay Marina is larger

18  than the recreational plans contemplated by the 1984 EIS and 1997

19  EA, the 2007 EA explains that those changes are best understood in

20  the context of the extraordinary population growth in Maricopa

21  County and the attendant increase in demand for water-based

22  recreational opportunities.  See Admin. R., Vol. 3 ("2007 Final

23  EA") at 3-4.  To that end, the EA recognizes that the County's

24  management oversight, with the benefit of additional marina

25  facilities, would provide the best avenue to mitigate the

26  cumulative effects of the anticipated increase in watercraft using

27  the lake.  Id. at 39.  Accordingly, the EA calls for the County to

28

initiate a Water Recreation Opportunity Spectrum[7] study "within one year of commencement of the marina's operation" to "establish a numeric range for the purpose of identifying trigger points for actions and resources." Id. at 38, H-105. Once the County "determines it is appropriate," those actions would be "implemented to provide for a safe and enjoyable experience for the water users, while protecting sensitive natural resources." Id. The EA further provides that "[a] letter agreement between the County and [BOR] would be executed to ensure this study and subsequent management strategies are developed and implemented in a timely manner, as appropriate." Id. at 38.

Plaintiffs accuse BOR of "circular logic" for concluding that the marina facilities would alleviate the feeling of overcrowding by giving the County more resources to carry out its management responsibilities. Mot. (doc. # 12) at 16-17. According to Plaintiffs, "if [Scorpion Bay Marina] causes boating use to exceed the safe carrying capacity of [Lake Pleasant], then the [] project is not needed." Id. at 8. These arguments make the unwarranted assumption that the County will shirk the management responsibilities assigned to it years ago in the RMA contract with BOR, and fail to maintain safe conditions on the lake. See Admin. R., Vol. 1 ("RMA") at 002, 005, 006, 014. However, it was undisputed at oral argument that the Maricopa County Sheriff's

---

[7] Although the 1984 Water Control Study utilized the methodology of the U.S. Army Corps of Engineers to estimate the lake's average carrying capacity, the proposed Water Recreation Opportunity Spectrum study is one of a number of tools available to assist in the development and implementation of a recreational management plan. See Admin. R., Vol. 3 ("2007 Final EA") at H-99.

1   Office patrols the lake for security reasons.  (doc. # 38); <u>see</u>

2   <u>also</u> Admin. R., Vol. 3 ("2007 Final EA") at 41.  Plaintiffs suggest

3   that the County's pecuniary interest in concession income from the

4   new marina will be a disincentive to its maintenance of safe

5   boating conditions,[8] but the EA makes clear that concession income

6   will actually help fund the County's operations at LPRP.  <u>See</u> <u>id.</u>

7   at 44.  BOR's decisions and reasoning do not strike the Court as

8   arbitrary or capricious, and Plaintiffs have not demonstrated any

9   reason to believe that the County will not maintain safe conditions

10  at the lake if a new marina is built.

11       Nevertheless, Plaintiffs argue that BOR should have conducted

12  a carrying capacity study and determined the relevant information

13  prior to approving the proposed plan, rather than simply rely on

14  the County's management responsibility and obligation to conduct

15  studies in the future.  Mot. (doc. # 12) at 8-9.  Plaintiffs rely

16  principally on <u>National Parks & Conservation Association v.</u>

17  <u>Babbitt</u>, 241 F.3d 722 (9th Cir. 2001), in which the court reviewed

18  the National Park Service's failure to issue an EIS for a proposal

19  to increase cruise-ship traffic in Alaska's Glacier Bay National

20  Park and Preserve.  The Ninth Circuit reversed the district court's

21  decision to uphold the Park Service's FONSI, because the Park

22  Service had proposed to conduct the relevant studies after, not

23  before, the implementation of the proposed action.  <u>Nat'l Parks &</u>

24  <u>Conservation Ass'n</u>, 241 F.3d at 725-26.  Among the impacts not

25  _____

26       [8]  According to the EA, and as the parties acknowledged at the
    hearing, the Maricopa County Sheriff's Office patrols the lake for
27  security purposes.  The Court takes judicial notice of the fact that
    the Maricopa County Sheriff is an independent, separately elected
28  County officer.

1  adequately investigated in the EA was the proposal's effect on the

2  habitat of Glacier Bay's endangered species such as the humpback

3  whale.  See id. at 732.  Although the Park Service's EA

4  acknowledged the certainty of these adverse effects, it described

5  their intensity as "unknown," and instead proposed a post hoc

6  monitoring program as a means of obtaining the necessary

7  information and implementing mitigation measures after the fact.

