WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PROTECT LAKE PLEASANT, LLC,  )
an Arizona limited liability )
company, et al.,             )        No. CIV 07-454 PHX RCB
                             )
        Plaintiffs,          )            O R D E R
                             )
            vs.              )
                             )
ROBERT W. JOHNSON, in his    )
official capacity as         )
Commissioner, United States  )
Bureau of Reclamation, et al.,)
                             )
        Defendants.          )
_____)

     In this action for declaratory and injunctive relief,
Plaintiffs allege that the United States Bureau of Reclamation
("BOR"), by authorizing Maricopa County (the "County") to proceed
with the development and construction of the proposed Scorpion Bay
Marina & Yacht Club ("Scorpion Bay Marina") at Lake Pleasant
Regional Park ("LPRP"), violated, inter alia, the National
Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and
the Clean Air Act, 42 U.S.C. §§ 7401 et seq.  Am. Compl. (doc. # 4)
¶¶ 57-117.  On May 18, 2007, the Court issued an order (doc. # 40)

1  denying Plaintiff's motion for preliminary injunction (doc. # 12).
2  Plaintiffs have appealed that decision (doc. ## 43, 45, 49), and
3  have filed a motion (doc. # 47) asking this Court to stay its
4  previous order denying injunctive relief, or, in the alternative,
5  to issue an injunction pending appeal.  The matter has been fully
6  briefed.  See Resp. (doc. # 56); Reply (doc. # 58).  Having
7  carefully considered the arguments raised, the Court now rules.

8  **I.    BACKGROUND**

9      Lake Pleasant was originally formed in the 1920s when the
10 Waddell Dam was built by a company that is now the Maricopa
11 Municipal Water Conservation District ("Water District").  In 1969,
12 the Water District and the County entered into an operating
13 agreement requiring the County to manage Lake Pleasant as a
14 regional park.

15     Under the Colorado River Basin Project Act of 1968, Congress
16 authorized BOR to develop and build the Central Arizona Project.
17 Pursuant to this authority, BOR proposed the construction of a new
18 dam in the 1980s.  In 1984, BOR prepared a final environmental
19 impact statement ("EIS") for the CAP storage division which
20 included the New Waddell Dam.  Because water levels were to
21 increase significantly with the construction of the New Waddell
22 Dam, submerging the then existing public marina, the 1984 EIS
23 included a recreational development plan for the enlarged lake
24 resulting from the new dam.

25     Construction of the New Waddell Dam was commenced in 1985 and
26 completed in 1992.  In 1990, BOR and Maricopa County entered into a
27 50-year Recreation Management Agreement ("RMA") under which the
28 County, through its Parks and Recreation Department, would manage

1  recreation in LPRP.  Under the RMA, the County is authorized to
2  enter into third-party concession agreements for recreational
3  services and facilities subject to BOR approval.  The County
4  subsequently developed a Master Recreational Plan ("MRP") based on
5  the conceptual plan described in the 1984 EIS.  In 1997, BOR
6  prepared an environmental assessment ("EA") comparing the impacts
7  of the MRP with the impacts of the recreational plan discussed in
8  the 1984 EIS.  The 1997 EA determined that a Finding of No
9  Significant Impact ("FONSI") was appropriate for the MRP.  However,
10  the 1997 EA stipulated that any proposed concession and
11  recreational development at LPRP was required to be consistent with
12  the overall recreational management plans and goals for Lake
13  Pleasant identified in Appendix C of the 1984 Final EIS, and would
14  be subject to BOR review for site-specific NEPA compliance.

15     In 2005, the County issued a request for proposals ("RFP") for
16  development of the marina project on Lake Pleasant.  The RFP
17  expressly precluded any party possessing any commercial interest
18  adjacent to or near the lake from bidding.  Intervenor-Defendant
19  Lake Pleasant Marina Partners, LLC ("Marina Partners") submitted
20  the only bid for the project, and BOR subsequently approved the
21  Proposed Use Management Agreement between Marina Partners and the
22  County.  The County then entered into a final Use Management
23  Agreement with Marina Partners.

24     On March 1, 2006, BOR issued a notice of public scoping for
25  the proposed marina, and, on July 28, 2006, issued a draft EA for
26  public comment.  After public comment, a revised draft EA was
27  released for further comment in October of 2006.  Plaintiffs Maule-
28  Ffinch and Pensus Group, LLC submitted comments on the draft EA.

