**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Protect Lake Pleasant, LLC, an Arizona limited liability company; David Maule-Ffinch; Michael Viscuis; and Pensus Group, L.L.C., an Arizona limited liability company, | ) ) ) ) ) ) ) | No. CIV 07-0454-PHX-RCB |
| Plaintiffs | ) ) | |
| vs. | ) ) | O R D E R |
| J. William McDonald in his official capacity as Commissioner, United States Bureau of Reclamation;[1] United States Bureau of Reclamation; an agency of the United States Department of Interior, and Ken Salazar, in his official capacity as Secretary, United States Department of Interior,[2] | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |

---

[1] In accordance with Fed. R. Civ. P. 25(d), which allows for substitution when, among other reasons, "a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,]" the court hereby substitutes J. William McDonald, Acting Commissioner of the Bureau of Reclamation ("BOR"), for Robert W. Johnson, former BOR Commissioner.

[2] As with Mr. Johnson, in accordance with Fed. R. Civ. P. 25(d), the court hereby substitutes Ken Salazar, current Secretary of the Interior, for Dirk Kempthorne, former Secretary of the Interior.

```
 1                              )
        and                     )
 2                              )
   Lake Pleasant Marina Partners,)
 3 LLC, an Arizona limited      )
   liability company,           )
 4                              )
                                )
 5            Defendant-Intervenor)
   _____)
 6
```

7    In count one of their First Amended Complaint ("FAC")

8  plaintiffs allege that the United States Bureau of Reclamation

9  ("BOR"),[3] by authorizing Maricopa County ("the County") to proceed

10 with the development and construction of the Scorpion Bay Marina &

11 Yacht Club at Lake Pleasant Regional Park ("LPRP"), violated the

12 Federal Property and Administrative Services Act of 1949 ("FPASA"),

13 as well as various related regulations and BOR Directives and

14 Standards ("D&Ss") and policies.

15    Currently pending before the court is plaintiffs' motion for

16 partial summary judgment pursuant to Fed. R. Civ. P. 56 on count

17 one (doc. 88).  BOR is cross-moving for that same relief (doc.

18 114).  Defendant/intervenor Lake Pleasant Marina Partners, LLC,

19 ("Partners") filed a "counter motion" for partial summary judgment

20 also directed to count one (doc. 110).  Three motions to strike, by

21 BOR (doc. 106); ("Partners") (doc. 107); and plaintiffs (doc. 124)

22 are also pending.  Finally, plaintiffs are moving to supplement the

23 thirteen volume administrative record (doc. 87).[4]

24 _____

25    [3]    Hereinafter BOR shall be read as including the individual federal
   defendants as well, Messrs. McDonald and Salazar.

26
27    [4]    As Fed. R. Civ. P. 78(b) allows, the court will decide these motions
   without oral argument and thus denies the parties' requests in that regard.  The
   court is quite familiar with this litigation and the parties provided fairly
   comprehensive briefs on the issues.  Consequently, oral argument will not aid the

                                    - 2 -

### *Background*

This recitation of facts is for the limited purpose of providing a factual overview of plaintiffs' FPASA claims in count one of the FAC.  These facts will be further developed herein as necessary to resolve discrete issues, such as jurisdiction, which these motions raise.

Two agreements figure prominently in plaintiffs' FPASA claims – the 1990 "Recreational Management Agreement" ("RMA") between BOR and the County and the "Use Management Agreement" ("UMA") between the County and Partners.  The statutory authority for the first agreement, the RMA, is the Federal Water Project Recreation Act.  Admin. Rec., Vol. 1 at 1.  In that RMA, BOR "designat[ed]" the County as its "exclusive recreational management contractor[.]"  Id. at 4, Art. 2(a).  As part of that Agreement, the County transferred "existing park facilities and related property interests" to BOR.  Id. at 6, Art. 4.  The consideration for that transfer took several forms.  As part of that consideration, with BOR's "approval[,]" BOR granted to the County "the authority . . . to enter into third party concession agreements[,]" such as the "Use Management Agreement" ("UMA") entered into between the County and Partners for the LPRP marina.  See id. at 7, Art. 4(c)(4).  Another aspect of that consideration was BOR's $2,500,000.00 payment to the County to "be utilized only in connection with the recreational development of the LPRP wherein [BOR] has Federal land management responsibility."  Id.

court's decisional process, and its denial will not result in prejudice to any party.  See Lake at Las Vegas Investors Group, Inc. v. Pac. Dev. Malibu Corp., 933 F.2d 724, 729 (9th Cir. 1991) (no prejudice in refusing to grant oral argument "[w]hen a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law[]").

1  at 7, Art. 4(c)(6).

2      Article 13 of the RMA delineated the circumstances under which

3  the County could "enter into direct agreements with third parties to

4  operate concession attractions, developments or services on the

5  LPRP[.]" Id. at 15, Art. 13(a).  In that Article, the County

6  "agree[d] to provide to [BOR] for its approval, a copy of each third

7  party concession agreement involving a pre-approved use as set

8  forth" later in Article 13.  Id.  The marina complex which was the

9  subject of the UMA is included in that "pre-approved list." See id.

10  At 16, Art. 13(d)(3);(d)(4); and (d)(6).  "Subject to final [BOR]

11  approval," the RMA also provided that the County "may consider" the

12  marina complex, among other items, to be "pre-approved for

13  negotiation purposes[.]"  Id.

14      In 2005 the County issued a Request for Proposal ("RFP") for

15  the Scorpion Bay Marina.  That RFP contained a clause, section 6.8,

16  entitled "Competition, Non-Collusion & Conflict of Interest[.]" PSOF

17  (doc. 89)[5], exh. 29 thereto at BORFOAI00315.  Plaintiffs view that

18  clause as "anti-competitive," whereas defendants view it as "pro-

19  competition."  Regardless, essentially section 6.8 precluded any

20  party possessing any commercial interest adjacent to or near Lake

21  Pleasant from bidding on that project.  Because plaintiff Pensus

22  Group ("Pensus") operates a marina adjacent to the Lake, it claims

23  that in light of section 6.8, it could not bid on the project.  In

24  _____

25  [5]     These motions present a procedural conundrum.  On the one hand,
   defendants are seeking to strike nearly all of the exhibits included with
   plaintiff's statement of facts ("PSOF"), while at the same time, they are arguing
26  lack of jurisdiction.  Plainly, if the court is without jurisdiction, it would not
   have the power to rule on the motions to strike or plaintiffs' motion to
   supplement. Because the defendants are not moving to strike exhibits 29 (the 2005
27  RFP) and 30 (the Proposed UMA), the court will consider those documents, which, in
   any event, evidently are part of the Administrative Record.

response to the 2005 RFP, Partners submitted the only bid for the Scorpion Bay project.

As the next step in the process, the County prepared a Proposed ("UMA") for Partners.  Plaintiffs allege that the Proposed UMA "varied significantly from the terms contained in the 2005 RFP." FAC (doc. 4) at 11, ¶ 43.  In particular, the 2005 RFP included two provisions which were not in the Proposed UMA.  According to plaintiffs, the 2005 RFP included an encumbrance provision prohibiting the concessionaire from mortgaging or encumbering marina improvements, whereas the Proposed UMA did not include such a provision.  Furthermore, the 2005 RFP included a provision mandating that the concessionaire transfer all marina improvements to the County upon termination of any contract entered into pursuant to that RFP, PSOF (doc. 89), exh. 29 thereto at 5, § 2.0, whereas the Proposed UMA omitted that reversion provision.  Then, despite the fact that the 2005 RFP did not give the concessionaire a "right of first refusal" with respect to 30 additional acres of land, the Proposed UMA did.  Subsequently, the BOR approved the Proposed UMA as tendered by the County.  Admin. Rec., Vol. 1 at 000162.   In turn, the County entered into a Final UMA with Partners for the development and operation of Scorpion Bay Marina.  See id. Vol. 1 at 000163-000210.

Broadly stated, based upon the foregoing plaintiffs contend that the BOR violated the FPASA by not ensuring "full and open competition" with respect to the Scorpion Bay Marina bidding process.  For one thing, plaintiffs allege that the BOR improperly allowed the County to include section 6.8 in the 2005 RFP.  The

1  result, according to plaintiffs was a "lack of competition for the

2  2005 RFP" and a concomitant "contract price substantially below

3  market value."  Pl. Mot. (doc. 88) at 16:6-7.

4       Second, plaintiffs contend that the BOR improperly allowed the

5  County to make material changes to the UMA.  One purported material

6  change is that the encumbrance and reversion provisions, mentioned

7  above, which had been in the 2005 RFP were not included in the Final

8  UMA.  Another improper material change, according to plaintiffs, is

9  that the Final UMA included a right of first refusal which did not

10  appear anywhere in the 2005 RFP.

11      The underlying theory of plaintiffs' FPASA claims is that the

12  "BOR has independent oversight responsibilities" with respect to

13  non-federal partners, such as the County.  See id. at 17:9.  Based

14  upon that theory, the FAC sweepingly alleges that "BOR's failure to

15  ensure [the] County's compliance with applicable law, regulation,

16  and policy was arbitrary and capricious, an abuse of discretion, and

17  a violation of governing provisions of federal law."  FAC (doc. 4)

18  at 18, ¶ 82.  In similarly broad language, plaintiffs further allege

19  that "BOR's approval of the Proposed UMA, which was based on the

20  illegal 2005 RFP, was also arbitrary and capricious, an abuse of

21  discretion, and a violation of governing provisions of federal law."

22  Id. at 18, ¶ 83.  Plaintiffs conclude count one by alleging:

23              The consequences of BOR's unlawful action are,
            among others, a prima facie violation of federal
24          procurement law that excluded Plaintiffs Maule-Ffinch
            and Pensus from responding to the 2005 RFP for which
25          they were highly and uniquely qualified and known to
            be a financially viable candidate.
26

27  Id. at 18, ¶ 84.  In their motion for partial summary judgment

1    plaintiffs are seeking a declaration that the Final UMA is "illegal

2    and void *ab initio*.  Pl. Mot. (doc. 88) at 1.

3         Succinctly stated, BOR's response is that for the most part, in

4    count one plaintiffs are focusing on the County's actions, and

5    obviously the County is not a party to this lawsuit.  As for the RFP

6    which is the subject of count one, BOR stresses that it was "neither

7    authorized by nor subject to [BOR's] approval."  BOR Resp. (doc.

8    113) at 25:22.  Turning to the UMA, over which BOR did have final

9    approval, BOR asserts that it is entitled to summary judgment as to

10   count one because its decision to approve that agreement "was not

11   arbitrary, capricious or otherwise not in accordance with the law."

12   Id. at 9.

13        As the private entity which ultimately was awarded the UMA for

14   the marina, Partners' interests differ from those of the BOR, and

15   their arguments herein reflect those differences.  Instead of

16   focusing on plaintiffs' interactions with BOR, Partners focuses on

17   plaintiffs dealings with the County.  It first argues that plaintiff

18   Pensus failed to exhaust available County administrative remedies.

19   Similarly, Partners maintains that "the Arizona Court of Appeals has

20   already found that the County followed local procurement

21   procedures[.]" Part. Mot. (doc. 110) at 4:16-17.  Next, Partners

22   assert that jurisdiction properly lies in the Court of Federal

23   Claims, not this district court.  Finally, Partners claims that they

24   are entitled to summary judgment as to count one because plaintiffs

25   "failed to object to the County's 2005 RFP in a timely manner."  Id.

26   at 6:3-4.  Importantly, Partners expressly joins in BOR's summary

27   judgment motion.  Id. at 1:9-11.

1

***Discussion***

2

***I.  Jurisdiction***

3

In responding to plaintiffs' motion for partial summary

4

judgment and in cross-moving for partial summary judgment, BOR

5

strongly implies that subject matter jurisdiction is lacking here.

6

Similarly, presupposing that count one is a "bid protest," Partners

7

assert jurisdiction lies with the Court of Federal Claims – not with

8

this court.  Part. Mot.[6] (doc. 110) at 5:21.

9

Lack of subject matter jurisdiction is not the first argument

10

which defendants advance on these motions.  Consistent with the

11

established principle, that "[f]ederal courts must determine that

12

they have jurisdiction before proceeding to the merits[,]" the court

13

will address this issue first.  See Lance v. Coffman, ___ U.S. ___,

14

___, 127 S.Ct. 1194, 1196, 167 L.Ed.2d 29 (2007) (citation omitted).

15

Indeed, the court must proceed in this way given the Supreme Court's

16

admonition against "'assuming' jurisdiction for the purpose of

17

deciding the merits – the 'doctrine of hypothetical jurisdiction.'"