8  Id. at 732-36.  The Ninth Circuit rejected this approach as

9  "ha[ving] the process exactly backwards," noting that "[t]he point

10 [of NEPA] is . . . that the 'hard look' must be taken before, not

11 after, the environmentally threatening actions are put into

12 effect."  Id. at 733.

13      Plaintiffs contend that BOR, like Park Services, by not

14 conducting a carrying capacity study before issuing its FONSI,

15 failed to take a "hard look" at the environmental consequences of

16 the proposed Scorpion Bay Marina.  The Court disagrees.  National

17 Parks is distinguishable from the present case in two important

18 important respects-- most notably that the context of the action

19 involved in the present case is significantly different from the

20 context involved in National Parks.

21      Plaintiffs claim that NEPA does not contemplate a "sliding

22 scale" approach that varies by context.  See Reply (doc. # 34) at

23 9.  Whatever label Plaintiffs would ascribe to its approach, the

24 Council on Environmental Quality clearly advises federal agencies,

25 in assessing the significance of environmental consequences, to

26 consider the "context" of the proposed action and the "intensity"

27 of its anticipated results.  See 40 C.F.R. § 1508.27.

28          [T]he significance of an action must be

analyzed in several contexts such as society as
a whole (human, national), the affected region,
the affected interests, and the locality.
Significance varies with the setting of the
proposed action.  For instance, in the case of
a site-specific action, significance would
usually depend upon the effects in the locale
rather than in the world as a whole.  Both
short- and long-term effects are relevant.

Id.  Unlike Glacier Bay, Lake Pleasant is not a UNESCO designated

international biosphere.[9]  See BOR's Resp. (doc. # 25) at 11-12;

MP's Resp. (doc. # 32) at 13-15; Nat'l Parks & Conservation Ass'n,

241 F.3d at 725.  It is a manmade lake that, since its creation by

the New Waddell Dam, has been considered as a site for County-

managed water-based recreational plans such as those reflected in

the 2007 EA, 1997 EA, and 1984 EIS.  In this context, the Court

cannot say that BOR did not adequately consider the environmental

consequences of the proposed Marina simply because a new carrying

capacity was not conducted.

Second, in National Parks, the reason the court indicated that

it was so critical for the studies to be carried out by the agency

prior to taking action was that the EA did not provide sufficient

information about the action's anticipated effects on the humpback

whale habitat in the bay.  Id. at 733-36.  That uncertainty should

have been considered as a factor in assessing both the intensity of

the environmental impact of the proposed action, see 40 C.F.R. §

1508.27(b)(5), as well as the efficacy of the Park Service's

proposed mitigation measure of post-action monitoring.  Nat'l Parks

---

[9]  Bald eagle nesting in an area of LPRP was addressed in the
1984 EIS and more recently in the 2007 EA, see Admin. R., Vol. 3
("2007 Final EA") at 58, and Plaintiffs have claimed that BOR did not
take a "hard look" at the impact of the proposed marina on the bald
eagles or other endangered species populations in the park.

& Conservation Ass'n, 241 F.3d at 733-36.  In the present case,

Plaintiffs have not claimed that any uncertainty surrounding the

issue of the lake's carrying capacity would affect sensitive

biological resources; rather, it is a matter primarily related to

safety and overcrowding.  In view of the County's existing

contractual responsibilities for management at LPRP under the

Recreation Management Agreement, see Admin. R., Vol. 1 ("RMA") at

002, 005, 006, 014, and BOR's commitment to obtain a letter

agreement from the County to ensure that studies and management

strategies "are developed and implemented in a timely manner," see

Admin. R., Vol. 3 ("2007 Final EA") at 38, the EA has demonstrated

reasonably developed mitigation measures that would render the

environmental impact of the new marina so minor as to not warrant

an EIS or a carrying capacity study prior to the issuance of the

FONSI.  See Nat'l Parks & Conservation Ass'n, 241 F.3d at 733-36.

        Ultimately, BOR determined that, due to the growing population

in northwestern Maricopa County and increasing demand for water-

based recreation, overcrowding at Lake Pleasant could occur with or

without the addition of a new marina, and decided that a more

effective method of dealing with overcrowding would be through

proper management rather than limiting recreational development.