1    On February 27, 2007, BOR issued the final EA and FONSI,
2  determining that the construction and operation of the proposed
3  Scorpion Bay Marina would not significantly impact the environment.
4  Plaintiffs filed this action and motion for preliminary injunction
5  shortly thereafter.

6  **II.   STANDARD OF REVIEW**

7    When an appeal is taken from an interlocutory judgment denying
8  preliminary injunctive relief, a district court may still issue an
9  injunction pending appeal.  Fed. R. Civ. P. 62©); Fed. R. App. P.
10  8(a)(1)©); Mayweathers v. Newland, 258 F.3d 930, 935 (9th Cir.
11  2001).  In deciding whether to grant an injunction pending appeal,
12  courts apply the standard employed when considering a motion for a
13  preliminary injunction, Tribal Village of Akutan v. Hodel, 859 F.2d
14  662, 663 (9th Cir. 1988), and may issue such an injunction if the
15  moving party demonstrates (1) a probability of success on the
16  merits and the possibility of irreparable harm, or (2) that the
17  lawsuit raises serious questions and the balance of hardship tips
18  sharply in the movant's favor.  Save Our Sonoran, Inc. v. Flowers,
19  408 F.3d 1113, 1120 (9th Cir. 2005).  "These two formulations
20  represent two points on a sliding scale in which the required
21  degree of irreparable harm increases as the probability of success
22  decreases.  They are not separate tests but outer reaches of a
23  single continuum."  Id. (internal quotation and citation omitted).

24  **III. DISCUSSION**

25    Plaintiffs have asked the Court to stay its prior order (doc.
26  # 40) denying their motion for preliminary injunction (doc. # 12),
27  or, in the alternative, to issue an injunction pending their appeal
28  of that order.  Mot. (doc. # 47).  As an initial matter, the Court

confesses that it is unclear what Plaintiffs would hope to achieve by having the Court stay its prior order denying injunctive relief. A stay pending appeal would accord relief if the Court had granted Plaintiffs' request for a preliminary injunction, and had been asked by Defendants to stay that injunction pending appeal, but that is not the case here.  Because Plaintiffs' request for a stay would not provide any relief, the Court will focus instead on Plaintiffs' more substantive request for injunctive relief pending appeal.

**A. Success on the Merits/Serious Legal Question**

Under NEPA all federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)©).  Procedurally, the decision as to whether an EIS is required is made by evaluating the collected data, analysis, and discussion in the agency's EA.  See 40 C.F.R. §§ 6.105(d), 1508.9.  If the EA establishes that a proposed action will not have a significant effect on the environment, the agency may issue a FONSI presenting convincing reasons "why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared."  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005) (quoting 40 C.F.R. § 1508.3); Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001) (citation omitted).

"NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions."  Navajo Nation v. U.S. Forest Serv., 479 F.3d 1024, 1050

1  (9th Cir. 2007) (quoting <u>Robertson v. Methow Valley Citizens</u>

2  <u>Council</u>, 490 U.S. 332, 350 (1989)).  The "hard look" requires an

3  agency to "undertake a thorough environmental analysis before

4  concluding that no significant environmental impact exists."

5  <u>Native Ecosystems Council</u>, 428 F.3d at 1239 (internal quotation

6  omitted).  In determining whether an agency undertook the requisite

7  "hard look," courts apply the arbitrary and capricious standard of

8  review.  <u>Id.</u>  In making this factual inquiry, the court may not

9  substitute its judgment for that of the agency.  <u>Navajo Nation</u>, 479

10  F.3d at 1050.  Rather, the purpose of the court's narrow review is

11  to consider whether the agency's decision was based on a

12  consideration of the relevant factors and whether there has been a

13  clear error of judgment.  <u>Id.</u>; <u>see also Headwaters, Inc. v. Bureau</u>

14  <u>of Land Mgmt.</u>, 914 F.2d 1174, 1177 (9th Cir. 1990).

15      With respect to the threshold decision of whether a proposed

16  federal action will so significantly affect the quality of the

17  human environment as to require an EIS, the implementing

18  regulations promulgated by the Council on Environmental Quality

19  identify two broad factors that the agency must consider: "context

20  and intensity."[1]  40 C.F.R. § 1508.27.