18

See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118

19

S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (citation omitted).  Only

20

when it has satisfied itself that it has subject matter jurisdiction

21

can the court consider the parties' respective summary judgment

22

motions, and the other pending motions.  That is so because

23

"'[w]ithout jurisdiction the court cannot proceed at all in any

24

cause."  Id. (quoting Ex parte McCardle, 7 Wall. 506, 514, 19 L.Ed.

25

264 (1868)).  "'Jurisdiction is  the power to declare the law, and

26

when it ceases to exist, the only function remaining to the court is

27

---

[6]     Although styled as a motion for "summary judgment," Part. Mot. (Doc. 110) at 1:2, like plaintiffs, Partners are seeking only partial summary judgment as their motion is directed only at count one.

1  that of announcing the fact and dismissing the cause.'" <u>Id.</u> (quoting
2  <u>McCardle</u>, 7 Wall. at 514).  Indicative of those well-settled
3  principles, Rule 12(h)(3) mandates that "[w]henever it appears by
4  suggestion of the parties or otherwise that the court lacks
5  jurisdiction of the subject matter, the court *shall* dismiss the
6  action."  Fed. R. Civ. P. 12(h)(3) (emphasis added).

7      The pending summary judgment motions pertain only to count one,
8  wherein plaintiffs allege violations of, *inter alia*, the FPASA.
9  Plaintiffs do not invoke jurisdiction under that Act, however.
10  Rather, they list three separate jurisdictional bases: (1) 28 U.S.C.
11  § 1331 (federal question); (2) 5 U.S.C. §§ 701-706 (the
12  Administrative Procedure Act) ("APA"); and (3) 28 U.S.C. § 1361 (the
13  mandamus statute).  FAC (doc. 4) at 2, ¶ 2.  Plaintiffs are seeking
14  declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive
15  relief pursuant to 28 U.S.C. § 2202, but the FAC does not rely upon
16  either of those statutes as a jurisdictional basis.  <u>See</u> <u>id.</u>

17      Defendants' initial subject matter jurisdiction challenges were
18  rather cursory.  The BOR contends that neither the FPASA, the
19  Declaratory Judgment Act nor the mandamus statute confer
20  jurisdiction upon this court.  Of course, as just shown, plaintiffs
21  are not relying upon either of those first two statutes as a basis
22  for jurisdiction herein.  More to the point, BOR accurately states
23  that "[j]urisdiction must come from a source other than the APA."
24  BOR Resp.(doc. 113) at 12:12-13 (citations omitted).  For that
25  reason, and disregarding the possibility of federal question
26  jurisdiction, the federal defendants raise the specter that subject
27  matter jurisdiction is lacking here.

1   Partners challenges subject matter jurisdiction in a different way.[7]

2   Implying without any analysis or discussion that count one is

3   actually a "bid protest," Partners asserts that jurisdiction lies

4   with the Court of Federal Claims pursuant to the Tucker Act, as

5   amended by the Administrative Disputes Resolution Act ("ADRA"), 28

6   U.S.C. § 1491(b).  Part. Mot. (doc. 110) at 5:22.  Accordingly,

7   Partners properly seek "dismiss[al][,]" id.. at 6:2, as opposed to

8   summary judgment, for lack of subject matter jurisdiction.  See

9   California Save Our Streams Council v. Yeutter, 887 F.2d 908, 913

10  (9th Cir. 1989) (citation omitted) ("Summary judgment is an

11  inappropriate disposition when the district court lacks [subject

12  matter] jurisdiction."); see also Smith v. United States, 1999 WL

13  33318819, at *1 (D.Ariz. March 11, 1999) ("Although Defendant raises

14  the issue of subject matter jurisdiction in a motion for summary

15  judgment, the court will treat the motion as one suggesting

16  dismissal based on lack of subject matter jurisdiction because the

17  court cannot enter judgment but rather only dismiss the complaint if

18  it lacks subject matter jurisdiction."), aff'd, 1999 WL 793695 (9th

19  Cir. 1999).

20      Plaintiffs' first response is procedural.  Plaintiffs contend

21  that because the defendants admitted jurisdiction in their answers,

22

23      [7]    After stating the general premise that "[t]he Federal Court of Claims
        has . . . Jurisdiction," Partners claim that "venue" is not "proper" in this court.
24      Part. Mot. (doc. 110) at 5:21.  "'[V]enue is not jurisdictional[,]'" however.
        Morales v. Willett, 417 F.Supp.2d 1141, 1142 (C.D.Cal. 2006) (quoting Libby,
25      McNeill & Libby v. City National Bank, 592 F.2d 504, 510 (9th Cir. 1978)).  Indeed,
        "'jurisdiction must be first found over the subject matter and the person before
26      one reaches venue[.]'" Park v. Cardsystems Solutions, Inc., 2006 WL 2917604, at *2
        (N.D.Cal. Oct. 11, 2006) (quoting Bookout v. Beck, 354 F.2d 823, 825 (9th Cir.
27      1965)).    Thus, because venue and subject matter jurisdiction are two distinct
        concepts, they cannot be used interchangeably.   The court construes Partners'
        argument as raising strictly a jurisdictional challenge.

1  they are now "bound" by those "admissions[.]" <u>See</u> Pl. Resp. (doc.
2  133) at 9:12 (citation omitted).  Defendants did expressly admit
3  jurisdiction in their respective answers.  <u>See</u> Part. Ans. (doc. 14)
4  at 1-2, ¶ 2; and BOR Ans. (doc. 42) at 2, ¶ 2.  As explained below,
5  however, those "admissions" are insufficient to confer subject
6  matter jurisdiction upon this court, assuming it is otherwise
7  lacking.

8     It is beyond peradventure that "'[t]he jurisdiction of the
9  federal courts . . . is a grant of authority to them by Congress and
10  thus beyond the scope of litigants to confer.'" <u>U.S. Fidelity &</u>
11  <u>Guar. Co. v. Lee Investments LLC</u>, 551 F.Supp.2d 1069, 1079 (E.D.Cal.
12  2008) (quoting <u>Neirbo Co. v. Bethlehem Shipbuilding Corp.</u>, 308 U.S.
13  165, 167, 60 S.Ct. 153, 84 L.Ed. 167 (1939)).  In other words,
14  defendants cannot agree to or admit subject matter jurisdiction
15  absent a Congressional grant of jurisdiction to this court.  Second,
16  notwithstanding defendants' admissions, "lack of subject matter
17  jurisdiction is never waived[,]" and indeed "may be raised by the
18  court <i>sua sponte</i> at any juncture." <u>Harrison v. Howmedica Osteonics</u>
19  <u>Corp.</u>, 2008 WL 615886, at *1 (D.Ariz. March 3, 2008) (citing
20  <u>Attorneys Trust v. Videotape Computer Products, Inc.</u>, 93 F.3d 593,
21  594-595 (9th Cir. 1996)).  In light of the foregoing, plaintiffs'
22  argument that defendants cannot challenge jurisdiction because of
23  the "admissions" in their answers, is wholly without merit.

24     Plaintiff's second response to defendants' jurisdictional
25  challenges is that the Tucker Act "only applies to claims for money
26  damages[,]" and they are seeking declaratory and injunctive relief.
27  Pl. Resp. (doc. 122) at 9:18-19 (citations omitted).  Hence,

1 plaintiffs reason, subject matter jurisdiction properly lies in this

2 district court.   Indeed, plaintiffs go so far as to state that

3 "[t]he Court of Federal Claims 'does not have the authority to issue

4 a declaratory judgment.'"   Id. at 9:22-23 (quoting Justice v. Lynp,

5 716 F.Supp. 1567, 1569 (D.Ariz. 1988)).

6     Plaintiffs are conveniently overlooking the fact, however, that

7 the Tucker Act was amended by ADRA in 1996.   The ADRA enlarged the

8 jurisdiction of the Court of Federal Claims, as well as expressly

9 authorizing that Court to "award any relief that [it] considers

10 proper, including declaratory and injunctive relief[.]" 28 U.S.C.

11 § 1491(b)(2) (West 2006) (emphasis added).   Thus, plaintiffs cannot

12 circumvent the jurisdiction of the Court of Federal Claims based

13 upon the nature of the relief which they are seeking.   See Advanced

14 Systems Technology, Inc. v. Barrito, 2005 WL 3211394, at *6 (D.D.C.

15 Nov. 1, 2005) (finding that because section 1491(b)(1) of the ADRA

16 allows for awards of declaratory and injunctive relief, the fact

17 that plaintiff sought only such relief did not provide a basis for

18 district court jurisdiction).   Moreover, the Tucker Act's 1996

19 amendment means that plaintiffs' reliance upon cases such as

20 Justice, decided well before that enactment, is misplaced.

21     The APA is the statutory basis for plaintiffs' claim that the

22 BOR's alleged violations of the FPASA are subject to judicial

23 review.   The APA provides that in most circumstances, "[a]n action

24 in a court of the United States seeking relief other than money

25 damages . . . shall not be dismissed nor relief therein be denied on

26 the ground that it is against the United States."   5 U.S.C. § 702

27 (West 2007).   Citing to the seminal case of Califano v. Sanders, 430

- 12 -

U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the BOR accurately states that the APA does not provide an independent jurisdictional basis for reviewing agency actions.

Plaintiffs are also relying upon the federal question statute, 28 U.S.C. § 1331, as a jurisdictional basis though.  Section 1331 grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331 (West 2006).  As plaintiffs are quick to point out, the <u>Califano</u> Court explained that section 1331 "confer[s] jurisdiction on federal courts to review agency action, *regardless* of whether the APA of its own force may serve as a jurisdictional predicate."  <u>Califano</u>, 430 U.S. at 105; 97 S.Ct. at 984 (emphasis added); <u>see also</u> <u>ANA Intern., Inc. v. Way</u>, 393 F.3d 886, 890 (9th Cir. 2004) (citation omitted) ("The default rule is that agency actions are reviewable under federal question jurisdiction, pursuant to 28 U.S.C. . . . § 1331 and reinforced by the enactment of the . . . APA, even if no statute specifically authorizes judicial review.")  After "not[ing] that agency actions are generally reviewable under federal question jurisdiction, pursuant to 28 U.S.C. § 1331," the Ninth Circuit in <u>Spencer Enterprises, Inc. v. U.S.</u>, 345 F.3d 683 (9th Cir. 2003), offered the following rationale:

> Even if no statute specifically provides that an
> agency's decisions are subject to judicial review,
> the Supreme Court
>
> > customarily refuse[s] to treat such silence
> > as a denial of authority to [an] aggrieved
> > person to seek appropriate relief in the
> > federal court, . . . and this custom has
> > been reinforced by the enactment of the [APA],
> > which embodies the basic presumption of
> > judicial review to one suffering legal wrong
> > because of agency action, or adversely affected

1
2
            or aggrieved by agency action within the meaning
            of a relevant statute.

3   _Id._ at 687-88 (internal quotation marks and citations omitted).  The

4   foregoing convinces the court that it has subject matter

5   jurisdiction under section 1331, "reinforced by" the APA, _see_ _ANA_

6   _Intern._, 393 F.3d at 890, to consider whether BOR acted arbitrarily,

7   capriciously and abused its discretion as the FAC alleges.

8        The court's jurisdictional analysis cannot end here though.

9   That is because the claims herein are against the United States,

10  _i.e._, the BOR.  As a sovereign the United States "is immune from

11  suit unless it has expressly waived such immunity and consented to

12  be sued."  _McGuire v. U.S._, 550 F.3d 903, 910 (9th Cir. 2008)

13  (internal quotation marks and citation omitted).  "Such waiver

14  cannot be implied, but must be unequivocally expressed."  _Id._

15  (internal quotation marks and citation omitted).  Accordingly, even

16  if jurisdiction is proper under section 1331, still, there must be

17  an explicit waiver of sovereign immunity.  _See id._ (internal

18  quotation marks and citation omitted) ("Where a suit has not been

19  consented to by the United States, dismissal of the action is

20  required . . . [because] the existence of such consent is a

21  prerequisite to jurisdiction.")  Plaintiffs did not consider this

22  sovereign immunity issue and BOR only alludes to it.  Because a

23  waiver of sovereign immunity is an essential part of the court's

24  subject matter jurisdiction in this case, however, the court must

25  carefully consider that issue.

26       **_A.  Waiver of Sovereign Immunity_**

27       Section 1331 is an undeniably broad jurisdictional grant, but

1 in and of itself that statute is not a waiver of sovereign immunity.