Admin. R., Vol. 3 ("FONSI") at 4.  Although a new carrying capacity

study has not been performed, the EA provides sufficient

information regarding the number of public boat ramps, park

visitors, and daily watercraft counts, as well as an estimate of

the expected increase in daily watercraft counts that would be

attributable to the new marina at full build-out.  As such, the

Court is satisfied that BOR took the necessary "hard look" at the

environmental consequences of the proposed Scorpion Bay Marina, and did not act in an arbitrary or capricious manner by issuing the FONSI without first conducting an updated carrying capacity study. There is no requirement under NEPA that an agency must carry out every conceivable study before action may be taken, see Jicarilla Apache Tribe v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973); cf. Brady v. FERC, 416 F.3d 1, 7 (D.C. Cir. 2005) (Roberts, J.) (finding that FERC's authorization of a marina expansion in spite of carrying capacity concerns was not arbitrary or capricious, because "the concept of 'carrying capacity' does not present the sort of bright-line limit that would mandate a particular finding"), and therefore BOR's decision is not arbitrary or capricious.

### ii. Overestimation of Surface Area; Underestimation of Daily Watercraft Counts

In Plaintiffs' view, the carrying capacity problem is further exacerbated by BOR's alleged overestimation of the usable surface area of the lake and underestimation of daily watercraft counts. Mot. (doc. # 12) at 14-17.  Plaintiffs argue that the EA's estimates of the lake's low and peak usable surface area do not account for unusable acreage occasioned by irregular shorelines and shallow water/"no wake" zones.  Id. at 14-15.  Plaintiffs also complain that the EA inadequately explains BOR's decision to ignore evidence in the administrative record that, on the weekend of July 4, 2006, over 3,000 boats were on the lake.  Id. at 15.

The Court does not share Plaintiffs' concern that BOR has been arbitrary or capricious in its consideration of these issues. Although lacking in mathematical certitude, the EA does acknowledge

that "[t]he area open to watercraft use is somewhat less [than estimated], adjusting for unusable boating areas (e.g., shallow areas, small coves, etc.)." Admin. R., Vol. 3 ("2007 Final EA") at 31.  Similar observations were also made in the discussion of carrying capacity in Appendix C to the 1984 EIS.  BOR stated there that "[t]he actual capacity of Lake Pleasant would be somewhat lower than ha[d] been calculated as adjustments for unusable boating areas of the lake ha[d] not been made (e.g. small coves too narrow to navigate and areas of extremely shallow water).  See Admin. R., Vol. 8 ("Appendix C") at 80.  The Court is satisfied that BOR has given these issues adequate consideration as similarly stated in the EA.  Even if it were physically possible to do so, the Court does not believe that BOR is obligated to obtain more precise measurements for the lake's usable surface area to avoid the appearance of arbitrary and capricious decision-making.

    With regard to daily boat counts, the EA estimates watercraft counts at a daily average and peak season daily average of 645 and 1,660 respectively.  Admin. R., Vol. 3 ("2007 Final EA") at 32. Plaintiffs claim that the latter figure should be much higher, relying on an email from a person claiming to have received information from a Maricopa County Sheriff officer that "on the [Saturday] during the fourth of july [sic] weekend, it would be safe to say over 3,000 (watercraft) on [sic] the lake."  See Admin. R., Vol. 3 ("2007 Final EA") at H-26; Mot. (doc. # 12) at 15.  As Marina Partners points out, BOR is not obliged to rely on a second-hand account of an unknown source's estimate.  See Resp. (doc. # 32) at 12.  More importantly, the EA not only acknowledges the unique nature of the peak demand experienced on the fourth of July

1   weekend, but explains the difficulty of obtaining exact daily

2   watercraft counts due to the County's monthly reporting cycle.   See

3   Admin. R., Vol. 3 ("2007 Final EA") at H-30.   Quite simply, there

4   is no basis to find that BOR's determination of average daily

5   watercraft counts was arbitrary or capricious.

6        **iii. Consideration of Alternatives**

7        Plaintiffs also argue that BOR did not give meaningful

8   consideration to alternatives to the proposed marina.   Mot. (doc. #

9   12) at 17-20.   Meaningful consideration of alternatives is part of

10  the required analysis under NEPA.   Bob Marshall Alliance v. Hodel,

11  852 F.2d 1223, 1228 (9th Cir. 1988); 42 U.S.C. § 4332(2)(E).

12  Plaintiffs complain that BOR's consideration of the "no action"

13  alternative was not meaningful, because BOR did not analyze current

14  waiting times by visitors or whether those times are acceptable to

15  the lake's visitors.   Mot. (doc. # 12) at 17-18.   Plaintiffs also

16  contend that BOR should have considered an alternative proposed by

17  Plaintiffs Pensus Group, LLC and David Maule-Ffinch, which involved

18  a build-out of wet slips and dry storage space at Pleasant Harbor

19  Marina.   Id. at 18.   Finally, Plaintiffs maintain that the only

20  other alternative considered by BOR-- a marina adding 196 fewer

21  boats and deemed to have essentially the same environmental impact

22  as the proposed marina-- does not constitute a meaningful

23  alternative.   Id. at 18 (citing Muckelshoot Indian Tribe v. U.S.