21  _____

22      [1]  The regulations set forth a number of additional factors
   relevant to determining the intensity or severity of impact
23  contemplated by a proposed action:

24          (1) Impacts that may be both beneficial and
25          adverse. A significant effect may exist even if
            the Federal agency believes that on balance the
26          effect will be beneficial.

27          (2) The degree to which the proposed action
            affects public health or safety.
28

- 6 -

1    Plaintiffs previously took the position that "BOR ha[d] failed

2   to satisfy its NEPA obligations in several ways," but, for purposes

3   of their original motion for preliminary injunctive relief, opted

4   to focus only on the "most glaring failures."  Mot. (doc. # 12) at

5   7, n.4.  Plaintiffs thus argued that BOR violated NEPA by (1)

6   failing to conduct a study of Lake Pleasant's carrying capacity,

7   id. at 8-14, (2) overestimating the lake's usable surface area and

8   underestimating daily watercraft counts, id. at 14-17, and (3) not

9

10              (3) Unique characteristics of the geographic area
              such as proximity to historic or cultural
11              resources, park lands, prime farmlands, wetlands,
              wild and scenic rivers, or ecologically critical
12              areas.

13              (4) The degree to which the effects on the
              quality of the human environment are likely to be
14              highly controversial.

15              (5) The degree to which the possible effects on
              the human environment are highly uncertain or
16              involve unique or unknown risks.

17
              . . .
18
              (7) Whether the action is related to other
19              actions with individually insignificant but
              cumulatively significant impacts.  Significance
20              exists if it is reasonable to anticipate a
              cumulatively significant impact on the
21              environment.  Significance cannot be avoided by
              terming an action temporary or by breaking it
22              down into small component parts.

23
              . . .
24

25              . . .

26              (10) Whether the action threatens a violation of
              Federal, State, or local law or requirements
27              imposed for the protection of the environment.

28   40 C.F.R. § 1508.27(b).

1  adequately considering alternatives to the Marina.  Id. at 17-19.
2  The Court denied that motion, explaining that Plaintiffs had not
3  raised any serious legal question or demonstrated any reasonable
4  probability of success on the merits of those claims.  Order (doc.
5  # 40) at 10-28.

6       Plaintiffs now seek an interim injunction pending their appeal
7  of that decision.  Mot. (doc. # 7).  Although they have since had
8  ample opportunity to scour the record produced by BOR following
9  their first motion for preliminary injunction, Plaintiffs have not
10 based their present motion on any of the "several" other NEPA
11 violations alluded to in their original motion.  Instead,
12 Plaintiffs rely principally on the same arguments that have already
13 been rejected, apparently to substantiate their apparent perception
14 that "the efficacy of arguing the probability of success on the
15 merits [of these claims] to this Court may be dubious."  Mot. (doc.
16 # 47) at 7.  Plaintiffs maintain that they have raised serious
17 legal questions, and believe that the Court has "substantially
18 deviate[d] from established NEPA law."  Id.  For the same reasons
19 set forth in its previous order, the Court finds that Plaintiffs'
20 claims fail to raise any serious legal questions or demonstrate any
21 reasonable probability of success with regard to BOR's alleged NEPA
22 violations.  See Order (doc. # 40) at 10-28.  Nevertheless,
23 Plaintiffs raise a few new arguments and differences with the
24 Court, which deserve special attention.

25      Plaintiffs' position essentially remains that BOR cannot
26 possibly satisfy its NEPA obligation to take a "hard look" at the
27 environmental consequences of the proposed Scorpion Bay Marina
28 without conducting a new study of the lake's carrying capacity

1   prior to issuing its FONSI.  It is not enough in Plaintiffs' view

2   that the EA discusses numerous factors including the number of

3   public boat ramps, park visitors, and daily watercraft counts, as

4   well as an estimated increase in daily watercraft counts that would

5   be attributable to the proposed marina.  It seems to be plaintiffs'

6   position that if they operated the agency, they would have

7   conducted a carrying capacity study in place of, or in addition to,

8   the information reviewed in the EA.  Of course, this fact alone

9   does not establish arbitrary or capricious conduct on the part of

10  BOR.  As the Court has previously explained, NEPA does not require

11  an agency to carry out every conceivable study before an action may

12  be taken.   See Jicarilla Apache Tribe v. Morton, 471 F.2d 1275,

13  1280 (9th Cir. 1973).  Indeed, the District of Columbia Circuit, in

14  a recent decision by then Judge Roberts, rejected a nearly

15  identical claim regarding the Federal Energy Regulatory

16  Commission's ("FERC") failure to conduct a carrying capacity study

17  prior to approving the expansion of an existing marina, explaining

18  that "the concept of 'carrying capacity' does not present the sort

19  of bright-line limit that would mandate a particular finding."