2 Pit River Home and Agr. Co-op Ass'n v. U.S., 30 F.3d 1088, 1098 n.5

3 (9th Cir. 1994) (citations omitted); see also Hughes v. U.S., 953

4 F.2d 531, 539 n. 5 (9th Cir. 1992) (citations omitted).

5 Consequently, this court has subject matter jurisdiction under

6 section 1331 only if there is separate statutory waiver of sovereign

7 immunity, which here means returning to the APA.

8 　　　The APA contains a limited waiver of sovereign immunity.

9 "[S]ection 702 of the APA waives sovereign immunity for Plaintiffs'

10 claims if (1) the claims are not for money damages; (2) an adequate

11 remedy for the claims is not available elsewhere; and (3) the claims

12 do not seek relief expressly or impliedly forbidden by another

13 statute." Grant County Black Sands Irr. Dist. v. U.S., 539

14 F.Supp.2d 1292, 1296 (E.D.Wash. 2008) (citing Tucson Airport

15 Authority v. General Dynamics Corp., 136 F.3d 641, 644 (9th cir.

16 1998)). Plaintiffs' claims herein satisfy all three prongs of this

17 test, as more fully explained below.

18 　　　*1.  "Money Damages"*

19 　　　Plaintiffs are not seeking monetary relief in this case; they

20 are seeking declaratory and injunctive relief, as noted earlier.

21 Consequently, there is no dispute that the first element of the

22 APA's limited waiver of sovereign immunity is met here.

23 　　　*2.  Adequate Remedy Not Available Elsewhere*

24 　　　Partners maintains that the Tucker Act as amended by the ADRA

25 vests exclusive jurisdiction in that Court. Framed in terms of

26 sovereign immunity, if an adequate remedy is available in the Court

27 of Federal Claims under the ADRA, then plaintiffs would not be

- 15 -

1  entitled to rely upon the APA's limited waiver of sovereign

2  immunity.   See Fire-Trol Holdings L.L.C. v. U.S. Dep't of

3  Agriculture Forest Service, 2004 WL 5066232, at *4 (D.Ariz. Aug. 13,

4  2004) (because plaintiff "alleges the violation of a statute or

5  regulation in connection with a proposed procurement, under the

6  ADRA, the Court of Federal Claims ha[d] exclusive jurisdiction[,]"

7  thus "preempt[ing]" the court's § 1331 jurisdiction and the APA's

8  waiver of sovereign immunity), aff'd in part, rev'd in part on other

9  grounds without pub'd opinion, 209 Fed. Appx. 625 (9th Cir. 2006).

10  Conversely, if an adequate remedy is not available in the Court of

11  Federal Claims, then the second element necessary to establish a

12  waiver of sovereign immunity under the APA is present here.

13       Whether an "adequate remedy is available" in the Court of

14  Federal Claims necessarily implicates that Court's jurisdiction in

15  the first instance.   Section 1491(b)(1) provides in relevant part

16  that the United States Court of Federal Claims:

17            [S]hall have jurisdiction to render judgment
              on an action by an interested party objecting
18            to a solicitation by a Federal agency for bids
              or proposals for a proposed contract or to a
19            proposed award or the award of a contract or any
              alleged violation of statute or regulation in
20            connection with a procurement or a proposed
              procurement.
21

22  28 U.S.C. § 1491(b)(1) (West. 2006).[8]   In arguing the merits, the

23  parties vigorously dispute whether the UMA or the RMA are

24  "procurement" contracts.   They did not specifically address the

25  _____

26       [8]    Consideration of whether this action comes within the scope of the ADRA
         is imperative for the additional reason that "where a case falls under Tucker Act
27       [ADRA] jurisdiction, federal question jurisdiction[,]" which plaintiffs herein are
         invoking, "cannot serve as an alternative basis for jurisdiction." Marceau v.
         Blackfeet Housing Authority, 455 F.3d 974, 986 n. 6 (9th Cir. 2006).

"interested party" or "Federal agency" aspects of section 1491(b)(1).  For the sake of completeness, the court will address all three factors.

### a.  *"Interested Party"*

A concrete definition for "interested party" under section 1491(b)(1) has "yet [to be] precisely . . . delineated[.]" <u>Phoenix Air Group, Inc. v. United States</u>, 46 Fed.Cl. 90, 102 (Fed. Cl.), <u>appeal</u> <u>dismissed</u> <u>per</u> <u>stipulation</u>, 243 F.3d 555 (Fed. Cir. 2000). "Without an explicit definition, previous Court of Federal Claims decisions have found that, to be an 'interested party' under the Tucker Act, a plaintiff must stand in some connection to the procurement, and it must have an economic interest in it." <u>Id.</u> (internal quotation marks and citation omitted).  Given this broad interpretation, it is possible to find that plaintiffs Maule-Ffinch and Pensus (the only plaintiffs which count one names), are "interested parties" for purposes of section 1491(b)(1).  They stood "in some connection to the procurement" in that, as a marina developer and operator in the area, they wanted to respond to the 2005 RFP (although they believed that section 6.8 precluded them from so doing).  Those plaintiffs also had an economic interest in the "procurement," because an award of the UMA to them, rather than to Partners, obviously would have inured to their financial benefit.

Under the terms of the Pleasant Harbor lease, Partners maintains that plaintiffs were not qualified bidders because supposedly that lease prohibited plaintiffs from basically operating a competing marina, such as Scorpion Bay.  Plaintiffs are correct that Partners selectively quoted from that lease.  Immediately

1  following that seemingly prohibitive language, the lease lists the

2  "conditions" under which the lessor was required to permit

3  plaintiffs to engage in a competing marina business.  Pl. Resp.

4  (doc. 26) at 1-2 (citation omitted).  There is no need at this

5  juncture to become mired down in the discrete issue of whether that

6  lease barred plaintiffs from bidding on the 2005 RFP, especially

7  because Partners did not raise that issue in the context of section

8  1491(b)(1).

9       For present purposes, the court is hesitant to adopt a strict

10 and narrow view of an "interested party" under that statute.  This

11 hesitancy stems in part from how broadly the Court of Federal Claims

12 has construed "interested party."  L-3Communications EOTech, Inc. v.

13 United States, 2009 WL 426462 (Fed. Cl. Feb. 18, 2009), is

14 illustrative.  There the court "held that protestors had standing to

15 protest the agency action, even though there was no solicitation by

16 the agency for which they could compete."  Id. at *4 (citation

17 omitted).  That holding is representative of the broad parameters of

18 the "interested party" element of section 1491(b)(1).  Thus, the

19 court finds that plaintiffs Maule-Ffinch and Pensus are "interested

20 parties" within the meaning of that statute.

21                    ***b.  "Federal Agency"***

22      The next jurisdictional prerequisite under the ADRA is a

23 showing that plaintiff "competed in a government-sponsored

24 solicitation, which was issued by a federal agency and not a private

25 party."  Blue Water Envt'l, Inc. v. U.S., 60 Fed.Cl. 48, 51 (2004).

26 That is because the Court of Federal Claims "has no authority over

27 non-Federal entities."  Id. (internal quotation marks and citation

- 18 -

omitted).  Thus, unless the soliciting entity is federal or "acting as an 'agent' for a federal entity[,]" jurisdiction under § 1491(b)(1) of the ADRA is lacking.  See id.

The ADRA does not define "federal agency."  Novell, Inc. v. U.S., 46 Fed.Cl. 601, 606 n. 3 (2001).  However, it "[i]s is well-settled that for purposes of determining Tucker Act jurisdiction, the definition of 'agency' in 28 U.S.C. § 451 is controlling."  Blue Water Envt'l, 60 Fed.Cl. at 51.  That statute's definition of agency "'includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest unless context shows that such term was intended to be used in a more limited sense.'"  Id. at 51-52 (quoting 28 U.S.C. § 451).

In count one, plaintiffs allege a "prima face violation of federal procurement law" arising from BOR's "approval of the Proposed UMA, which was based on the illegal 2005 RFP."  FAC (doc. 4) at 18, ¶¶ 83 and 84.  That RFP allegedly was "illegal" because it "violated the principle of full and open competition reflected in federal procurement law" in several ways.  Id. at 17, ¶ 80; and at 18, ¶ 83.  The 2005 RFP was issued by Maricopa County, however.  Therefore, on the face of it, the underlying solicitation which forms the basis for count one was not issued by a federal agency under section 451's definition.

Nonetheless, the court must consider whether the County was "acting as 'agent' for a federal entity[,]" i.e. so as to confer "Federal agency" status upon the County within the meaning of section 1441(b)(1).  In Blue Water Envt'l, the court discussed two

possible theories which could render a non-federal entity a "Federal agency" with the meaning of that statute – "day-to-day supervision" and "purchasing agent[.]" Blue Water Envt'l, 60 Fed. Cl. at 51 and 53.  The court in Blue Water Envt'l held that a private contractor, Brookhaven Science Associates ("BSA"), which operated a national laboratory owned by the Department of Energy ("DOE") pursuant to a contract with DOE, was not a "Federal agency" under either theory. Thus, it dismissed the complaint for lack of subject matter jurisdiction.

BSA, the private contractor in Blue Water Envt'l, issued a series of RFPs which ultimately resulted in a contract between it and another private entity to perform remediation at the laboratory site.  A "disappointed proposer[]" filed suit against the DOE claiming that BSA "illegally, arbitrarily and capriciously . . . review[ed] the proposals under the [RFP], and violated the law by awarding the [clean-up] contract" to another entity.  Id. at 50 (internal quotation marks omitted).

On its motion to dismiss for lack of subject matter jurisdiction under § 1491(b)(1), the DOE argued that BSA was not a "Federal agency" within the meaning of that statute.  Plaintiff attempted to establish that the BSA was a "Federal agency" because it was "managing and operating a government facility under the day-to-day supervision of the Federal Government."  Id. at 52.  Rather than examining that broader alleged supervision, the court narrowed its inquiry to whether "the BSA was an 'agency' under a day-to-day supervision theory in connection with the subject procurement."  Id. Finding that "DOE was removed from day-to-day supervision of the

- 20 -

1  subcontracting process at issue[,]" and that it did not "control[]"
2  that process, the court held that even if "plaintiff's day-to-day
3  supervision theory [wa]s sufficient to establish 'agency' for
4  purposes of the Tucker Act, the plaintiff . . . failed to establish
5  that DOE supervised or directed the subcontracting process in th[at]
6  case." Id. at 52-53.  Therefore, the court found that BSA was not a
7  "Federal agency" as section 1491(b)(1) uses that phrase.

8       Several factors weighed in the Blue Water Envt'l court's
9  determination that "BSA acted independently from DOE[.]" Id. at 52.
10  First, the court pointed to the absence of consultations between BSA
11  and DOE in terms of "selecting and awarding the subcontract" at
12  issue.  Id.  Second, neither DOE's contracting officer nor his staff
13  "participate[d] in the subcontracting process[.]"  Id.   Third, DOE
14  did not "exercise any control over" that subcontracting process as
15  is evidenced in part by the fact that DOE "did not review the . . .
16  project solicitation or contract[.]"  Id. (internal quotation marks
17  omitted).  In light of the foregoing, the Blue Water Envt'l court
18  found that "DOE was removed from day-to-day supervision of the
19  subcontracting process[.]" Id.  Thus, the court declined to find
20  that BSA was acting as a "federal entity for purposes of the subject
21  procurement." Id.

22       The present case stands in sharp contrast to Blue Water Envt'l.
23  Far from "act[ing] independently" from BOR, BOR had significant
24  involvement in the RFP process which is the basis for count one.
25  See id.  The 2005 RFP was preceded by RFPs in 2002 and 2004.  Those
26  earlier two RFPs were remarkably similar to the 2005 RFP, but unlike
27  that RFP, the earlier two RFPS never came to fruition.  So even

1  though count one refers only to the 2005 RFP, the court cannot

2  ignore BOR's involvement with the marina project over the years, up

3  through its approval of the Final UMA in 2005.

4      BOR was heavily involved in the decision-making process with

5  respect to the marina project, unlike the private contractor in Blue

6  Water Envt'l.  The County did not undertake that process on its own.

7  There was extensive interplay between the County and BOR as to the

8  2002 RFP.  In 2002, the County submitted at least two draft RFPs to

9  BOR.  Admin. Rec., Vol. 1 at 000158.  On May 13, 2002, BOR received

10  an RFP from the County for BOR's "review and approval[.]" Id.