24  Forest Serv., 177 F.3d 800, 813 (9th Cir. 1999)).

25       With regard to alternative marina plans, BOR argues that it

26  was not obligated to consider unfeasible alternatives, and notes

27  that "[t]he County and its concessionaire ha[d] determined a marina

28  with capacity less than what [wa]s proposed under [the alternative

considered in the EA] would not be economically viable."  BOR's
Resp. (doc. # 25) at 10 (citing Headwaters, Inc., 914 F.2d at
1189); Admin. R., Vol. 3 ("2007 Final EA") at 17.  In response,
Plaintiffs argue that BOR has impermissibly identified the project
objectives in unreasonably narrow terms by deferring to the County
and concessionaire's determination of economic feasability, and
argue that BOR's resulting consideration of a nearly identical
marina plan with the essentially same environmental impact as the
proposed marina is inadequate.  Mot. (doc. # 12) at 18-19 (citing
Citizens against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (9th
Cir. 1997)).

     The Court finds that the EA sufficiently considers the "no
action" alternative.  Although the EA does not set forth exact
figures for the waiting times at the public boat ramps or poll
results regarding visitors' satisfaction with the waiting times,
the EA's conclusions regarding increased waiting times under the
"no action" option are reasonable in light of the increased
visitation numbers that have been documented.  See Admin. R., Vol.
3 ("2007 Final EA") at 8.  Plaintiffs may feel that BOR gave the
"no action" option a shorter discussion than others, but the mere
fact that an alternative is given brief treatment does not
necessarily indicate that it was not evaluated seriously.  See
Headwaters, Inc., 914 F.2d 1181.

     Moreover, while BOR did not consider the alternatives proposed
by Plaintiffs during the public review and comment period--
specifically, the expansion of Pleasant Harbor Marina-- it is
apparent that BOR did not find those options feasible in light of
the EA's statement of purpose and need for the marina.  Plaintiffs

1   argue that BOR unreasonably eliminated other alternatives from
2   further consideration by relying on the County's statement of need
3   and economic viability.   However, the Court sees nothing arbitrary
4   and capricious in BOR's doing so, as the EA makes clear that the
5   proposed marina and associated revenue stream is necessary to
6   assist the County in its management of the park.   See Admin. R.,
7   Vol. 3 ("2007 Final EA") at 35-38.   Therefore, the Court finds that
8   Plaintiffs have not demonstrated at this stage any reasonable
9   probability of success on the merits of their claim that BOR did
10  not adequately consider alternatives to the proposed marina.

11      **2. Possibility of Irreparable Harm**

12          Notwithstanding Plaintiffs' suggestion to the contrary, "there
13  is no presumption of irreparable harm in procedural violations of
14  environmental statutes."   See Save Our Sonoran, Inc., 408 F.3d at
15  1124-25; Mot. (doc. # 12) at 6.   Plaintiffs argue that in the
16  presence of strong NEPA claims, more liberal standards would favor
17  the issuance of an injunction.   Mot. (doc. # 6) at 6.   However, for
18  the reasons explained in Part III.B.1, supra, the Court finds that
19  Plaintiffs have not demonstrated any reasonable probability of
20  success on any of the NEPA claims raised in their motion, or
21  established a sufficient likelihood of environmental injury that
22  can be traced to the procedural violations alleged in their motion.
23  See Save Our Sonoran, Inc., 408 F.3d at 1125.   Because Plaintiffs
24  have not made a strong showing of the probability of success on the
25  merits of their NEPA claims, or the possibility of irreparable harm
26  that would result in the absence of a preliminary injunction, the
27  motion (doc. # 12) will be denied.   Therefore,

28

1    IT IS ORDERED that Intervenor-Defendant Lake Pleasant Marina
2    Partners, LLC's motion in limine (doc. # 35) is GRANTED in part and
3    DENIED in part.   In reviewing Plaintiffs' motion for preliminary
4    injunction, the Court considers Dr. Haas' testimony for the limited
5    purpose of explaining technical terms and complex subject matter
6    relating to the Water Recreation Opportunity Spectrum, but not for
7    any other purpose, including his opinions regarding the NEPA
8    planning process.

9    IT IS FURTHER ORDERED that Plaintiffs' motion for preliminary
10   injunction (doc. # 12) is DENIED.

11   DATED this 18th day of May, 2007.


                        _____
                        Robert C. Broomfield
                        Senior United States District Judge


Copies to counsel of record