20  Brady v. FERC, 416 F.3d 1, 7 (D.C. Cir. 2005).

21       Similarly, in this case, the concept of carrying capacity has

22  never been, and still does not, reflect the sort of bright-line

23  rule that Plaintiffs seem to perceive.  Appendix C to the 1984 EIS

24  clearly explained that the carrying capacity figure of 546 boats,

25  on which Plaintiffs hang much of their case, "is an average," and

26  that "it should be remembered that the lake can safely accommodate

27  more boats early in the recreation season and fewer boats as autumn

28  approaches and the combined CAP-MCMWCD drawdown becomes greater."

- 9 -

1  Admin. R., Vol. 8 ("Appendix C") at 80 (emphasis added).

2      In spite of the flexible nature of the 1984 carrying capacity
3  figure, Plaintiffs previously argued that the Lake's carrying
4  capacity has already been exceeded. See Mot. (doc. # 12) at 15
5  (arguing that "[t]he current usage of the Lake substantially
6  exceeds the carrying capacity of 546 [boats] from the 1984 EIS.
7  That fact alone raise [sic] substantial questions as to whether the
8  [proposed marina] may significantly impact the environment.").
9  Based on their idiosyncratic extrapolations from usage data for the
10 July 4th weekend, and assumptions of daily boating turnover rates
11 from the 1984 study, Plaintiffs derived a figure of 830 boats that
12 may possibly have been present on the lake at any one time during
13 that weekend.  Id.  Plaintiffs press the same argument in the
14 present motion.  See Mot. (doc. # 47) at 8 n.3.  By transmuting the
15 1984 carrying capacity figure of 546 boats from a flexible figure,
16 as it was intended to be, into an absolute cap, they surmise that
17 the lake's capacity has already been exceeded even before the
18 addition of the proposed marina.  Id.  Plainly, where a federal
19 agency has taken a "hard look" at the environmental consequences of
20 a proposed action, as BOR has in this case, it cannot be found to
21 have acted arbitrarily or capriciously simply by virtue of the
22 gloss a litigant would place on the same information through self-
23 serving assumptions and manipulations of the data.

24      Perhaps aware that this argument is questionable, Plaintiffs
25 now maintain that the key inquiry under NEPA is not whether the
26 1984 capacity is currently being exceeded-- even though they have
27 argued this point thoroughly and repeatedly in this and their
28 previous motion-- but whether BOR properly evaluated the lake's

carrying capacity prior to issuing the FONSI.  Plaintiffs' central
claim that "BOR failed to provide any assessment of the Lake's
carrying capacity," see Mot. (doc. # 47) at 7, is not accurate.
Although BOR did not conduct a carrying capacity study prior to the
issuance of its FONSI, it has provided ample information from which
an intelligent reader can discern the nature of the recreational
experiences and corresponding carrying capacity that the lake's
visitors can anticipate upon completion of the new marina.  See
Admin. R., Vol. 3 ("2007 Final EA") at 33-34.  While the County has
been obliged to conduct a Water Recreation Opportunity Spectrum
("WROS") study "within one year of commencement of the marina's
operation" to "establish a numeric range for the purpose of
identifying trigger points for actions and resources," see id. at
38, H-105, the EA has already indicated that "boater[s] would have
a urban or suburban experience on a Saturday or Sunday during the
peak season."  Id. at 34.  Applying the "range of boating
coefficients" for the "urban" and "suburban" WROS classes to the
lake's surface area, it is readily apparent that BOR has assessed
that the lake's carrying capacity can accommodate boating densities
higher than those currently experienced on peak weekends, and has
considered the impact on the human environment in light of such
densities.  Yet Plaintiffs have not objected to these findings, or
suggested that, in consideration of the proposed mitigation
measures, they would pose a significant impact on the human
environment, nor can they.  Given these assessments, and the other
factors considered in the EA, it is evident that BOR has (1) taken
the requisite "hard look" at the environmental consequences of the
proposed marina and (2) reasonably developed mitigation measures to

be implemented by the County to support its decision to issue the FONSI.  The fact that Plaintiffs would have done differently is not sufficient to render BOR's analysis arbitrary or capricious.