11  Although BOR approved the May 2002 RFP, on September 25, 2002, BOR

12  received from the County an "amended copy" of the 2002 RFP.  Id.  A

13  couple of months later, a BOR e-mail shows that BOR questioned

14  whether "the County changed something after our [BOR's] approval."

15  Id.  That e-mail further states that BOR would "never have agreed to

16  the language in Article 6.2 Competition, Non-Conclusion [sic] &

17  Conflict of Interest."  Id.

18      Other internal BOR communications provide further indica that

19  unlike Blue Water Envt'l, BOR was not "removed from day-to-day

20  supervision" of the RFP process through the years.  See Blue Water

21  Envt'l, 60 Fed. Cl. at 52.  Although it seems that from the outset

22  BOR viewed the inclusion of the "competition" clause as problematic,

23  by March, 2003, BOR had somewhat allayed its concerns, noting that

24  it "and the County [would] have some control over rates[.]" Admin.

25  Re., Vol. 1 at 000159.  Also in March, 2003, BOR "offer[ed]" to the

26  County "to use the services of a review by the National Marina

27  Operator's president[.]" Id.

1    Further evidence of the close working relationship between the

2    County and BOR with respect to the marina RFP process is the

3    County's offer to "let [BOR] into the current process[.]" Id.  BOR

4    "declined" at that time, but "[if] the bidder [wa]s determined to be

5    valid, [BOR] [was to] be brought into th[e] process for *further*

6    questioning on his plans and proposal."  Id. (emphasis added).

7        BOR's involvement with the RFP process continued in the

8    following years.  On August 11, 2004, the County provided BOR with

9    an RFP, asking for BOR's "review" and to "make any necessary

10   comments on behalf of [BOR]."  Id. at 255.2.   BOR continued to

11   express concern with inclusions of the  "Competition" clause in that

12   RFP.  BOR noted its "total disagree[ment]" with that language

13   because "not only" does it "violate the competitive bid process, but

14   it also eliminates the owners of commercial operations 'near' LPRP."

15   Id. at 255.1.  BOR further observed that it "appear[ed] from the

16   contents of the recent RFP that [the County]" did not take "advice"

17   from BOR, among others.  Id.

18       The court cannot stress enough that at this juncture, the

19   import of these BOR communications is *not* in how BOR purportedly

20   viewed the "competition" clause, but BOR's awareness of it in the

21   first place.  BOR's awareness that the County was including that

22   clause shows that BOR was quite closely monitoring those RFPs.

23   Indeed the documents quoted above, taken together, give the distinct

24   impression that BOR and the County were engaged in somewhat of a

25   collaborative effort in terms of the RFP process.  The County would

26   provide BOR with a draft RRP; BOR would review it and comment and

27   return it to the County for revision.  The process would continue

1    until BOR approved the RFP.

2         In addition to being part of the RFP process, in sharp contrast

3    to BSA which did not "exercise any control" over the subcontracting

4    process in Blue Water Envt'l, here, BOR exercised ultimate control.

5    The RMA vested the prerogative of final approval rights in the BOR.

6    Under the express terms of the RMA, agreements such as the UMA, were

7    "[s]ubject to the final approval of" BOR.   Admin. Rec., Vol. 1 at

8    000016.   Another provision of the RMA includes an express retention

9    by BOR of the "right of final approval" over all agreements such as

10   the UMA.   Id. at 00018.

11        Additionally, the Administrative Record makes clear that BOR

12   actually exercised the approval authority which it had under the

13   RMA.   In a November 14, 2005, letter BOR "indicat[ed] [its]

14   agreement in principle" to the UMA.   Id. at 000162.   In that letter,

15   BOR advised the County that it had "reviewed [the County's] most

16   recent draft [UMA] between . . . [the] County and [Partners],

17   . . . , for the development of the . . . Marina."   Id. at 000160.

18   BOR further stated that "[f]inal review and approval of this

19   contract will be provided after minor corrections are addressed and

20   legal review has been completed."   Id.   That letter continued,

21   noting that the draft UMA "accurately state[d] that various

22   activities during both the developmental phase and the operational

23   phase of this project will Require [BOR] approval."   Id. (emphasis

24   added).   BOR "reiterate[d] the importance of abiding by th[o]se

25   requirements[.]" Id.   Consistent with the foregoing, BOR noted that

26   the draft UMA needed to be "correct[ed] . . . to add [BOR] as an

27   approving entity" for a certain potential use.   Id.   After listing

                                  - 24 -

"[k]ey areas requiring [BOR] approval[,]" BOR advised the County of

BOR's "require[ment]" for advance funding for certain administrative

costs.  <u>Id.</u>

Furthermore, while BOR agreed that as part of the UMA, Partners

could be offered a "right of first refusal for the potential use" of

certain "Highway . . . frontage[,]" BOR expressly conditioned that

approval upon [BOR] developing and executing an Amendment with the

County to the [RMA] for th[o]se uses." <u>Id.</u> at 000161.  Among other

things that amendment would "provide for a long term revenue sharing

agreement between" BOR and the County.  <u>Id.</u>  In the  penultimate

sentence of that letter, BOR informed the County that "[o]nce legal

review is complete," it would "provide . . . formal approval" of the

UMA.  <u>Id.</u>  Lastly, the County was instructed to contact BOR if it

had "any further questions."  <u>Id.</u>

In a second letter, dated December 6, 2005, BOR informed the

County that it had "completed [its] final review of the [proposed

UMA], including [the County's] most recent changes[.]" <u>Id.</u> at 00162.

BOR found the proposed UMA "acceptable" in that form.  <u>Id.</u>  Again,

BOR closed that letter by indicating the if the County had "any

further questions[,]" it could contact the BOR staff person named

therein.  <u>Id.</u>

As detailed above, BOR had an integral role in the RFP process;

it was not merely rubber-stamping those RFPs.  BOR actively

participated nearly every step of the way in the process which

culminated in the Final UMA.  It reviewed the RFPs and the proposed

UMA.  BOR attempts to distance itself from its final approval

authority by stressing that the RMA did not require that it give

1  final approval to the RFPs, only to the UMA itself.  In that regard,

2  BOR notes that "[b]oat storage/both wet and dry/boat repair and

3  sales[,]" and "[s]upply stores/including boat equipment" are

4  specifically enumerated in the "pre-approved list of potential

5  public recreational uses for LPRP third party concession

6  agreements[.]" Id. at 000017.  Reliance upon the fact that the

7  marina was on the "pre-approved" list of potential uses ignores the

8  reality of BOR's involvement.  On the record as presently

9  constituted, BOR's heavy involvement in the RFP process, culminating

10  in approving the Final UMA, is readily apparent.  Given its

11  retention of broad "final approval" rights over the UMA, if BOR was

12  not satisfied with any aspect of that Agreement, including the RFP

13  process, it could have withheld final approval; but it did not.

14  Therefore, the court finds that the County was "acting as an 'agent'

15  for a federal entity[,]" BOR, within the meaning of section

16  1491(b)(1).  See Blue Water Envt'l, 60 Fed. Cl. at 51.

17                    ***c. Violation in Connection with Procurement***

18       Having found the plaintiffs Pensus and Maule-Ffinch are

19  "interested parties" and that the County was acting as an agent for

20  BOR, the next step in analyzing section 1491(b)(1) is whether

21  plaintiffs are claiming "any alleged violation of statute or

22  regulation in connection with a procurement or proposed

23  procurement[]" in count one.  See 28 U.S.C. § 1491(b)(1).  The "in

24  connection with" language, which the Federal Circuit has observed is

25  the "operative phrase," is "very sweeping in scope." RAMCOR Serv.

26  Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999).

27  "[A] statute is 'in connection' with a procurement, or a proposed

1  procurement, '[a]s long as [the] statute has a connection to a

2  procurement proposal." <u>Rhinocorps Ltd. Co. v. United States</u>, 2009

3  WL 320642, at *5 (Fed.Cl. Jan. 28, 2009) (quoting <u>RAMCOR</u>, 185 F.3d

4  at 1289).  "The clause ["in connection with"] 'does not require an

5  objection to the actual contract procurement.'" <u>Public Warehousing</u>

6  <u>Company K.S.C. v. Defense Supply Center Philadelphia</u>, 489 F.Supp.2d

7  30, 38 (D.D.C. 2007) (quoting <u>RAMCOR</u>, 185 F.3d at 1289).  "Thus, a

8  'statute or regulation in connection with a procurement or a

9  proposed procurement' includes, by definition, a regulation in

10  connection with any stage of the federal contracting acquisition

11  process, including 'contract completion and closeout.'" <u>Id.</u>

12  Likewise, "the Federal Circuit [has] held that a statute is 'in

13  connection with a procurement' where 'an agency's actions under a

14  statute . . . clearly affect the award and performance of a

15  contract.'" <u>Id.</u> (quoting <u>RAMCOR</u>, 185 F.3d at 1289).

16      <u>Phoenix Air Group</u>, <u>supra</u>, is particularly instructive given

17  that the plaintiff therein alleged violations of the Armed Services

18  Procurement Act ("ASPA"), which is "almost identical" to the FPASA –

19  the primary basis for count one herein.  <u>See id.</u> at 101, n. 12

20  (citation omitted).  The ASPA requires, like other statutes, that

21  "government agencies conducting procurements must obtain full and

22  open competition through the use of competitive procedures in

23  accordance with the requirements of this chapter and the Federal

24  Acquisition Regulation[s] [("FAR")][.]" <u>Id.</u> at 101 (internal

25  quotation marks and citation omitted).  After noting the "sweeping

26  scope" of the phrase "in connection with," the <u>Phoenix Air Group</u>

27  court held that allegations that defendant violated the ASPA by

- 27 -

1  "sole-source acquisition of training flight services . . . without
2  any competition[,]" was "sufficient to satisfy the portion of the
3  jurisdictional requirements [of section 1491(b)(1)] relating to a
4  'violation of statute or regulation.'" <u>Id.</u>

5      In the present case, the statutory basis for count one is the
6  FPASA, and related regulations.  Quoting several regulations
7  requiring "*full and open competition*" in "[a]ll procurement
8  transactions[,]" FAC (doc. 4), at 15, ¶¶ 63 and 66 (emphasis in
9  FAC), plaintiffs are seeking a declaration, *inter alia*, that
10 defendants violated "FPASA by failing to ensure compliance with
11 federal procurement law by [the County], and authorizing the
12 Proposed UMA based on the illegal 2005 RFP[.]" <u>Id.</u> at 26, Prayer for
13 Relief, at ¶ 1.  Given that the FPASA is "almost identical" to the
14 ASPA, and that plaintiffs herein are relying upon essentially the
15 same "full and open competition" requirements at issue in <u>Phoenix</u>
16 <u>Air Group</u>, the court has little difficulty finding that alleged
17 violations of the FPASA and related regulations satisfy the "portion
18 of the jurisdictional requirements relating to a 'violation of a
19 statute or regulation'" under section 1491(b)(1).  <u>See Phoenix Air</u>
20 <u>Group</u>, 46 Fed.Cl. at 101; and at 101 n. 12.

21      That does not end the court's inquiry, however.  In fact, in
22 some respects that is just the starting point because "[m]uch
23 depends . . . on the meaning of the term 'procurement'" – another
24 term which the ADRA does not define.  <u>Public Warehousing</u>, 489
25 F.Supp.2d at 38.  Nor, for that matter, do the FARs define
26 procurement.  Instead, after the listing for "procurement[,]" the
27 FARs directly refer to the definition of "'acquisition'" therein.

1   See 48 C.R.F. 2.101(b).  However, "[t]he Court of Federal Claims has

2   construed 'procurement' as used in section 1491(b)(1) to encompass

3   'all stages of the process of *acquiring property or services*,

4   beginning with the process for determining a need for property or

5   services and ending with contract completion and closeout,'

6   borrowing from Congress's definition of the term procurement at 41

7   U.S.C. § 403(2)."  Public Warehousing, 489 F.Supp.2d at 38

8   (citations and footnote omitted) (emphasis added).

9        Section 403(2) does not define "acquiring," but the FARs are

10  instructive.  Section  2.101(b)(2) defines acquisition as follows:

11              the acquiring by contract *with appropriated
                funds of supplies or services* (including
12              construction) by and for the use of the Federal Government
                through purchase or lease, whether the supplies or
13              services are already in existence or
                must be created, developed, demonstrated, and
14              evaluated.

15  48 C.F.R. § 2.101(b)(2) (emphasis added).  That FAR further defines

16  "supplies" as "all property *except* land or interest in land."  Id.