Plaintiffs also complain that "[t]he Court has missed the point [that] . . . BOR failed to undertake _any_ analysis or study of the amount of boats on the Lake during peak weekends (such as July 4th)." See Mot. (doc. # 47) at 8 n.3 (emphasis added).  Plaintiffs may have overlooked the fact that the EA does discuss the daily average watercraft counts for those peak weekends in a manner that is not arbitrary or capricious.  See Admin. R., Vol. 3 ("2007 Final EA") at 32.  This was also mentioned in the Court's prior order.

Finally, Plaintiffs rely on LaFlamme v. FERC, 852 F.2d 389 (9th Cir. 1988) (hereafter, "FERC I"), for the proposition that the County's obligation to conduct a future WROS study is insufficient to satisfy BOR's NEPA obligations.  As explained below, FERC I is readily distinguishable from the present case.

In FERC I, it is noteworthy that the primary basis for the court's rejection of FERC's analysis was the fact that FERC had not even prepared an EA or FONSI as required by 40 C.F.R. § 1501.4. See FERC I, 852 F.2d at 399.  The court went on to observe that FERC's evaluation was also substantively deficient under NEPA for its failure to reasonably develop the mitigation measures on which it relied in concluding that the project would not pose any significant impact on the quality of the human environment.  Id. at 400.  In addition to criticizing FERC's reliance on future post-licensing studies, the court noted the fact that no recreational data had been submitted or evaluated for the specific project site. Id.  However, in subsequent proceedings, after FERC had prepared an

1   EA and FONSI, the Ninth Circuit upheld the agency's conclusion that

2   the project would not have any significant impact on the quality of

3   the human environment, and determined that an EIS was not

4   necessary.  LaFlamme v. FERC, 945 F.2d 1124, 1228-29 (9th Cir.

5   1991) (hereafter, "FERC II").  More importantly, based on the pre-

6   licensing studies underlying the EA and FONSI, the court found no

7   error in FERC's reliance on the proposed post-licensing studies and

8   monitoring.  Id. at 1229-30.  Finally, the court held that FERC had

9   properly considered the economic viability of the project,

10  notwithstanding the plaintiff's allegations that it had "subrogated

11  its analysis of the public interest to [the] economic interest" of

12  its non-federal partner."  Id. at 1130.  The present case is more

13  like FERC II than FERC I.  Unlike the agency in FERC I, BOR has

14  prepared an EA and FONSI discussing studies and recreational data

15  for the project site, and, as the Court has previously held, has

16  reasonably developed mitigation measures based on that information

17  to deal with the effects of boats accessing the lake from the

18  proposed marina.

19      For the foregoing reasons, and for the reasons set out in the

20  Court's order denying Plaintiffs' motion for preliminary

21  injunction, see Order (doc. # 40) at 10-28, the Court finds that

22  Plaintiffs have not demonstrated, at this stage, any serious legal

23  questions or any reasonable probability of success on the merits of

24  their NEPA claims.

25      **B. Possibility of Irreparable Harm**

26      "[T]here is no presumption of irreparable harm in procedural

27  violations of environmental statutes."  See Save Our Sonoran, Inc.,

28  408 F.3d at 1124-25.  Notwithstanding, Plaintiffs maintain that the

1    Court "is simply wrong with regard to the showing of irreparable

2    harm required in this circuit." Mot. (doc. # 47) at 15.  Such

3    statements will not alter the law.  The Court is also not moved by

4    Plaintiffs' recharacterizations of its interpretation of the

5    National Parks case. See Mot. (doc. # 47) at 11-13, 16-17.  As the

6    Court has held before, Plaintiffs have not made a strong showing of

7    the probability of success on the merits of their NEPA claims, or

8    the possibility of irreparable harm to the environment that would

9    result in the absence of an injunction pending appeal.  Therefore,

10         IT IS ORDERED that Plaintiffs' motion for stay or injunction

11   pending appeal (doc. # 47) is DENIED.

12         DATED this 27th day of July, 2007.

13

14         _____
                   Robert C. Broomfield

15                 Senior United States District Judge

16

17

18   Copies to counsel of record

19

20

21

22

23

24

25

26

27

28

- 14 -