17  (emphasis added).  Among other things, "supplies" "include[] (but is

18  not limited to) public works, buildings, and facilities; ships,

19  [and] floating equipment . . . ; and the alteration or installation

20  of any of the foregoing."  Id.   The FARs do not define services.

21       The parties vigorously dispute, albeit in the merits context,

22  whether the RMA and the UMA are procurement contracts.  There is no

23  reason to believe that the parties would not advance these same

24  arguments in considering whether plaintiffs can avail themselves of

25  the APA's sovereign immunity waiver.  The court will proceed on that

26  assumption.

27       Plaintiffs are seeking a declaration that defendants violated

- 29 -

the FPASA by "authorizing the Proposed *UMA* based on the illegal 2005 RFP."  FAC (doc. 4) at 26, Prayer for Relief, at ¶ 1 (emphasis added).  Ultimately, plaintiffs are seeking to have this court "[s]et aside the [Final] 2005 *UMA*[.]"  Id. at 27, Prayer for Relief, at ¶ 8 (emphasis added).  Thus, for the moment, the court will confine its analysis to whether the UMA, as opposed to the RMA, is a procurement contract, so as to bring it within the ambit of section 1491(b)(1).

BOR contends that the UMA is not a procurement contract; it is a concession contract.  Expressly distinguishing concession from procurement contracts, the Court of Federal Claims has explained that the former operates as "a grant of a permit to operate a business and the Government is not committing to pay out government funds or incur monetary liability."  Frazier v. United States, 67 Fed.Cl. 56, 59 (2005) (internal quotations and citations omitted), aff'd without pub'd opinion, 186 Fed.Appx. 990 (C.A.Fed. 2006).  BOR maintains that the UMA easily fits within that definition.  Additionally, BOR reasons that the UMA cannot be deemed a procurement contract because it did not "require[] or obligate[] the expenditure of federal appropriated funds or involve[] the acquisition of property, services, or construction for the federal government or even the County."  BOR Resp. (doc. 113) at 17:27-18:1.

Begging the issue, in their reply plaintiffs simply contend that "BOR's mandatory [D&Ss] require that concessions by non-federal partners comply with federal law, and make no exceptions for federal procurement law."  Pl. Reply (doc. 188) at 5:22-24.

1  Plaintiffs never explain how the UMA can be considered a

2  procurement within the meaning of the applicable statutes,

3  regulations or case law, however.

4      Examination of the UMA shows that it is not a procurement

5  contract.  Neither the County nor BOR acquired property under the

6  UMA.  Regardless of the definition of "services," the "public at

7  large" acquired the "services" rendered thereunder - not the County

8  and not BOR.  Admin. Rec., Vol. 1 at 000167 (stating that the

9  parties were entering into that agreement "to provide dry stack

10 storage, watercraft rentals, boating supply store and other related

11 services to the public at LPRP ").[9]  Further, under the UMA neither

12 the County nor BOR are committed to paying out any government

13 funds.  The funds flowed the opposite way; Partners is obligated to

14 pay the County a percentage of gross receipts.  Id., Vol. 1 at

15 000168- 000170.

16     Likewise, neither BOR nor the County incurred any monetary

17 liability under the UMA.  Moreover, the UMA mandates that Partners

18 shall "indemnify and  hold harmless" both the County and BOR.  Id.,

19 Vol. 1, at 000186 at ¶ 21(A).  The UMA also mandates that Partners

20 include both the County and BOR  as "'additional insureds' under

21 all policies of insurance."  Id., Vol. 1 at 000188, ¶ 21(B)(4)(a).

22 These provisions severely restrict if not avoid altogether the

23 possibility of either the County or BOR incurring any monetary

24

25     [9]     The court realizes that the Administrative Record contains what

26 purports to be the December 6, 2005 "Final Version" of the UMA, and the FAC is
   quoting from a October 19, 2005 "Draft" version.  See FAC, exh. I thereto.  The

27 language quoted herein is the same in both versions, however, so for present
   purposes it matters not that the Administrative Record contains the "Final
   Version," but the FAC is relying upon a "Draft" version.

1    liability under the UMA.   Thus the fundamental hallmarks of a
2    procurement contract are missing from the UMA.

3        Bolstering the conclusion that the UMA is a concession
4    contract is the language which that agreement employs.   The UMA is
5    replete with references to concession in its various forms.   For
6    example, Partners is referred to throughout as the
7    "CONCESSIONAIRE."   <u>See</u> Admin. Rec., Vol. 1 at 000166-000203
8    (emphasis in original).   "General Provisions" in the UMA
9    specifically describe the "Concession Granted[.]" <u>Id.</u>, Vol. 1 at
10   000167, ¶ 1.   The UMA also specifically refers to BOR's "Directives
11   and Standards ["D&Ss"] as identified in exhibit B" thereto.   <u>Id.</u>,
12   Vol. 1 at 000167.   The "subject" of those particular D&Ss is
13   "*Concessions* Management by Non-Federal Partners[.]" <u>Id.</u>, Vol. 1 at
14   000150 (emphasis added).   Somewhat tellingly, at the same time
15   plaintiffs are strenuously arguing that this is a procurement
16   action, they sometimes refer to the UMA as a "concession
17   agreement."   <u>See</u>, <u>e.g.</u>, Pl. Reply (doc. 118) at 2:18-19.

18       The court hastens to add that use of the word "concession" or
19   "concessionaire" is not alone dispositive of the nature of the UMA.
20   After all, any agreement could be denoted a "concession agreement."
21   Rather what governs here is the nature of the UMA, which clearly
22   granted Partners permission to develop, operate and maintain a
23   marina at LPRP, without any expenditure of government funds.
24   Having found that the UMA is a concession contract, necessarily,
25   the Court of Federal Claims would not have jurisdiction under
26   section 1491(b)(1) over any claimed statutory or regulatory
27   violations "in connection with" the UMA.

The court cannot disregard plaintiffs' argument, however, that the RMA, which authorized the County to enter into the UMA, is a procurement contract.  Vigorously contending that the RMA is a procurement contract, plaintiffs tacitly assume that so, too, is the UMA.  The court has serious reservations as to this line of reasoning.  But again, to be thorough, and because the BOR and plaintiffs devoted a fair portion of their briefs to this issue, the court will address it as well.

Plaintiffs point to several aspects of the RMA which they believe establish that it is a procurement contract.  First, they stress that BOR acquired property from the County under the RMA. The County "transfer[red] to" BOR, *inter alia*, "any and all incorporeal property interests of said County in the existing park lands, and *facilities*, including any purported water rights . . . ; and any and all fixtures or improvements in such lands which have not been otherwise acquired by [BOR]."  Admin. Rec., Vol. 1 at 000007, Art. 4(a) (emphasis added).  Plaintiffs further explain that in accordance with the RMA, "[a]s full and complete consideration" for transfer of those property interests, BOR granted the County, *inter alia*, "the exclusive right . . . to manage for public recreational uses the lands and waters thereon . . . as Federal LPRP land manager."  Id., Vol. 1 at 000007, at Art. 4(c)(3).  That consideration also included BOR granting authority to the County to "enter into third party concession agreements[.]"  Id., Vol 1 at 000008, Art. 4(c)(4).  In addition to the foregoing consideration, BOR paid the County $2.5 million which, from plaintiffs' standpoint, was "in exchange for the County

1  providing *services* in the form of management of BOR land."  Pl.

2  Reply (doc. 118) at 5:16-17 (emphasis added).  The County was to

3  "utilize[]" those monies "*only* in connection with the *recreational*

4  *development* of the LPRP wherein [BOR] has Federal land management

5  responsibility[,]" however.  Admin. Rec., Vol. 1 at 000008, Art.

6  4(c)(6) (emphasis added).  Therefore, the County was not receiving

7  payment for rendering management services *per se*.

8      Plaintiffs further rely on one cost-sharing provision of the

9  RMA which they believe demonstrates that it is a procurement

10 contract.  In that provision, the County and BOR agreed to "share

11 costs . . . for the development of the LPRP for public recreational

12 uses."  <u>Id.</u>, Vol. 1 at 000005 at Art. 2(d).  Lastly, plaintiffs

13 note that "any development of LPRP lands subject to the third party

14 concession agreement . . . may be completed at [the] . . . County's

15 sole cost and expense" provided BOR has given its prior approval.

16 <u>Id.</u>, Vol. 1 at 000011, Art. 6(b).  Plaintiffs highlight the fact

17 that that provision further states that "[u]pon termination of

18 th[e] [RMA], title to such facilities shall be vested in [BOR]

19 unless otherwise noted in [BOR]'s approval of the development of

20 such Facilities."  <u>Id.</u>  Although unstated, evidently it is

21 plaintiffs' position that that possible future vesting of title

22 amounts to BOR acquiring certain facilities pursuant to the RMA.

23     BOR strongly disagrees with plaintiffs' characterization of

24 the RMA as a procurement contract.  BOR counters that none of the

25 aspects of the RMA upon which plaintiffs are relying establish that

26 it is a procurement contract.  Essentially, it is BOR's position

27 that it did not "acquire" anything from the County pursuant to the

RMA.   BOR explains that the management right which it granted the County under the RMA was "as partial consideration for the County's property transfer to [BOR]."   Fed. Def. Reply (doc. 134) at 7:20. Therefore, despite plaintiffs' assertion to the contrary, BOR maintains that that management right was "not a 'service' for which [it] was paying consideration."   Id. at 7:21.   BOR further asserts that the only "property" which it acquired was land, which is "excluded from federal procurement law."   Id. at 7:24 (citing 48 C.F.R. § 2.101.)   Nor were these monies to provide financial assistance to the County.   As further support for this argument, BOR stresses that the RMA's transfer provisions, found in Article 4, are not incorporated in Article 2's recreational management provision, nor in the third-party concession provision of Article 13.

BOR also challenges plaintiffs' attempt to cast any of the RMA's cost sharing provisions as an acquisition, and hence a procurement.   BOR explains that it did not "acquire" anything under those provisions.   Rather, those cost sharing provisions "merely outline the circumstances under which some costs will be shared between [BOR] and the County[]" on a 50-50 basis.   BOR Reply (doc. 134) at 8:3-4.   Perhaps most notably, in accordance with the RMA, no federal funds or assistance were provided in connection with development of facilities such as the marina complex.   The development was undertaken pursuant to the UMA - a third party agreement, with Partners bearing the cost.

As to the possible future vesting of title in BOR for "improvements built without federal assistance" under Article 6,

1  which sets forth, *inter alia*, "LPRP Development Obligations[,]" BOR

2  persuasively asserts that its "ability to potentially obtain

3  improvements to the park under the contingencies noted in [that]

4  article . . . can hardly fall within the definition of acquisition

5  as noted in . . . FAR[,] 48 [C.F.R.] § 2.101." BOR Reply (doc.

6  134) at 8:15-18.  Instead, BOR maintains that the RMA is, as its

7  name indicates, nothing more than a management agreement, which is

8  not synonymous with procurement.

9      In disputing whether the RMA is a procurement contract, the

10  parties fail to take into account the entirety of what was

11  transferred to BOR.  BOR emphasizes that pursuant to Article 4 of

12  the RMA, the County transferred land to it.  This emphasis is

13  understandable because, as previously mentioned, in defining

14  supplies under the FARs, "land or interest in land" is expressly

15  excluded from the definition of "supplies" which may be acquired by

16  contract.  See 48 C.F.R. § 2.101(b).  Therefore, if, as BOR urges,

17  the RMA exclusively involves a transfer of "and or interest in

18  land," then the RMA would not be a procurement, as section

19  1491(b)(1) uses that term.  Hence, the RMA would not be subject to

20  federal procurement laws.  Necessarily then, the Court of Federal

21  Claims would lack jurisdiction under section 1491(b)(1) to consider

22  any disputes pertaining thereto.

23      Significantly, however, the County transferred more than just

24  land to the BOR under the RMA.  As Article 4 states in its title,

25  it pertains to the "[t]ransfer of [e]xisting [p]ark [f]*acilities*

26  and [r]elated [p]roperty [i]nterests[.]" Admin. Rec., Vol. 1 at

27  000007, Art. 4 (emphasis added).  Subarticle (a) explicitly states

1   that the "County agrees to transfer to [BOR]. . . and [BOR] accepts
2   . . . , any and all incorporeal property interests of said County
3   in the existing park lands, and *facilities*[.]" Id., Vol. 1 at
4   000007, Art. 4(a) (emphasis added).   Subsection(c) of that Article
5   4 indicates that "[a]s full and complete consideration for [the]
6   County's transfer of its property interests as set forth in
7   subarticle (a) above, [BOR] shall provide[]" to the County, *inter*
8   *alia*, $2.5 million.   Id., Vol. 1 at 000007 and 000008, Arts. 4(c)
9   and 4(c)(6).   Under the express terms of the RMA then, the County
10   transferred to BOR not only land interests, but also facilities.
11   Although land interests are exempt from the definition of
12   "supplies" under the FARs, facilities are not, as noted earlier.
13   Additionally, those facilities were obtained through the
14   expenditure of appropriated funds, *i.e.*, "the authority of the Act
15   of June 17, 1902 (. . . and all acts amendatory thereof and
16   supplemental thereto, including the Colorado River Basin Project
17   Act[.]" Id., Vol. 1 at 000008, Art. 4(c)(6).   Consequently,
18   although the land which the County transferred to the BOR is not a
19   procurement, the facilities would be, rendering the RMA a
20   "procurement," at least partially.
21        At the end of the day though, the court is unwilling to hold
22   that count one pertains to an "alleged violation of statute or
23   regulation in connection with a *procurement* or a proposed
24   *procurement*." See 28 U.S.C. § 1491(b)(1) (emphasis added).   The
25   relationship between the RMA and the central issue in count one –
26   alleged improprieties in the RFP process – is simply too attenuated
27   to deem that count to be "in connection with a procurement."   Put

1   differently, although there is a procurement aspect to the RMA,
2   that is not enough to bring the allegations of count one within the
3   purview of section 1491(b)(1).  The Court cannot ignore the reality
4   that the "solicitation" of which plaintiffs are complaining in
5   count one pertains solely to the UMA, which the court has found is
6   a concession agreement.

7       At first glance, arguably count one of the FAC is a classic
8   bid protest, as Partners contends, which would lie within the
9   exclusive jurisdiction of the Court of Federal Claims.  As should
10  be patently obvious by now, one limitation on that Court's
11  jurisdiction under section 1491(b)(1) of the ADRA is, as discussed
12  above, the claim must be "in connection with a procurement or
13  proposed procurement."  Close scrutiny of the UMA, which is at the
14  core of count one, reveals that it does not meet that criteria;
15  indeed, it cannot because the UMA is a concession agreement  – not
16  a procurement agreement.  Moreover, the fact that the RMA, from
17  which the UMA emanates, is partially a procurement is not a
18  sufficient basis upon which to find that count one alleges a
19  violation of a statute "in connection with procurement."  Because
20  at a minimum the procurement element of section 1491(b)(1) is
21  missing, the Court of Federal Claims is without jurisdiction to
22  entertain count one.  Thus, "an adequate remedy for . . . [that
23  count] is not available elsewhere[,]" *i.e.* in the Court of Federal
24  Claims.  See Grant County Black Sands, 539 F.Supp.2d at 1296
25  (citation omitted).  Hence, the second condition for showing a
26  waiver of sovereign immunity under the APA also is met here.
27  . . .

1

### 3. *"Expressly of Impliedly Forbids"*

2      The third condition necessary to establish an APA waiver of

3  sovereign immunity is the claims sought must not seek relief

4  "expressly or impliedly forbid[den] by another statute."  See 5

5  U.S.C. § 702.  The parties do not even suggest, much less argue,

6  that another statute forbids plaintiffs' claims in count one.  It

7  is possible to insinuate from defendants' argument, though, that

8  because pursuant to the ADRA the Court of Federal Claims has

9  exclusive jurisdiction over plaintiffs' count one claims, that Act

10 "expressly or impliedly forbids" this court from exercising

11 jurisdiction over those same claims.  The court's reasoning in

12 section I(A)(2) above as to the availability of adequate remedies

13 elsewhere resolves this argument.  Because the Court of Federal

14 Claims lacks jurisdiction to entertain count one, it follows that

15 the ADRA does not "expressly or impliedly" forbid those claims.

16 Thus, because all three conditions necessary to establish waiver of

17 sovereign immunity under the APA are satisfied, plaintiffs are

18 entitled to rely upon that limited waiver.

### II.  *Failure to Exhaust Administrative Remedies*

20      There is one additional argument which the court must address

21 before turning to the merits – plaintiffs' alleged failure to

22 exhaust administrative remedies.  Failure to exhaust is the first

23 ground for Partners' partial summary judgment motion, but BOR did

24 not raise that issue.

### A.  *Standing*

26      Before turning to the merits of this exhaustion argument, the

27 court must consider plaintiffs' contention that Partners "[l]acks

1   [s]tanding to [a]ssert" that "[d]efense."  Pl. Resp. (doc. 122) at

2   1:17.  The only potentially relevant case to which plaintiffs cite,

3   Wright v. Inman, 923 F.Supp. 1295 (D.Nev. 1996), does not support

4   their argument.  Wright actually supports Partners' argument that

5   they should be allowed to raise the exhaustion issue.  In Wright,

6   the United States Forest Service approved a mining company's

7   expansion project on a national forest.  Plaintiffs, adjacent

8   landowners and opponents of that expansion, filed suit against the

9   Forest Service alleged violations of the National Environmental

10  Policy Act.  The defendant/intervenor mining company, moved to

11  dismiss for lack of subject matter jurisdiction, asserting that

12  plaintiffs failed "to satisfy the APA's exhaustion requirement."

13  Id. at 1299.  The Wright court did comment that "[i]t [wa]s

14  interesting . . . . that the Forest Service [did] not join[] in"

15  that motion.  Id. at 1299 n.5.  Nonetheless, the court did address

16  the mining company's exhaustion argument on the merits.  This court

17  declines to rely upon that passing observation in Wright to find

18  that Partners lack standing to raise exhaustion of administrative

19  remedies.

20      **_B.  Waiver_**

21      Plaintiffs also suggest that the exhaustion requirement has

22  been waived here.  Plaintiffs contend that exhaustion is an

23  affirmative defense and because BOR did not raise that defense in

24  its answer or motion, Partners should not be allowed to raise it

25  now.  In other words, BOR waived its right to assert exhaustion,

26  and thus, by extension, so did Partners.  Assuming _arguendo_ that

27  exhaustion is waivable, the court declines to impute BOR's supposed

1  waiver of that defense to Partners.

2      Partners explicitly asserted exhaustion of administrative

3  remedies as an affirmative defense in its answer.  <u>See</u> Part. Ans.

4  (doc. 14) at 8, ¶ 55.   Moreover, the cases upon which plaintiffs

5  rely to support their argument that exhaustion is waivable are

6  readily distinguishable.  None are even remotely similar to the

7  present case.  As Partners correctly point out, none of those cases

8  "involved an intervenor attempting to protect a contractual

9  interest created as part of a procurement process."  Part. Reply

10 (doc. 137) at 5:12-13.  Under these circumstances, the court finds

11 that Partners did not waive its right to assert failure to exhaust

12 administrative remedies.

13     ***C.  Merits***

14     Referring to section 704 of the APA and 43 C.F.R.

15 § 12.76(b)(12), Partners contends that plaintiffs were "required to

16 exhaust administrative remedies before" commencing this action.

17 Part. Mot. (doc. 110) at 2:5.  Section 704 allows for judicial

18 review of "final agency action for which there is no other adequate

19 remedy in court."  5 U.S.C. § 704 (West 2007).  "That section means

20 that when a statute or agency rule dictates that exhaustion of

21 administrative remedies is required, the federal courts may not

22 assert jurisdiction to review agency action until the

23 administrative appeals are complete."  <u>White Mountain Apache Tribe</u>

24 <u>v. Hodel</u>, 840 F.2d 675, 677 (9th Cir. 1988) (citation omitted).

25 Here, the regulation which Partners invokes provides that "[a]

26 protestor *must exhaust all administrative remedies* with the grantee

27 and subgrantee *before pursuing a protest with the Federal agency*."

1  43 C.F.R. § 12.76(b)(12) (emphasis added).  In accordance with that

2  regulation, Partners believes that plaintiffs had an obligation to

3  exhaust their administrative remedies with the County, and

4  plaintiffs did not do that.  Hence, the court should grant

5  Partners' motion for partial summary judgment based upon failure to

6  exhaust.

7       On the face of it, section 12.76(b)(12) does not apply here

8  because it does not, as Partners believe, require exhaustion before

9  seeking judicial review.  That regulation mandates exhaustion of

10  administrative remedies as a prerequisite only to agency review.

11  Given the exceedingly narrow scope of Partners' exhaustion

12  argument, the court finds that it has no merit.[10]  Therefore,

13  Partners are not entitled to partial summary judgment on that

14  basis.

15       With the issues of subject matter jurisdiction, waiver of

16  sovereign immunity and failure to exhaust administrative remedies

17  behind it, the court, at last, can address the merits.

18  ### III.  *Motions for Partial Summary Judgment*

19       Basically, plaintiffs assert that they are entitled to summary

20  judgment as to count one because "BOR improperly failed to ensure

21  full and open competition" in the Scorpion Bay marina project in

22  violation of "federal procurement law, regulation and policy."  Pl.

23  Mot. (doc. 88) at 9:9; and FAC (doc. 4) at 17, ¶ 80.  As should be

24  abundantly clear by now, BOR strenuously denies that this is a

25  procurement action.  Thus, BOR is taking the position that in count

26  _____

27       [10]    To some extent, Partners' reliance upon that particular regulation is
understandable because count one refers to various subsections of 43 C.F.R. Part
12, although not that specific one.

one plaintiffs are improperly relying upon the FPASA, "which is the

organic authority for most of the regulations controlling

procurement decisions."  See Motor Coach Industries, Inc. v. Dole,

725 F.2d 958, 966 (4th Cir. 1984).  Likewise, BOR asserts that in

that count plaintiffs are improperly relying upon various

regulations, BOR D&Ss and BOR policies, all of which govern

procurement.  The court will separately address the potential

applicability of the FPASA, the cited regulations, and the cited

BOR D&Ss and policies.

### A.  FPASA

In its jurisdictional statement, plaintiff baldly alleges that

it is asserting "violations of . . . FPASA[,]" among other

statutes.  FAC (doc. 4) at 2, ¶ 1.  Nowhere in their FAC do

plaintiffs articulate precisely what those alleged statutory

violations are, however.  Citing to the "purpose" section of the

FPASA, the FAC merely  alleges that that Act was "intended to

provide the federal government with an economical and efficient

system for procuring property and services."  Id. at 14, ¶ 59

(citing 40 U.S.C. § 101).  The FAC also cites to sections 121(a)

and (c) of the FPASA.  Respectively, those sections "authorize the

President to "prescribe policies and directives necessary to carry

out the FPASA[,] id. (citing 40 U.S.C. § 121(a)), and "authorize"

the Administrator of General Services to "prescribe regulations to

carry out" the FPASA.  40 U.S.C. § 121(c) (West 2005).  That is the

sum total of plaintiffs' FPASA allegations.  Conspicuously absent

from plaintiffs' memoranda of law filed herein is any mention of

alleged FPASA violations.  Accordingly, because plaintiffs have not

1   even alleged, much less proven, a violation of the FPASA,

2   defendants are entitled to summary judgment on count one insofar as

3   it is premised upon such violations of the FPASA.

4       ***B.  Regulations***

5       It is also possible to construe count one, however, as

6   alleging that the BOR violated several regulations.  The FAC

7   alleges that the RMA is a "cooperative agreement[;]" and as such is

8   governed by the regulations set forth in 41 C.F.R. Part 105.  FAC

9   (doc. 4) at 15, ¶ 60.  The FAC then selectively quotes identical

10  language from 41 C.F.R. § 105.71-136 and 43 C.F.R. § 12.76.  Those

11  sections outline "procurement standards" which "grantees and

12  subgrantees will follow" "[w]hen procuring property and services

13  under a *grant*[.]" 41 C.F.R. § 71.136(a) and (b) (emphasis added);

14  and 43 C.F.R. § 12.76(a) and (b) (emphasis added).  As the FAC

15  alleges, those regulations state, *inter alia*, that "[a]ll

16  procurement transactions will be conducted in a manner providing

17  full and open competition[.]" 41 C.F.R. § 105.71-136(c)(1); and 43

18  C.F.R. § 12.76(c)(1).  As the FAC further alleges, both regulations

19  also state that "[s]ome of the situations considered to be

20  restrictive of competition included . . . [p]lacing unreasonable

21  requirements on firms in order for them to qualify to do business

22  . . . and [a]ny arbitrary action in the procurement process." Id.

23  The thrust of count one seems to be that BOR acted arbitrarily,

24  capriciously and abused its discretion when it approved the

25  Proposed UMA in violation of these regulations.

26      This argument fails on several grounds.  First, the UMA is not

27  a grant or a cooperative agreement; hence those regulations do not

1   apply.  Cooperative agreements are, *inter alia*, "legal

2   instrument[s] reflecting a relationship between the United States

3   Government and . . . , a local government, . . . when . . . the

4   principal purpose of the relationship is to transfer a thing of

5   value to the . . . , local government, . . . to carry out a public

6   purpose[.]" 31 U.S.C. § 6305(1) (West 2003).  The applicable

7   regulatory definition of "grant" subsumes "cooperative agreements."

8   Grant "means an *award of financial assistance*, including

9   cooperative agreements, in the form of money, or property in lieu

10  of money, by the Federal Government to an eligible grantee."  43

11  C.F.R. § 12.43 (emphasis added).

12      It is patently obvious that the UMA is not a "cooperative

13  agreement" in that it is not a "legal instrument reflecting a

14  relationship between the United States Government and . . . a local

15  government[.]"  See 31 U.S.C. § 6305(1).  The UMA is between a

16  local government, the County, and Partners, a private entity.  Even

17  deeming the County to be the United States government for purposes

18  of the UMA, that agreement did not "transfer a thing of value to

19  [a] local government to carry out a public purpose."  See id. The

20  purpose of the UMA was, as previously explained, to grant a

21  concession to Partners, a non-federal entity, to develop, operate

22  and maintain a marina complex at LPRP.

23      Likewise, the UMA is not a "cooperative agreement" in that the

24  federal government was not awarded financial assistance under the

25  UMA.  Even proceeding under the theory that the County was acting

26  as BOR's agent for purposes of the UMA, that would not be

27  sufficient to transform the UMA into a cooperative agreement.  That

is because the concession agreement was not "an award of financial assistance" to Partners.  In fact, Partners incurred significant monetary obligations thereunder in that it had to provide financing for the marina complex, as well as a "capital construction guarantee[.]" Admin. Rec., Vol. 1 at 000170, ¶¶¶ 6(A) and (B).  In short, because the UMA is not a grant or a cooperative agreement, as a matter of law, plaintiffs cannot rely upon the regulations set forth in their FAC to sustain their first cause of action.

Attempting to bring the UMA within the scope of those regulations, the FAC alleges that the RMA is a cooperative agreement.[11]  FAC (doc. 4) at 15, ¶ 60.  Evidently plaintiffs are positing that if the RMA is a cooperative agreement governed by the regulations specified in the FAC, then because the RMA was the source for the UMA, those regulations govern the UMA too.  The fact remains, however, that count one is challenging BOR's actions only with respect to the UMA.  So, even if the RMA is a cooperative agreement, that is simply too remote a basis upon which to find that BOR had to comply with these regulations as to the UMA – which clearly is neither a grant nor a cooperative agreement.

### *C.  BOR Policies and D&Ss*

Having found that the FPASA and the regulations cited in count one are inapplicable, the remaining possible sources for imposing a legally enforceable duty upon BOR are the D&Ss and policies in

---

[11]    Wisely, plaintiffs did not allege, nor do they assert that the RMA is a grant.  The RMA could not be deemed a grant because it did not award "financial assistance" to the County.  The monies paid thereunder were in partial consideration for the County transferring land and facilities to BOR. Additionally, those monies were restricted in that they could "be utilized only in connection with recreational development of the LPRP wherein [BOR] has Federal land management responsibility."  FAC (doc. 4), exh. A thereto at 7, Art. 4(c)(6).

1   BOR's Manual.  Count one of the FAC quotes from three D&Ss and two

2   policies which BOR allegedly violated.  BOR argues that by their

3   terms, none of those items apply here.  Even if substantively

4   applicable, BOR contends that plaintiffs cannot rely upon those

5   D&Ss and policies because those items are mere "guidelines[.]"  BOR

6   Resp. (doc. 114) at 19:3(citations omitted).  They "do not have the

7   force and effect of law and cannot form the basis of a claim for

8   relief."  Id. at 19:3-4 (citations omitted).

9       Taking the opposite view, plaintiffs counter that the D&Ss and

10  policies in the FAC do apply here.  Further, given the "mandatory"

11  language of the Manual, plaintiffs contend that the cited D&Ss[12] are

12  binding on BOR.  See Pl. Reply (doc. 118) at 6:5.  In addition to

13  the Manual's language, plaintiffs refer to a BOR letter which they

14  construe as "confirm[ing] that BOR intended its D&Ss for concession

15  management by non-federal partners to be binding."  Id. at 9:9-10.

16      ***1.  Applicability?***

17      The court will first consider the applicability of the D&Ss

18  and policies as alleged in count one.  It will then go on to

19  consider whether those items have the full force and effect of law.

20      The first D&S to which count one refers is from a D&S the

21  "subject" of which is "Concessions Management by Non-Federal

22  Partners[.]"  See Admin. Rec., Vol. 1 at 000150.  Quoting a single

23  sentence from that 8 page D&S, the FAC states that BOR "'is

24  responsible for continuous management oversight of managing

25

26      ───────────────

        [12]      The FAC quotes from two BOR *policies* as well.  FAC (doc. 4) at 16, ¶¶

27  71 and 72.  Plaintiffs do not mention those policies in their Reply, however.
    Presumably plaintiffs' argument as to the supposedly binding nature of the D&Ss
    also applies to the policies.

1  partners and their concessions operations.'" FAC (doc. 4) at 16,

2  ¶ 68 (quoting exh. O thereto at 1, ¶ 1); see also Admin. Rec., Vol.

3  1 at 000150, ¶ 1.  This sentence does not mention procurement,

4  acquisition, or even the broader concept of fair competition, as

5  BOR emphasizes.  Therefore, the only portion of this D&S to which

6  the FAC refers does not, on the face of it, encompass any

7  obligations on the part of BOR with respect to the RFP process.

8       As plaintiffs note though, paragraph 5 of this D&S (which the

9  FAC does *not* mention) states that "[c]oncession development will

10 adhere to the concession principles listed in" BOR's "Policy"

11 governing "Concessions Management" policy.  Admin. Rec., Vol. 1 at

12 000152, ¶ 5.  Among those "principles" are two which the FAC quotes

13 verbatim.  The first principle is to "ensure fair competition in

14 the awarding of concessions contracts[.]" Id., Vol. 1 at 000134,

15 ¶ 3(E); see also FAC (doc. 4) at 16, ¶ 17 (internal quotation marks

16 and citation omitted).  The second is that "[c]oncessions will

17 comply with applicable Federal, State, and local laws." Id., Vol.1

18 at 000134, ¶ 3(G); see also FAC (doc. 4) at 16, ¶ 72 (internal

19 quotation marks and citation omitted).  Thus, from plaintiffs'

20 perspective the "management oversight" responsibilities in

21 paragraph one of D&S (LND 04-02) include compliance with the just

22 quoted policies.

23      Even assuming the validity of that argument, these

24 "principles" are included in the "Policy" section of BOR's Manual.

25 And, as will be seen, BOR's policies do not have the full force and

26 effect of law.  Consequently, plaintiffs cannot rely upon any

27 alleged violation of those principles to support a claim of

1   arbitrary and capricious conduct by BOR.

2       The FAC further alleges that in accordance with another D&S,

3   "all concession contracts issued by non-federal partners must use

4   language 'that complies with all applicable Federal laws, rules,

5   regulations, and Executive Orders.'"  Id. at 16, ¶ 69 (quoting exh.

6   O thereto at ¶ 6(B)); see also Admin. Rec., Vol. 1 at 000153,

7   ¶6(B).  Plaintiffs' reliance upon this D&S is misplaced because as

8   the court construes count one, they are not objecting to the

9   language of the "concession contract," i.e., the UMA.  Plaintiffs

10  are objecting to the language of the 2005 RFP.  Regardless, to the

11  extent the UMA can be read as alleging that the UMA violated this

12  particular D&S, it, too, does not have the full force and effect of

13  law, as will be explained momentarily.

14      The FAC next selectively quotes from another D&S which BOR

15  purportedly violated.  Plaintiffs sweepingly allege that the

16  "Manual . . . requires BOR to ensure 'fair competition' in the RFP

17  process."  Id. at 16, ¶ 70 (quoting exh. P thereto (BOR Manual –

18  LND 04-01) at ¶ 4(B)(1)); see also Admin. Rec., Vol. 1 at 000139,

19  ¶ 4(B)(1).  Plaintiffs' reliance upon this particular D&S is wholly

20  misplaced.  First of all, as BOR points out, this D&S is contained

21  in that part of the Manual governing "Concessions Management by

22  [BOR][.]" Admin. Rec., Vol. 1 at 000135  (footnote omitted)

23  (emphasis added).  The note to that title explicates that the D&Ss

24  listed therein "apply to concessions managed directly by [BOR]."

25  Id., Vol. 1 at 000135, n. 1 (emphasis added).  Continuing, that

26  note advises, "Separate directives and standards address

27  concessions managed by non-Federal partners."  Id.  There is no

1  dispute that the marina which is the subject of the UMA is not

2  "managed directly" by BOR.  Thus, on the face of it this D&S does

3  not apply here.

4      Even if this "fair competition" D&S had some application here,

5  the FAC takes that phrase completely out of context.  The "fair

6  competition" phrase is part of an "approach" which "will be applied

7  . . . [t]o allow for a wide distribution[]" of RFPs.  Id., Vol. 1

8  at 000139, ¶ 4(B).  That phrase comes from the following sentence:

9  "To ensure fair competition before and during the RFP process,

10  meetings to discuss the RFP with existing or potential

11  concessionaires or other outside parties must be conducted."  Id.

12  As can easily be seen, that D&S does not, as the FAC implies,

13  impose some broad, overarching requirement of fair competition on

14  the RFP process.  Moreover, plaintiffs cannot rely upon this D&S to

15  impose a legal duty upon BOR because as with the other D&Ss, it

16  does not have the force and effect of law.

17          **_2.  "Full Force and Effect of Law"_**

18      While "an agency can create a duty to the public which no

19  statute has expressly created, . . . not all agency policy

20  pronouncements which find their way to the public can be considered

21  regulations enforceable in federal court."  Multnomah Legal Service

22  Workers Union v. Legal Services Corp., 936 F.2d 1547, 1554 (9th Cir.

23  1991) (internal quotation marks and citations omitted).  "To have

24  the full force and effect of law . . . , the internal documents

25  must prescribe substantive rules - _not_ interpretive rules, general

26  statements of policy or rules of agency organization, procedure or

27  practice[.]"  Id. (internal quotation marks and citations omitted)

1  (emphasis in original).

2      In the Ninth Circuit, "[t]wo factors determine whether a rule
3  is interpretive or substantive."  _Id._  First of all, a rule is
4  "substantive . . . with binding effect[] if it "modifies or effects
5  a change in existing rights, law or policy[.]" _Id._ (internal
6  quotation marks and citation omitted).  "If, however, the rule is
7  only indicative of the agency's interpretation of existing law or
8  policy, it is interpretive."  _Id._ (internal quotation marks and
9  citations omitted).

10      Second, "if the rule is promulgated pursuant to statutory
11  discretion or under statutory authority, it is a substantive rule."
12  _Id._ (internal quotation marks and citation omitted).  But where
13  "the agency does not exercise delegated legislative power to
14  promulgate the rule, it is interpretive."  _Id._ (internal quotation
15  marks and citation omitted).  As the Ninth Circuit has explained,
16  "[t]o satisfy this requirement, [an agency's] policy must have been
17  promulgated pursuant to a specific statutory grant of authority, so
18  that a policy that was neither published in the Federal Register
19  nor disseminated to the public for scrutiny and comment will not
20  have the force and effect of law."  _Id._ (internal quotation marks
21  and citations omitted); _see_ _also_ _Novell_, _supra_, 46 Fed. Cl. at 615
22  (internal quotation marks and citation omitted) (emphasis added by
23  _Novell_ Court) ("[T]o be entitled to force and effect of law, a
24  binding agency regulation must, _at the very least_, be promulgated
25  by an agency with the intention that it establishes a binding rule.
26  Promulgation requires some act of publication, i.e., dissemination
27  to the public.")  BOR and plaintiffs agree that the two factors

1  described above provide the framework for the court's analysis, but

2  they disagree as to the results of that analysis.

3      Significantly, nothing on the face of the D&Ss or policies

4  states or even suggests that they are modifying or effecting a

5  change in any existing rights, law or policy.  What is more,

6  plaintiffs are not making that argument.  Instead, plaintiffs place

7  undue emphasis on what they deem to be the "mandatory" language

8  contained in those D&Ss', policies, and elsewhere.  For example,

9  plaintiffs point to language stating that "concession contract[s]

10  . . . must meet the requirements of these Concessions Management

11  D&Ss[;]" and "non-Federal concession contract[s] . . . must be

12  approved by [BOR]."  Pl. Reply (doc. 118) at 8:2-4 (quoting exh. O

13  to FAC at 2, ¶4(A)(1) and (2)); see also Admin. Rec., Vol. 1 at

14  000151, ¶¶ 4(A)(1) and (2).  This language does not suffice,

15  however, to render these D&S' substantive rules with binding

16  effect, absent a showing that they modified or effected a change in

17  existing rights, law or policy.  Hence, the court finds that the

18  D&Ss and policies which form the basis for count one lack the first

19  essential element of a substantive rule.

20      Further undermining plaintiffs' argument that these D&Ss and

21  policies are substantive, and not interpretative, are statements

22  found on BOR's website.[13]  As plaintiffs undoubtedly would stress,

23

24      [13]    Plaintiffs place a great deal of credence in BOR's website when
  addressing the promulgation issue, but they did not request that the court take
25  judicial notice of that website.  In the exercise of its discretion, however, as
  Fed. R. Evid. 201(c) allows, the court will take judicial notice of BOR's website
26  at http://www.usbr.gov/recman/.  See In re Charles Schwab Corp. Sec. Litig., 2009
  WL 262456, at *23 n. 18 (N.D.Cal. Feb. 4, 2009) (even though "neither side offered
27  the FASB [Financial Accounting Standards Board] concepts at issue for judicial
  notice," the court took judicial notice of those concepts because they are
  "publicly available from the FASB's website[]").

that website explicitly states that "[a]ll requirements in the [BOR] Manual are mandatory." http://www.usbr.gov/recam/ at 1. The court cannot ignore the larger context in which that statement appears though. BOR's website explains that its "Manual consists of a series of Policy and [D&Ss]." Id. "Collectively," those items "assign program responsibility and establish and document [BOR]-wide methods of doing business." Id. The policies, as distinguished from the D&Ss, "reflect the [BOR] Commissioner's *leadership philosophy* and principles and *defines the general framework* in which [*BOR*] *pursues its mission*." Id. (emphasis added). In a similar vein, the policies which the FAC quotes are included in a list of "Concessions Principles[.]" See Admin. Rec., Vol. 1 at 000133 at ¶ 3. The express purpose of those principles is to "*guide* the planning, development, and management of concessions[.]" Id. (emphasis added).

Balancing the polices are the D&Ss, which "provide the level of detail necessary to ensure consistent application of Policy [BOR]-wide[,]" while at the same time are "structured to provide flexibility to local offices[.]" http://www.usbr.gov/recam/ at 1-2. In further explaining the significance of the policies and D&Ss, BOR's website indicates that those items "fall into two series[.]" Id. at 2. "Those in the Program series," such as the Land Management and Development D&Ss and policies in count one, "primarily direct and define [BOR]'s processes for the operation, maintenance, and use of its projects and facilities." Id.

As the foregoing amply demonstrates, the D&Ss and policies which BOR allegedly violated are not substantive rules. They are

1  pronouncements of BOR's policies and practices regarding

2  concessions management.  Overall, the D&Ss and policies place a

3  heavy emphasis on the internal workings of the BOR as is evidenced

4  by the fact that those items "establish and document [*BOR*]-*wide*

5  methods of doing business."  Id. at 1 (emphasis added).  Likewise,

6  those "program" policies and D&Ss "primarily direct and define

7  [*BOR*'s] *processes*[.]"  Id. at 2 (emphasis added).  Hence, the court

8  has little difficulty finding that the D&Ss and policies in count

9  one constitute "statements of policy or rules of agency

10 organization, procedure or practice[.]"  See  Multnomah Legal

11 Service Workers, 936 F.2d at 1554 (internal quotation marks and

12 citations omitted).  They do not "purport[] to prescribe

13 'legislative-type' rules enforceable in federal court against the

14 [BOR]."  See Rank v. Nimmo, 677 F.2d 692, 698 (9th Cir. 1982).

15      Turning to the promulgation issue, BOR acknowledges that its

16 Manual is "made available to the public, principally through [its]

17 website[.]" BOR Resp. (doc. 114) at 22:24.  Despite that

18 availability, because the Manual "is developed and promulgated

19 entirely through an internal agency process, and is not made

20 available for public review and comment through formal rulemaking

21 or any other public process[,]" BOR contends that the D&Ss and

22 policies therein are not binding, enforceable agency rules.  Id. at

23 22:24-27.

24      Plaintiffs challenge that assertion because "it *appears* that

25 BOR publishes, and accepts public comment about[] draft [D&Ss]

26 prior to adoption" on its website.  Pl. Reply (doc. 118) at 9

27 (footnote omitted) (emphasis added).  This acceptance of public

1   comments, from plaintiffs' standpoint, "indicates that the [D&Ss]

2   are binding, not merely policy." Id. at 10:1-2.  In its reply, BOR

3   adheres to the view that its Manual is the result of an "internal

4   agency process and not subject to public comment."  BOR Reply (doc.

5   134) at 11:27-28.  As such, BOR explains that its Manual is not

6   governed by the formal notice and comment procedures of section 553

7   of the APA.[14]  Therefore, BOR reasons that plaintiffs cannot

8   maintain a cause of action against it for alleged violations of the

9   D&Ss and policies in BOR's Manual.

10       The court is fully cognizant that BOR's website invites

11  "stakeholders to submit comments" regarding "*DRAFT* Polic[ie]s or

12  [D&Ss]" by us[ing] the links below."  http://www.usbr.gov/recam/ at

13  1 (emphasis in original).  That website explains that BOR "will

14  review and consider the comments received during the revision

15  process[.]" Id.  BOR unequivocally advises that it "will not

16  provide responses to submitted comments[,] however." Id.  The

17  purpose of this dissemination is thus very different from

18  dissemination allowing for "public scrutiny and comment" under the

19  APA's formal rule making procedures.  As the Ninth Circuit so

20  aptly put it in Rank, "[N]ot all agency policy pronouncements which

21  find their way to the public can be considered regulations

22  enforceable in federal court." Rank, 677 F.2d at 698 (citation

23  omitted).  Especially because plaintiffs have not shown that any of

24  BOR's policies or D&Ss upon which they are relying were published

25  in the Federal Register - a  critical aspect of promulgation, and a

26  _____

27      [14]    That section exempts from the APA formal notice-and-comment procedure,
    "interpretative rules, general statements of policy, or rules of agency
    organization, procurement, or practice[.]" 5 U.S.C. § 553(A) (West 2007).

1    hallmark of a substantive rule – those items do not have the full

2    force and effect of law.

3         In a final effort to prove that the policies and D&Ss in BOR's

4    Manual are binding, plaintiffs resort to a 1998 letter from BOR to

5    the County.  The import of that letter, plaintiffs believe, is that

6    it "confirms" that BOR intended its concession management D&Ss to

7    be binding.  Pl. Reply (doc. 118) at 9:9.  Hence, the court should

8    give those D&Ss the full force and effect of law.  In that letter,

9    BOR approves the County's issuance of a RFP for a marina complex at

10   LPRP, "which is to be issued on April 20, 1998[.]"  PSOF (doc.89),

11   exh. 6 thereto at 1.  More specifically, plaintiffs are relying

12   upon the penultimate paragraph in that letter, stating that "It is

13   important that the [County] adhere to" the enclosed D&Ss "during

14   the RFP and selection process for the marina concessionaire."  Id.

15   Even if admissible,[15] this reminder by BOR, approximately seven

16   years before the events complained of in count one, does not

17   establish its D&Ss and policies have the full force and effect of

18   law.

19        In sum, even if plaintiffs were successful on their argument

20   that BOR violated its Manual by not ensuring the County's

21   compliance therewith, and by approving the UMA, because they have

22   not shown that that Manual has the full force and effect of law,

23   violations of the Manual's terms are not enough to prove that the

24   UMA is invalid.  See Frazier v. United States, 79 Fed. Cl. 148, 164

25

26        [15]   This letter pertains to the 1998 RFP, which is not the subject of count
     one.  It is thus irrelevant and so inadmissible under Fed. R. Evid. 402.  And
     because the court "may only consider admissible evidence on a motion for summary
27   judgment[,]" it cannot consider this letter.  See Ballen v. City of Redmond, 466
     F.3d 736, 745 (9th Cir. 2006) (citation omitted).

1  (2007)(emphasis added) (and cases cited therein), aff'd without
2  published opinion, 301 Fed.Appx. 974 (Fed. Cir. 2998) ("Even if the
3  court had been convinced that something in the bonus points
4  provision of the prospectus violated the 'fair competition'
5  pronouncement in [BOR's] manual, plaintiffs have not alleged, and
6  have certainly not proved, that the manual carries the force of
7  law.); see also Infrastructure Defense Technologies, LLC v. United
8  States, 81 Fed.Cl. 375, 397 (2008) (citations omitted) (defense
9  contractor in pre-award bid challenge could not rely upon
10 Department of Defense Directive because it did "not establish[]
11 that the Directive has the effect of a statute or regulation such
12 that acting inconsistently with its provisions would constitute
13 grounds to set aside or enjoin th[at] solicitation[]").  Put
14 differently, even if shown, a violation of BOR's policies and D&Ss
15 "would not constitute arbitrary and capricious agency action" by
16 BOR because those policies and D&Ss lack the force and effect of
17 law.  See Labat-Anderson, Inc. v. United States, 42 Fed. Cl. 806,
18 840 (1999) (citation omitted).

19      The fundamental weakness with count one is that plaintiffs
20 have not shown, and indeed for the reasons set forth above, could
21 not show a statutory, regulatory or policy which BOR violated by
22 approving the UMA.  Absent such a violation, plaintiffs cannot show
23 that the BOR acted arbitrarily, capriciously, or abused its
24 discretion in approving the UMA.  Thus, for the reasons set forth
25 above, the court finds that BOR and Partners are entitled to
26 summary judgment as to count one.  Conversely, the court must deny
27 plaintiffs' motion for summary judgment as to that count.

1  *IV.   Motions to Strike and Supplement Administrative Record*

2       With one exception,[16] resolution of the parties' summary

3  judgment motions did not require the court to resort to any

4  documents beyond the Administrative Record.   Therefore, the court

5  DENIES as moot the motions to strike (docs. 106; 107 and 124), as

6  well as plaintiffs' motion to supplement the administrative record

7  (doc. 87).

8                          ***Conclusion***

9       For the reasons set forth above, the court hereby ORDERS that:

10            (1) "Plaintiff's Motion to Supplement Administrative
              Record" (doc. 87) is DENIED as moot;

11
12            (2) Plaintiffs "Motion for Summary Judgment" (doc. 88)
              is DENIED;

13            (3) "Federal Defendants' Motion to Strike Extra Record
              Declarations" (doc. 106) is DENIED as moot;

14
15            (4) "Marina Partners' Motion to Strike Plaintiffs' Motion
              for Summary Judgment, Separate Statement of Facts, and
              Its Attached Exhibits" (doc. 107) is DENIED as moot;

16
17            (5) "Marina Partners' Counter Motion for Summary
              Judgment" (doc. 110) is GRANTED;

18            (6) "Federal Defendants' Cross-Motion for Summary
              Judgment on Count One of the First Amended Complaint"
19            (doc. 114) is GRANTED; and

20            (7) "Plaintiffs' Motion to Strike Exhibits 1 and 3" (doc.
              124) is DENIED as moot.

21

22       IT IS FURTHER ORDERED that a Joint Proposed Pretrial Order

23  shall be lodged by April 20, 2009.

24       IT IS FURTHER ORDERED setting a Pretrial Conference on May 11,

25

26  _____

       [16]

27       The court did refer to one document not in the Administrative Record - the
    1998 letter from BOR to the County.  However, because it was irrelevant, that letter
    did not impact the court's analysis.

1   2009 at 10:30 a.m., in Courtroom 606, Sixth Floor, Sandra Day

2   O'Connor United States Courthouse, 401 West Washington Street,

3   Phoenix, Arizona.  A trial date and any other necessary deadlines

4   will be set at the Pretrial Conference.

5          DATED this 20th day of March, 2009.

6

7

8   _____

    Robert C. Broomfield

9   Senior United States District Judge

10

11

12

13

14

15  Copies to counsel of record

16

17

18

19

20

21

22

23

24

25

26

27