1    **WO**

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF ARIZONA

9

10

11

12   Protect Lake Pleasant, LLC,        )
     an Arizona limited liability        )
13   company; David Maule-Ffinch;        )    No. CIV 07-0454-PHX-RCB
     Michael Viscuis; and Pensus         )
14   Group, L.L.C., an Arizona           )
     limited liability company,          )
15                                        )
                 Plaintiffs              )
16                                        )
                 vs.                     )              O R D E R
17                                        )
     Michael Connor,[1] in his           )
18   official capacity as                )
     Commissioner, United States         )
19   Bureau of Reclamation;              )
     United States Bureau of             )
20   Reclamation; an agency of           )
     the United States Department        )
21   of Interior, and Ken Salazar,       )
     in his official capacity as         )
22   Secretary, United States            )
     Department of Interior,             )
23                                        )
                 Defendants              )
24                                        )
            and                          )
25                                        )

26   _____

27        [1]      In accordance with Fed. R. Civ. P. 25(d), which allows for substitution
     when, among other reasons, "a public officer who is a party in an official capacity
     . . . ceases to hold office while the action is pending[,]" the court hereby
28   substitutes Michael Connor, Commissioner of the Bureau of Reclamation
     ("Reclamation"), for former Acting BOR Commissioner, Robert W. Johnson.

```
 1  Lake Pleasant Marina Partners,)
    LLC, an Arizona limited    )
 2  liability company,          )
                                )
 3                              )
            Defendant-Intervenor)
 4  _____)
```

Plaintiff David Maule-Ffinch is the owner of Pensus Group, LLC, also a plaintiff herein. Pensus Group is the developer and operator of the Pleasant Harbor Marina located on the eastern shore of Lake Pleasant in Maricopa County ("the County"), Arizona. As thoroughly discussed in Protect Lake Pleasant, LLC v. McDonald, 609 F.Supp.2d 895 (D.Ariz. 2009) ("Protect Lake Pleasant V"), Pensus Group was precluded from bidding on a 2005 Request for Proposal for the development and operation of Scorpion Bay Marina, to be located on the western shore of Lake Pleasant. Eventually, Lake Pleasant Marina Partners, LLC ("LPMP"), the defendant-intervenor, was awarded that contract, and the Scorpion Bay Marina & Yacht Club is now operating.

On February 8, 2007, the Arizona Corporation Commission approved the formation of Protect Lake Pleasant LLC, also a plaintiff herein. See http://starpas.azcc.gov/scripts/ cgiip.exe/WService=wsbroker1/names-detail.p?name-id=L1. That non-profit limited liability company was "formed[,]" among other reasons, to protect the natural environment, wildlife and resources at Lake Pleasant and Lake Pleasant Regional Park [("LPRP")][.]" First Amended Complaint ("FAC") (Doc. 4) at 3, ¶ 4:2-3. Plaintiff Michael Viscusi is a "participating member of Protect Lake Pleasant[.]" Id. at 4, ¶ 7:18. Several weeks after the formation of the LLC, on February 27, 2007, plaintiffs commenced this

lawsuit.

The FAC alleges several violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347, and a violation of the Clean Air Act ("CAA"), 42 U.S.C. 42 U.S.C. §§ 7401-7671q,[2] by defendant, the United States Bureau of Reclamation ("Reclamation"[3]).  Basically, plaintiffs allege that Reclamation violated NEPA by issuing a Final Environmental Assessment and Finding of No Significant Impact ("FONSI") with respect to the Scorpion Bay project.  Plaintiffs further allege that Reclamation violated NEPA by not preparing an Environmental Impact Statement ("EIS") for that project.  Alternatively, if the court determines that an EIS was not required, plaintiffs allege that Reclamation violated NEPA by failing to perform an adequate environmental assessment ("EA").  Plaintiffs' final NEPA claim is based upon Reclamation's supposed failure to provide meaningful opportunity for public comment of the Final EA.

Currently pending before the court are motions for summary judgment by plaintiffs (Doc. 150), and cross-motions for summary judgment by Reclamation (Doc. 154) and LPMP's (Doc. 157).  Three motions to strike also are pending before the court (Docs. 152; 168; and 169).  Reclamation is seeking to strike from plaintiffs' statement of facts ("PSOF") an internal Maricopa County Air Quality Department ("MCAQ") e-mail.  Plaintiffs are seeking to strike

---

[2]     Previously, the court granted summary judgment in favor of Reclamation and LPMP as to count one of the FAC, alleging violations of the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 100-126.  See Protect Lake Pleasant V, 609 F.Supp.2d 895.

[3]     Hereinafter Reclamation shall be read as including the individual defendants as well, Messrs. Connor and Salazar.  However, when citing to Reclamation's memoranda, the court will use the abbreviation "BOR."

1  exhibit A to Reclamation's Reply – an untitled document which

2  Reclamation describes as "Calculation of $PM_{10}$[4] and Ozone Emissions

3  Using Plaintiffs' Mileage Estimates[]" ("the Emissions Chart")

4  (footnote added). <u>See</u> BOR's Reply (Doc. 164) at 16:20.  If granted,

5  these two motions to strike could expand the scope of the record.

6  Therefore, the court will address these motions at the outset.[5]

7  . . .

---

23  [4]    "PM" refers to "'particulate matter,' that is, the particles found in
the air, such as dust, dirt, soot, smoke, and liquid droplets." <u>Latino Issues</u>

24  <u>Forum v. EPA</u>, 558 F.3d 936, 938-39 (9th Cir. 2009). "Particles with a diameter less
than or equal to ten micrometers are known as PM-10." <u>Id.</u> at 939 (citing 40 C.F.R.

25  § 50.6(c)).

26  [5]    Only the plaintiffs are requesting oral argument.  Given the court's
intimate familiarity with this action, in its discretion, the court denies

27  plaintiffs' request as oral argument will not aid the decisional process. <u>See</u>
Fed.R.Civ.P. 78; <u>Lake at Las Vegas Investors Group, Inc. v. Pac. Dev. Malibu Corp.</u>,
933 F.2d 724, 729 (9th Cir. 1991); <u>Partridge v. Reich</u>, 141 F.3d 920, 926 (9th Cir.

28  1998).

### *Discussion*[6]

## I.  *Motions to Strike*[7]

The primary basis for all three motions to strike is that the

parties are impermissibly seeking to expand the scope of the

administrative record herein.  Twice already this court has

---

[6]  Roughly coinciding with the filing of plaintiffs' summary judgment motion, Scorpion Bay Marina began operating.  Despite that, wisely neither Reclamation nor LPMP argue that this action is moot, and hence this court lacks jurisdiction.  See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 871-872 (9th Cir. 2005) (proper remedy for Corps of Engineers' failure to prepare an EIS before issuing a permit to allow construction of an extension to an oil refinery dock was to require preparation of an EIS, even though the dock extension had been completed); West v. Sec'y of the Dep't of Transp., 206 F.3d 920, 925 (9th Cir. 2000) (NEPA action not moot although Stage I of a highway interchange project was complete because court's "remedial powers would include remanding for additional environmental review and, conceivably, ordering the interchange closed or taken down[]"); and Feldman v. Bomar, 518 F.3d 637, 642 (9th Cir. 2008) (citations and internal quotation marks omitted) (cataloging Ninth Circuit decisions finding "live controversies in environmental cases even after the contested . . . projects were complete[]" because the "violation complained of may have caused continuing harm and . . . the court can still act to remedy such harm by limiting its future adverse effects[]").

However, LPMP alone argues that plaintiffs' request for injunctive relief is moot. (Plaintiffs also are seeking (1) a declaration that the FONSI was issued in violation of NEPA; and (2) a remand . . . to [Reclamation] with instructions to prepare an EIS regarding the proposed marina[.]" Pls'. Mot. Summ.  J. (Doc. 150) at 25:19-20; and 22-23 (citations omitted))). LPMP posits that plaintiffs' "request for 'an injunction barring the continued operation of, or, at a minimum, any further consideration at, the proposed marina' is not cognizable because the injunctive relief was rendered moot by [Reclamation's] approval of the FONSI." LPMP's Cross-mot. (Doc. 157) at 24:11-13. Assuming *arguendo* that LPMP is correct, and in part because there are no challenges to the other forms of relief which plaintiffs are seeking, the court will first address the merits.  If plaintiffs' ultimately prevail on any or all of their three remaining claims, obviously then the court  will address the nature and scope of available remedies.  For now though, the court will concentrate on the merits of plaintiffs' claims.

[7]  Local Rule of Civil Procedure 7.2(m)(2) is clear: "An objection to the admission of evidence offered in support of or opposition to a motion **must** be presented in the objecting party's response or reply memorandum (or, if the underlying motion is a motion for summary judgment, in the party's response to another party's separate statement of material facts) and **not** in a separate motion to strike or other separate filing.  LRCiv 7.2(m)(2) (emphasis added).  In direct contravention of that Rule, LPMP and Reclamation filed separate motions to strike. Also in direct contravention of that Rule, the parties filed separate responses to the various motions to strike.  (Admittedly, LPMP did partially comply with that Local Rule by setting forth its position as to Reclamation's motion to strike exhibit one in its response to plaintiffs' summary judgment motion.)  Further, although LRCiv 7.2(m)(2) makes no provision for replies in connection with a motion to strike, the parties also filed replies. By failing to fully comply with the Local Rules of this court, the parties have unnecessarily multiplied the filings in this action.

"enumerated the limited circumstances . . . where it is proper to consider extra-record material when reviewing an agency decision under the APA [Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*].” <u>Protect Lake Pleasant v. Johnson</u>, 2:07-cv-00454-RCB (Doc. 97) at 6:17-19 (“<u>Lake Pleasant IV</u>”).  Rather than repeating those exceptions and the case law construing them, the court incorporates by reference the relevant portions of its prior decisions, <u>see</u> <u>id.</u>; and <u>Protect Lake Pleasant v. Johnson</u>, 2007 WL 1486869, at *4 (D.Ariz. May 21, 2007) (“<u>Lake Pleasant I</u>”), <u>aff'd</u> <u>without</u> <u>pub'd</u> <u>opinion</u>, 252 Fed. Appx. 856 (9th Cir. 2007) (“<u>Lake Pleasant III</u>”), and continues to be guided by those principles in addressing these motions to strike.

### *A. MCAQ e-mail*

Exhibit one to PSOF is a January 24, 2007, MCAQ e-mail pertaining to carbon monoxide (“CO”) emissions from Matthew Poppen, a MCAQ Planner.  In that capacity, Mr. Poppen ran models for “calculat[ing] . . . CO emissions generated by the proposed marina to assist [Reclamation] in preparing the [EA] at issue”[8] herein. Pls.' Resp. (Doc. 159) at 1:12-15 (citations omitted).  In that e-mail, Mr. Poppen listed the reasons why he “ran into nothing but dead ends when looking through the CO redesignation request for information on pleasure craft[.]” <u>Id.</u>  Opining that the “[S]corpion [B]ay [M]arina is dead in the water, up a creek, etc.,” Poppen concluded, “[s]ince we have already exceeded projected emission values for 2006 and 2015, [he] [did not] know where else to go[.]” <u>Id.</u>

---

[8]    Hereinafter that 2007 EA will be referred to as the “Final EA.”

1    Reclamation is moving to strike this e-mail (exhibit one) from
2  PSOF, and LPMP joins in that motion.  See LPMP's Cross-mot. (Doc.
3  157) at 15, n. 6.   This motion to strike is one of several aspects
4  of the pending motions with which the court has more than passing
5  familiarity.

6    During the preliminary injunction hearing, plaintiffs sought
7  to introduce this same e-mail into evidence.  Plaintiffs offer
8  the same rationale as they did then.  Primarily because that e-mail
9  is not part of the administrative record, Reclamation contends that
10 the court must strike it from PSOF.  Reclamation further asserts
11 that the court should not consider this e-mail because it is an
12 internal MCAQ e-mail which was not provided to Reclamation until
13 after the fact.  Lastly, Reclamation notes that this e-mail "is a
14 pre-decisional document."  BOR's Mot. Strike (Doc. 152) at 4:21.
15 Sustaining Reclamation's objection as "well[-]taken[,]" this court
16 refused to consider the January 24, 2007, MCAQ e-mail in connection
17 with plaintiffs' preliminary injunction motion.  Id., exh. A
18 thereto (Doc. 152-2) at 6.

19    Despite the foregoing, plaintiffs counter that the court now
20 should consider this e-mail as "background information that
21 explains and gives context to the prior and subsequent e[-]mails
22 and other communications" in the administrative record pertaining
23 to "Poppen's calculation of emissions for the proposed marina which
24 are also part of the [administrative record]."  Pls.' Resp. (Doc.
25 159) at 3 (citations omitted).  Additionally, given Mr. Poppen's
26 acknowledgment in that e-mail that the County "ha[s] already
27 exceeded projected emission values for 2006 and 2015," plaintiffs
28 suggest that "the subsequent adjustments to the data at the behest

of [LPMP] were not done in good faith, but instead to reach a
predetermined result." Id. (citation omitted).

Plaintiffs also deem significant the timing of this e-mail.
From plaintiffs' standpoint, the fact that this e-mail was created
*after* the November 17, 2006, deadline for public comment on the
Revised Draft EA "reinforce[s] [its] argument that [Reclamation]
violated the public disclosure requirements of [NEPA]." Id. at
3:25 – 4:1 (citation omitted). These reasons, according to
plaintiffs, provide more than a sufficient basis for denying
Reclamation's motion to strike exhibit one (the January 24, 2007
MCAQ e-mail) from PSOF.

Generally in reviewing agency determinations, judicial review
is limited to the administrative record. The Ninth Circuit has
identified four exceptions allowing consideration of extra-record
materials, however:

> (1) if necessary to determine whether the agency has
> considered all relevant factors and has explained its
> decision,
>
> (2) when the agency has relied on documents not in
>  the record,[ ]
>
> (3) when supplementing the record is necessary to
> explain technical terms or complex subject matter,
> [or] . . .
>
> (4) when plaintiffs make a showing of agency bad faith.

Biological Diversity v. U.S. Fish, Wildlife, 450 F.3d 930, 943 (9th
Cir. 2006) (citation omitted). Reclamation responds to plaintiffs'
effort to expand the administrative record by noting that
"background information" is not one of those four delineated
exceptions.

Reclamation's position is well-taken. Plaintiffs have not

shown, as they must, that this particular e-mail comes within the ambit of any of the four exceptions to the general rule that "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" See id. (quoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)) (other citation omitted).

Further, the authority to which plaintiffs cite does not support a "background" exception to the rule disfavoring supplementation of the administrative record. In Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754 (9th Cir. 1996), an environmental action, the Ninth Circuit did hold that the district court properly considered an extra-record declaration on a summary judgment motion. That declaration was not allowed as "background information" per se, but to explain a "highly technical matter" as to how the Forest Service's "'habitat viability analyses' [we]re insufficient." Id. at 760. Mr. Poppen's January 24, 2007, e-mail, does mention some CO numbers, but it does not contain or explain "highly technical matter[s]" such as the analyses at issue in Inland Empire.

Plaintiffs' citation to Thompson v. U.S. Dept. Of Labor, 885 F.2d 551 (9th Cir. 1989), is equally inapposite. There, the disputed evidence fell within the second exception - agency reliance upon a document. More particularly, the Court found that certain correspondence was part of "the whole administrative record" because it was "considered by the [agency], either directly or indirectly, . . . and consequently [was] properly part of the administrative record." Id. at 555-56. Plainly the January 24,

2007 e-mail was not considered either directly or indirectly by Reclamation as part of the administrative process. Reclamation did not even become aware of this e-mail until well after the fact. Thus, the court disagrees with plaintiffs that <u>Thompson</u> supports the view that this court should consider that e-mail even though it was not part of the "whole administrative record" herein.

Plaintiffs do imply bad faith on Reclamation's part, as mentioned earlier, and bad faith is one of the bases for considering extra-record materials. As Reclamation soundly reasons, however, the subject e-mail cannot support a finding of bad faith by Reclamation because its decision-makers never received that e-mail. Hence, as Reclamation also soundly reasons, it would be practically impossible for plaintiffs to establish any casual connection between that e-mail and any purported bad faith by Reclamation. Merely incanting the phrase "bad faith," as plaintiffs do, is not tantamount to a "strong showing of bad faith or improper behavior," discussed in <u>Lake Pleasant IV</u>, so as to justify consideration of extra-record materials. <u>See</u> <u>id.</u> (Doc. 97) at 13-20. Finally, given the timing of this e-mail – *after* the November 17, 2006, deadline for public comment on the Revised Draft EA – it strikes the court that perhaps plaintiffs are improperly attempting to "use post-decision information as a new rationalization . . . for . . . attacking [BOR's] decision." <u>See</u> <u>Biological Diversity</u>, 450 F.3d at 943 (internal quotation marks and citation omitted).

Although the parties' respective arguments are more fully developed than they were at the preliminary injunction hearing, that does not change the result. The court abides by its prior

ruling, and for the reasons outlined above, in deciding these cross-motions for summary judgment, it will not consider the January 24, 2007 MCAQ e-mail. Accordingly, the court grants Reclamation's "Motion to Strike Exhibit One from Plaintiffs' Motion for Summary Judgment" (Doc. 152).

### B. Emissions Chart

Correspondingly, plaintiffs filed a motion to strike an exhibit which Reclamation is proffering – an untitled three page document Reclamation describes as "Calculation of $PM_{10}$ and Ozone Emissions Using Plaintiffs' Mileage Estimates[]" ("the Emissions Chart"). See BOR's Reply (Doc. 164) at 16:20. That Emissions Chart is attached to Reclamation's Reply, as opposed to a supporting affidavit.

On its face, there is no indication on that Emissions Chart as to the purpose for which it was prepared; the sources for most of the data thereon; who prepared it and when. These omissions are all problematic, as is the timing of its offering. Reclamation produced this Emission Chart for the first time as an attachment to its Reply on these summary judgment motions.

Despite these obvious shortcomings, Reclamation is relying upon this Chart to counter plaintiffs' argument that the Final EA understates the $PM_{10}$ and Ozone emissions. That Chart is based upon plaintiffs' mileage estimates which Reclamation acknowledges are not part of the administrative record. See BOR's Resp. (Doc. 171) at 1:24-25. Nonetheless, Reclamation urges this court in its discretion to consider that Chart to illustrate that "[e]ven assuming, as plaintiffs wish, that a 10 mile trip is insufficient to realistically project $PM_{10}$ and ozone emissions, a recalculation of

these emissions using plaintiffs ['] proposed mileage figures would not result in emissions in excess of the de minimus levels." BOR's Reply (Doc. 164) at 16:17-20 (citation omitted).

Plaintiffs offer a host of reasons as to why the court should strike that Chart from Reclamation's Reply. There are several possible reasons for striking that Chart, but the most fundamental is lack of authentication.

In ruling on a motion for summary judgment, a trial court "may only consider admissible evidence[.]" <u>Ballen v. City of Redmond</u>, 466 F.3d 736, 745 (9th Cir. 2006) (citation omitted). It is the contents of the evidence which must be admissible; at the summary judgment stage the "focus [is not] on the admissibility of the evidence's form." <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003) (citations omitted). Here, the issue is whether the contents of the Emissions Chart are admissible. <u>See</u> <u>id.</u> at 1036 ("It would be sufficient if the contents of the diary are admissible at trial, even if the diary itself may be inadmissible.")

As the Ninth Circuit has explained, "[a]uthentication is a 'condition precedent to admissibility, and this condition is satisfied by 'evidence sufficient to support a finding that the matter is what its proponent claims.'" <u>Orr v. Bank of America</u>, 285 F.3d 764, 773 (9th Cir. 2002) (quoting Fed. R. Evid. 901(a)) (footnotes omitted). "[U]nauthenticated documents cannot be considered in a motion for summary judgment[,]" as this Circuit has "repeatedly held[.]" <u>Id.</u> (citing cases).

Here, the Emissions Chart is not attached to an affidavit which meets the requirements of Fed. R. Civ. P. 56(e). Therefore, it must be authenticated in "any manner permitted by Federal Rule

of Evidence 901(b) or 902."  See id. at 774 (citations omitted).
This Chart does not come within the ambit of any of the ten
illustrative ways in which evidence can be authenticated or
identified pursuant to Rule 901(b).  Rule 901(b) permits other
means of authentication,[9] but Reclamation does not suggest any
other means.

Likewise, Reclamation did not attempt to show (and indeed it
could not) that the Chart was self-authenticating pursuant to
Fed.R.Evid. 902, such that no extrinsic foundation is required.  In
fact, as with several other of plaintiffs' proffered reasons for
striking this Chart, Reclamation did not dispute this lack of
authentication ground.  Because a proper foundation has not been
laid to authenticate this Chart, the court grants "Plaintiffs'
Motion to Strike Exhibit A to Federal Defendants' Reply" (Doc.
168).  Consistent with that ruling, the court will strike the
reference to that Chart in Reclamation's Reply.

### C.  Pretasky Affidavit & Ninth Circuit Transcript

Plaintiffs direct their second motion to strike (Doc. 169) to
two "extra-record" documents upon which LPMP relies.  The first is
an affidavit from Michael Pretasky, LPMP's Chief Executive Officer
and a partner in that entity.  The second is the transcript from
oral argument before the Ninth Circuit appealing this court's
denial of plaintiffs' motion for a preliminary injunction ("the
transcript").  LPMP is offering those two documents strictly with
respect to remedies, and the availability of permanent injunctive

---

[9]    That Rule makes clear that the "examples of authentication or
identification" enumerated therein are "[b]y way of illustration only, and not by
way of limitation[.]" Fed.R.Evid. 901(b).

relief in particular.

Plaintiffs are seeking a permanent injunction.  Accordingly, they must show "actual success" on the merits.  See <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. ___, ___, 129 S.Ct. 365, 381, 172 L.Ed.2d 249, ___ (2008) (citation and internal quotation marks omitted) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.") Because the affidavit and transcript which plaintiffs are moving to strike relate solely to the issue of a permanent injunction, it would be premature for the court to consider this particular motion at this juncture.  See <u>Sierra Club v. Penfold</u>, 857 F.2d 1038, 1319 (9th Cir. 1988) ("Because actual success on the merits was not shown, the district court did not err in denying permanent injunctive relief.")  Only if the court grants summary judgment in plaintiffs' favor as to one or all of its remaining claims, will plaintiffs be able to show "actual success" on the merits.  At that point, the issue of remedies will become germane; and at that point it will become necessary for the court to address this particular motion to strike – but not before.  So for now, the court will hold in abeyance plaintiffs' motion to strike the Pretasky affidavit and the transcript.

## II.  *Law of the Case*

In moving for summary judgment as to Count Two of the FAC, basically plaintiffs argue that the 2007 Final EA does not comport with NEPA.  LPMP responds that "[a]*ll* issues related to Count Two [NEPA] have been repeatedly considered and rejected" by this Court

- 14 -

and the Ninth Circuit Court of Appeals.  LPMP's Reply (Doc. 166) at 11:3-4 (emphasis added); and LPMP's Cross-mot. (Doc. 157) at 4:15. LPMP thus argues that in the exercise of its discretion the court should apply the law of the case doctrine and grant summary judgment in its favor on "Count[s] II and VI[10][.]"  LPMP's Reply (Doc. 166) at 12:14 (footnote added).

Plaintiffs' response is two-fold.  First, because LPMP is a defendant-intervenor, plaintiffs challenge its right to invoke the law of the case doctrine when, according to plaintiffs, defendant Reclamation did not.  Second, implicitly recognizing that the law of the case doctrine eliminates at least some of their claimed NEPA violations, plaintiffs contend that their preliminary injunction motion "did not encompass *all* of [such] violations" in Count Two. Pls.' Reply (Doc. 161) at 1:16 (emphasis added).  Thus, plaintiffs argue that the law of the case doctrine does not preclude this court from revisiting Count Two's alleged NEPA violations.  The court will address these arguments in turn.

### A.  Intervenor Status

Plaintiffs broadly declare that "an intervenor may not raise arguments not raised by the principal parties."  Pls.' Resp. (Doc. 161) at 4 (citing, *inter alia*, Time Warner Entertainment Co., L.P. v. F.C.C., 56 F.3d 151 (D.C.Cir. 1995)).  Thus, plaintiffs assert that "[b]ecause [BOR] do[es] not invoke the [law of the case]

---

[10]    This is a typographical error in that the FAC only has five sections denoted by Roman numerals; and the "counts" are denoted by Arabic numbers.  Even if "VI" is a transposition, *i.e.*, "IV," it still would make no sense.  Count Four is a narrow NEPA violation, *i.e.* "failure to provide meaningful opportunity for public comment[,]" raised for the first time on these motions.  Obviously then, LPMP cannot be invoking the law of the case doctrine as to Count Four.  In fact, LPMP does not; its summary judgment argument is based upon the merits, or lack thereof, of that count.  See LPMP's Cross-mot. (Doc. 157) at 19-23; and LPMP's Reply (Doc. 166) at 19-20.  Consequently, the court is disregarding this reference to "count VI."

doctrine, Intervenor [LPMP] may not either."   Pls.' Reply (Doc.
161) at 2:6-7 (citations omitted).

There are two flaws with this argument.  First, contrary to
plaintiffs' assertion, Reclamation does invoke the law of the case
doctrine, albeit implicitly.  In responding to plaintiffs' summary
judgment motion, Reclamation discusses Lake Pleasant I at some
length, concluding that "this Court previously thoroughly discussed
and analyzed Reclamation's evaluation of the carrying capacity of
the lake and determined that Reclamation's actions and analysis
were not arbitrary or capricious."  BOR's Cross-mot. (Doc. 154) at
11:3-5 (citation omitted).   Similarly, several times in its Reply,
Reclamation specifically relies upon earlier findings by this court
to bolster its argument that summary judgment in its favor is
warranted as to Count Two.  For example, Reclamation points out
that in Lake Pleasant I this court rejected plaintiffs' arguments
as to Reclamation's supposed failure to give meaningful
consideration to alternatives to the proposed marina.  See BOR's
Reply (Doc. 164) at 11-12.  As the foregoing shows, despite
plaintiffs' contrary assertion, Reclamation's cross-motion and
reply implicate, albeit inferentially, the law of the case
doctrine.  Consequently, there is no basis for plaintiffs' argument
that the law of the case doctrine is not implicated here because
Reclamation did not invoke that doctrine in the first instance.

Second, even if the court agreed with plaintiffs that
Reclamation has not raised the law of the case doctrine, as
discussed below, that would not preclude LPMP from invoking that
doctrine.  LPMP could still rely upon the law of the case because
the rule prohibiting intervenor's from raising arguments not raised

by principal parties is slightly more nuanced than plaintiffs suggest, and their reasoning too simplistic.

"It is a general rule that an intervenor may argue only the issues raised by the principal parties and *may not enlarge those issues*." See <u>Southwestern Penn. Growth Alliance v. Browner</u>, 121 F.3d 106, 121 (3rd Cir. 1997) (citing, *inter alia*, <u>Vinson v. Washington Gas Light Co.</u>, 321 U.S. 489, 498, 64 S.Ct. 731, 735, 88 L.Ed. 883 (1944)) (emphasis added). Enlargement of issues is not a concern here, however. In part that is because LPMP is a defendant intervenor, not an intervening plaintiff or petitioner. Thus, because LPMP is defensively asserting the law of the case doctrine, if the court finds that that doctrine governs Count Two, there will be a reduction, if not complete elimination, in the number of issues to be resolved herein. Therefore, rather than enlarging the issues herein, by relying upon the law of the case doctrine, LPMP is seeking to do just the opposite. It is seeking to reduce or eliminate the issues for this court's consideration.

<u>Time Warner</u>, to which plaintiffs cite, is factually and legally distinguishable and hence does not warrant a different result here. In <u>Time Warner</u>, various cable companies and municipalities petitioned the D.C. Circuit Court of Appeals for review of several Federal Communications Commission ("FCC") regulations. The Court held that the intervenor, a small cable television association, was barred from challenging those regulations on grounds not raised by petitioners where the intervenor had participated in the FCC proceedings, and did not avail itself of the opportunity to file an independent petition for review with the Court. The <u>Time Warner</u> Court stressed that

"[h]aving foregone that opportunity, the [intervenor] was barred from protesting the [FCC's] regulations on grounds not presented by the petitioners." Time Warner, 56 F.3d at 202.

Plainly no such waiver argument can be made in the present case. Moreover, the law of the case doctrine is not the sort of issue which would have been raised in the context of the Reclamation proceedings at issue herein. In short, because LPMP's law of the case argument does not broaden the scope of the FAC or alter the nature of the underlying proceedings, LPMP's intervenor status does not preclude it from arguing that the law of the case doctrine bars the NEPA allegations in Count Two. See Vinson, 321 U.S. at 499, 64 S.Ct. 731, 88 L.Ed.2d 883 ("[A]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration in the nature of the proceeding.")

### B. *Legal Standards*

The law of the case doctrine is "an imminently practical rule[.]" Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Local 142, 297 F.Supp.2d 1238, 1249 (D.Haw. 2003). It is a doctrine of "a judicial invention designed to aid in the efficient operation of court affairs." U.S. v. Lummi Indian, 235 F.3d 443, 452 (9th Cir. 2000) (citation and internal quotation marks omitted). "[T]he law of the case doctrine ensures the finality of legal issues decided in an earlier proceeding in the *same* suit." Orantes-Hernandez v. Gonzales, 504 F.Supp.2d 825, 836 (C.D.Cal. 2007) (citing Arizona v. California, 460 U.S. 605, 619, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Avoiding "reconsideration of questions previously decided . . . during the course of a single

case" promotes and maintains "consistency[.]" <u>United States v.</u>
<u>Mills</u>, 810 F.2d 907, 909 (9th Cir. 1987) (citation omitted).
Accordingly, the law of the case doctrine "ordinarily precludes a
court from reexamining an issue previously decided by the same
court or a higher court in the same case." <u>Southern Oregon Barter</u>
<u>Fair. v. Jackson County</u>, 372 F.3d 1128, 1136 (9th Cir. 2004)
(citation omitted).

"For the doctrine to apply, the issue in question must have
been decided explicitly or by necessary implication in [the]
previous disposition." <u>Lummi Indian</u>, 235 F.3d at 452 (citation and
internal quotation marks omitted). "A significant corollary to the
[law of the case] doctrine is that dicta have no preclusive
effect." <u>Rebel Oil Co., Inc. v. Atlantic Richfield Co.</u>, 146 F.3d
1088, 1093 (9th Cir. 1998) (citation and internal quotation marks
omitted). Likewise, the "'law of the case' does not apply to
issues or claims that were not actually decided." <u>Mortimer v.</u>
<u>Baca</u>, 594 F.3d 714, 720 (9th Cir. 2010) (citations and internal
quotation marks omitted); <u>cf.</u> <u>Casumpang</u>, 297 F.Supp.2d at 1249
(citation and internal quotation marks omitted) ("[D]istrict courts
are necessarily free to decide[] issues not otherwise resolved on
appeal."). Given the discretionary nature of the law of the case
doctrine, "[a] trial judge's decision to apply [it] is . . .
reviewed for an abuse of discretion." <u>Lummi Indian</u>, 235 F.3d at
452 (citation omitted).

Here, LPMP premises its law of the case doctrine argument
primarily upon this court's denial of a preliminary injunction.
Precisely because of that, plaintiffs urge that the law of the case
doctrine does not apply here.

Plaintiffs are correct that generally "decisions on
preliminary injunctions are not binding at trial on the merits,
. . . and do not constitute the law of the case[.]" <u>Jackson</u>
<u>County</u>, 372 F.3d at 1136 (citation and internal quotation marks
omitted). One reason for that is that typically "a preliminary
injunction leaves open the final determination of the merits of the
case." <u>Ranchers Cattlemen Action v. Dept. of Agric.</u>, 499 F.3d
1108, 1114 (9th Cir. 2007) (citation and internal quotations
omitted). Furthermore, "decisions on preliminary injunctions are
just that – preliminary – and must often be made hastily and on
less than a full record." <u>Id.</u> (citation and internal quotations
omitted).

Of course, here, the initial preliminary injunction decision,
<u>Lake Pleasant I</u>, 2007 WL 1486869 (D.Ariz. May 21, 2007), and
related decisions by this court, <u>Protect Lake Pleasant v. Johnson</u>,
2007 WL 2177327 (D.Ariz. July 27, 2007) ("<u>Lake Pleasant II</u>"); and
<u>Protect Lake Pleasant v. Johnson</u>, No. CIV 07-454 (D.Ariz. May 5,
2008) (Doc. 97) ("<u>Lake Pleasant IV</u>"), were not "made hastily."
More importantly, this is an action brought pursuant to the APA.
Therefore, the administrative record is the source of the relevant
facts – not an expanded record based upon discovery taken after
denial of the preliminary injunction. The same administrative
record which is the factual basis for these summary judgment
motions was the factual basis at the preliminary injunction phase.
Thus, if otherwise warranted, the court will apply the law of the
case doctrine here, regardless of the fact that the prior
determinations were made in the preliminary injunction context.

Insisting that the law of the case doctrine does not entirely

bar Count Two's NEPA allegations, plaintiffs stress that previously they only "focus[ed] on BOR's *most glaring* [NEPA] failures[.]" <u>See</u> <u>Lake Pleasant I</u>, 2007 WL 1486869, at *6 n. 4 (citation and internal quotation marks omitted) (emphasis added). Plaintiffs further stress that when moving for injunctive relief, they reserved their right to address, *inter alia*, "*additional* NEPA violations at the summary judgment stage[,]" Pls.' Reply (Doc. 161) at 1:19 (citation omitted) (emphasis added), as this court previously noted. <u>Lake</u> <u>Pleasant I</u>, 2007 WL 1486869, at *6 n. 4. Accordingly, plaintiffs contend that because their summary judgment motion "raise[s] . . . [a] number of issues" which were not decided in their earlier preliminary injunction motion, the law of the case doctrine does not apply to these newly raised issues. Pls.' Reply (Doc. 161) at 2:13-14. Plaintiffs list four such issues but they do not expand upon any of them, merely citing to their summary judgment motion instead.

Plaintiffs add that the law of the case doctrine does not apply because their summary judgment motion "raises air emissions and public disclosure issues that were not raised in" their earlier preliminary injunction motion. <u>Id.</u> at 2:24 - 3:1. While accurate, this is irrelevant. LPMP confines its law of the case argument to Count Two of the FAC, alleging NEPA violations. LPMP argues the merits, however, of the Clear Air Act and NEPA public disclosure claims. Accordingly, as did LPMP, the court will limit its law of the case analysis to Count Two.

After selectively quoting from prior decisions, LPMP broadly pronounces that "[p]laintiffs are making the same arguments, under the same standard, based upon the same set of facts." LPMP's

1  Cross-mot. (Doc. 157) at 10:10-11.  Therefore, "[i]n the interest

2  of judicial economy," LPMP maintains that the law of the case

3  doctrine "preclude[s] Plaintiffs from re-litigating these same

4  arguments[.]"  Id. at 11:2-4.  LPMP merely string cites to prior

5  decisions,[11] and then objects to what it characterizes as an

6  "unsuccessful[]" attempt by plaintiffs "to repackage previously

7  decided issues by alleging four 'new' NEPA violations."  LPMP's

8  Reply (Doc. 166) at 12:5-6 (citations omitted).  LPMP did not

9  specifically identify any of the issues which purportedly were

10 decided earlier in this litigation.  Nor did LPMP explain precisely

11 the impact of prior court rulings on plaintiffs' summary judgment

12 motion.  This lack of analysis is troublesome to say the least.

13      Compounding this lack of analysis was plaintiffs', for the

14 most part unsuccessful, attempt to reframe issues in their reply to

15 suggest that those issues had not previously been decided.  A

16 thorough analysis of the law of the case doctrine by the parties

17 would have been preferable; and the lack of one made this court's

18 task unnecessarily arduous.  Nevertheless, keeping in mind the

19 underlying purpose of that doctrine – judicial efficiency - the

20 court has carefully compared plaintiffs' summary judgment arguments

21 to prior Lake Pleasant decisions.  That comparison shows, as fully

22 discussed below, that some of plaintiffs' current, "additional"

23 issues are, as LPMP declares, "repackage[d]" versions of NEPA

24 issues which this court as previously decided.  See LPMP's Reply

25

26      _____
          [11]      LPMP also cites to the "Attachment to Civil Appeals Docketing
27 Statement" plaintiffs filed on appeal.  See LPMP's Reply (Doc. 166) at 12:10.  LPMP
   asserts that that Docketing Statement, along with the four prior Lake Pleasant
28 decisions, "all addressed the issues that Plaintiffs claim were not previously
   raised[.]"  Id. at 12:10-11 (emphasis added).  It is incongruous to even suggest
   that a Docketing Statement addresses issues.

1  (Doc. 166) at 12:6.  Other issues are not, however.  So although
2  the law of the case doctrine has some applicability here, it is
3  not, as LPMP contends a complete bar to the NEPA claims in Count
4  Two.

5      ***C.  New or Supplemental EIS***

6       The first "additional" NEPA issue which plaintiffs claim is
7  not subject to the law of the case is Reclamation's alleged
8  improper failure to prepare a new EIS or a supplemental EIS
9  ("SEIS"[12]).  Based upon what plaintiffs characterize as "dramatic
10 changes in the Lake's environment" since the issuance of the 1984
11 EIS, they argue that NEPA regulations mandate that Reclamation
12 prepare a SEIS.  Pls.' Mot. Summ. J. (Doc. 150) at 11:2.  Because
13 Reclamation did not prepare a SEIS, plaintiffs are seeking summary
14 judgment on this aspect of Count Two.

15      Unlike some of the NEPA issues plaintiffs' summary judgment
16 motion raises, this is the first time that they are arguing a NEPA
17 violation based upon Reclamation's failure to prepare a SEIS.
18 Necessarily then, that SEIS issue has not already been decided.
19 The law of the case doctrine, therefore, does not limit the court's
20 ability to consider whether Reclamation should have issued a SEIS
21 due to changed circumstances.

22      Before continuing, the court must address one discrete aspect
23 of this SEIS issue  – – plaintiffs' assertion that the Lake has
24 become a breeding ground for bald eagles, and on that basis
25 Reclamation had an obligation under NEPA to issue a SEIS.  This is
26 not the first time the bald eagle issue has arisen in this

27 _____

28      [12]   For the sake of brevity, unless necessary to distinguish between the
new EIS and the SEIS, "SEIS" shall be read as encompassing both a new EIS and a
SEIS.

litigation.  Thus, from defendants' viewpoint the court should not
revisit the bald eagle issue now.

   While analyzing plaintiffs' carrying capacity argument in <u>Lake
Pleasant I</u>, this court stated:

>   Bald eagle nesting in an area of LPRP was addressed
>   in the 1984 EIS and more recently in the 2007 EA,
>   . . . , and Plaintiffs *have claimed* that BOR did not
>   take a 'hard look' at the impact of the proposed
>   marina on the bald eagles or other endangered species
>   populations in the park.

<u>Id.</u>, 2007 WL 1486869, at *10 n. 9 (emphasis added) (citation
omitted).  Relying upon that footnote, LPMP states that "this Court
acknowledged the Final EA's discussion of the eagle issue and found
that BOR did not act arbitrarily or capriciously."  LPMP's Reply
(Doc. 166) at 12 n.4 (citation omitted).  On that basis, LPMP
asserts that the law of the case precludes consideration of the
"'catch all' NEPA issue . . . relat[ing] to the Bald Eagle."  <u>Id.</u>

   LPMP is reading that footnote far too expansively.  As just
explained, plaintiffs' claim that NEPA requires a SEIS based upon
changed circumstances, including the bald eagle breeding grounds,
was not an issue in <u>Lake Pleasant I</u>.  So clearly this court did not
decide that issue - explicitly or implicitly.  The court thus
rejects LPMP's suggestion that the mention of bald eagles in <u>Lake
Pleasant I</u> forecloses consideration, under the law of the case
doctrine, of the bald eagle issue as it relates to a SEIS.
Moreover, at most, footnote nine was dicta and as such it will not
be given preclusive effect as the law of the case.  See <u>Rebel Oil</u>,
146 F.3d at 1093.

### D.  *Final EA's "Inaccurate Data and Guesswork"*

   Plaintiffs further contend that the law of the case doctrine

- 24 -

does not apply to the issue of "the Final EA's improper reliance on inaccurate data and guesswork about watercraft usage at the Lake and various environmental impacts of the proposed marina, including the addition of human waste and resulting contaminants into the water[.]" Pls.' Reply (Doc. 161) at 2:17-20. Referring to plaintiffs' summary judgment motion for clarification, plaintiffs claim that there is no basis for the "20% daily [watercraft] usage rate" in the Final EA. Pls.' Mot. Summ. J. (Doc. 150) at 15:6 (internal quotation marks omitted). Plaintiffs also contend that the Final EA's provision for a marina "pump-out system to remove waste from boats[]" is an insufficient response to "[p]ublic comment to the Draft EA warn[ing] that an increase in boat usage would increase the amount of human waste and resulting contaminants being deposited in the Lake." Id. at 16:3 (citation and internal quotation marks omitted); and at 15:24-25 (citations omitted). Comparing these two issues with the prior rulings in this action shows that neither has been previously decided - either explicitly or by necessary implication. Thus, as explained below, the law of the case doctrine does not preclude plaintiffs' NEPA claims to the extent they are challenging the basis for the Final EA's 20% daily usage rate assumption, and the pump-out system provision.

In denying plaintiffs' motion for a preliminary injunction in Lake Pleasant I, this court held that "there is no basis to find that BOR's determination of average daily watercraft counts was arbitrary and capricious." Lake Pleasant I, 2007 WL 1486869, at *12. Initially, this holding might appear to encompass plaintiffs' current argument that the Final EA lacks a basis for its 20% daily usage rate assumption. A close reading of Lake Pleasant I shows

that this court did not decide that particular usage rate issue,
however.  Rather in that decision, the court addressed plaintiffs'
narrowly tailored argument that "the EA inadequately explains BOR's
decision to ignore evidence in the administrative record that, on
the weekend of July 4, 2006, over 3,000 boats were on the lake."
Id. at *11 (citation omitted).  In fact, plaintiffs' preliminary
injunction motion did not mention at all this ostensibly baseless
20% daily usage rate assumption.

Admittedly, in that prior motion plaintiffs did note in
passing, as they do again now, Reclamation's "failure to account
for boats to be stored in the 5-acre fenced-in area at the marina
when it estimated the number of boats using the Lake."  Pls.' Mot.
(Doc. 12) at 15 n. 11; and Pls.' Mot. (Doc. 15) at 15:11-15
(citation omitted).  That alleged failure did not factor into the
court's analysis in Lake Pleasant I.  As just mentioned, there, the
court's focus was upon the alleged uncertainty of daily average
watercraft counts during peak season, and more particularly, on the
weekend of July 4, 2006.  Consequently, plaintiffs' current
challenge to Reclamation's "'20% daily usage rate' assumption" was
not decided by necessary implication either.  For these reasons,
the law of the case doctrine is not a bar to plaintiffs' claim that
there is no basis for the Final EA's 20% daily usage rate
assumption.  In deciding these summary judgment motions, the court
thus will address that particular usage rate issue on the merits.

The same reasoning applies to plaintiffs' current argument
that the Final EA violates NEPA because the "pump-out system" is an
inadequate response to public comment that there will be an
increase in human waste deposits in the Lake due to an increase in

watercraft usage.  This court has not before been confronted with that issue, so obviously it has not decided that issue – explicitly or implicitly.  Because the law of the case doctrine is not implicated as to that pump-out system issue, the court will address that issue on the merits.

### E.  Final EA's "Baseless Speculation"

Plaintiffs' reply identifies two additional issues which they contend are not governed by the law of the case.  In particular, the Final EA "improper[ly] reli[ed] on baseless speculation" regarding (1) the "purported need for another marina[;]" and (2) the amount of additional watercraft that the proposed marina will add to the Lake[.]" Pls.' Reply (Doc. 161) at 2:20-21.  Separately examining these issues in conjunction with Lake Pleasant I shows that, with one exceedingly narrow exception, the law of the case doctrine does not foreclose consideration of those issues now.

Turning to plaintiffs' summary judgment motion for elucidation, it is evident that plaintiffs' attack on the "purported need for another marina" is part of their broader argument that "[t]he Final EA's rejection of the 'no action' alternative is based upon speculation[.]" Pls.' Mot. (Doc. 150) at 16 (emphasis omitted).  This court did address that "No Action Alternative" in Lake Pleasant I, finding that "the [Final] EA sufficiently consider[ed]" that alternative.  Lake Pleasant I, 2007 WL 1486869, at *13.  Despite that seemingly broad finding, a careful reading of plaintiffs' preliminary injunction motion and Lake Pleasant I shows the relatively narrow basis for that finding.

The only argument that plaintiffs made regarding the "No Action Alternative" in Lake Pleasant I is that Reclamation's

- 27 -

consideration of that alternative was "not meaningful[] because
Reclamation did not analyze current waiting times by visitors or
whether those times are acceptable to the lake's visitors." Id. at
*12 (citing Mot. (doc. #12) at 17-18).  Addressing that discrete
argument, this court explained:

> Although the EA does not set forth exact figures for
> the waiting times at the public boat ramps or poll
> results regarding visitors' satisfaction with the
> waiting times, the EA's conclusions regarding increased
> waiting times under the "no action" option are
> reasonable in light of the increased visitation numbers
> that have been documented.

Id. at *13 (citation omitted).  As just shown, in Lake Pleasant I,
this court did address the "No Action Alternative," but in the
narrowly circumscribed context of waiting times.  Plaintiffs did
not raise, and hence the court did not consider, their current
challenges to the "No Action" Alternative, which include disputing
the need for a new marina, and two other objections unrelated to
waiting times, discussed herein.  Thus, the law of the case
doctrine does not bar these three most recent objections to the
Final EA's elimination of the "No Action" Alternative.

Plaintiffs' reply also does not explain what is meant by the
assertion that the Final EA "improper[ly] reli[ed] on baseless
speculation . . . about the amount of additional watercraft that
the proposed marina will add to the Lake[.]" Pls.' Reply (Doc. 161)
at 2:21-22.  Nor is plaintiffs' summary judgment motion
particularly helpful.  This asserted "speculation" as to the
"amount of additional watercraft" can be read as just another
iteration of plaintiffs' theory that "BOR acted arbitrarily and
capriciously by allowing an increase in the number of boats on the
Lake without first determining the Lake's carrying capacity."

Pls.' Mot. (Doc. 150) at 12:25-56.  As more fully discussed below,

that  carrying capacity argument has been thoroughly considered and

rejected several times during the course of this litigation.

Therefore, the law of the case doctrine clearly precludes

reconsideration of any form of that argument now.

On the other hand, it is possible to read plaintiffs' claim of

"baseless speculation" regarding additional watercraft as

incorporating plaintiffs' theory that the Final EA does not include

a basis for the "'20% daily usage rate' assumption[.]"  See id. at

15:6.  The law of the case doctrine does not bar consideration of

that particular issue because, as already discussed, that issue has

not been previously decided.

### F.  Final EA's "Various Other Infirmities"

The list of purportedly new or additional NEPA violations

in plaintiffs' reply includes a catch-all category, i.e. "various

other infirmities in the Final EA's analysis of the proposed

marina."  Pls.' Reply (Doc. 161) at 2:22-23 (citation omitted).

Plaintiffs' reply does not identify or describe the exact nature of

those "infirmities," leaving the court to once again extrapolate

from their summary judgment motion.  When it does that, the court

finds that those "various other infirmities," in general, pertain

to the Lake's capacity and the Final EA's consideration of

alternatives to the proposed marina.

### 1.  Carrying Capacity

Plaintiffs maintain that "BOR acted arbitrarily and

capriciously by allowing an increase in the number of boats on the

Lake without first determining the Lake's carrying capacity."

Pls.' Mot. (Doc. 150) at 12:25-56.  Undoubtedly, plaintiffs have

made this carrying capacity argument before.  In fact, as LPMP accurately states, this is now the fifth time plaintiffs have made this argument.  Each time, regardless of context, this argument has been soundly rejected – three times by this court, see Lake Pleasant I, 2007 WL 1486869, at *6 – *11; Lake Pleasant II, 2007 WL 2177327, at *4 – *6; Lake Pleasant IV, 2:07-cv-00454-RCB (Doc. 97) at 22-25; and once by the Ninth Circuit.  See Lake Pleasant III, 252 Fed.Appx. at 858-859.  What is more, plaintiffs are not suggesting that any of the three exceptions to the law of the case doctrine apply here.[13]  Once again, "'[n]othing has changed[]" – nothing whatsoever.  Lake Pleasant IV, 2:07-cv-00454-RCB (Doc. 97) at 24:21.  Consequently, based upon the law of the case, LPMP and Reclamation are entitled to summary judgment as to Count Two insofar as it alleges NEPA violations for failure to conduct a carrying capacity study.

### 2.  "Post-construction Study"

Plaintiffs' summary judgment motion includes another familiar argument.  They assert that "a post-construction study of watercraft usage at the Lake is no substitute for a pre-construction capacity study[.]" Pls.' Mot. (Doc. 150) at 13:1-2 (emphasis omitted).  This is just another way of arguing, as plaintiffs have before, "that the County's obligation to conduct a future WROS [Water Recreation Opportunity Spectrum] study is insufficient to satisfy BOR's NEPA obligations." See Lake Pleasant II, 2007 WL 2177327, at *6.  In Lake Pleasant II, the court

_____

[13]    Those exceptions are "when (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." Mortimer v. Baca, 594 F.3d 714, 721 (9th Cir. 2010) (citations and internal quotation marks omitted).

discussed and rejected that argument, distinguishing plaintiffs'
primary authority, <u>LaFlamme v. FERC</u>, 852 F.2d 389 (9th Cir. 1988)
("<u>LaFlamme</u>"), on several grounds. <u>See</u> <u>id.</u>

     To be sure, plaintiffs are no longer relying upon <u>LaFlamme</u>.
But they also are not arguing that any of the exceptions to the law
of the case doctrine apply, such as "intervening controlling
authority mak[ing] reconsideration appropriate[.]" <u>See</u> <u>Mortimer</u>,
594 F.2d at 721 (citations and internal quotation marks omitted).
Thus, because this court has already rejected plaintiffs' argument
that a future WROS study by the County does not satisfy NEPA, as
with their carrying capacity argument, the law of the case governs
here too.  As a result, LPMP and Reclamation also are entitled to
summary judgment as to Count Two insofar as it alleges a NEPA
violation based upon the failure to conduct a pre-construction
capacity study of the Lake.

### 3.  *Alternatives*

     In moving for summary judgment, plaintiffs assert that "the
Final EA does not adequately consider alternatives to the proposed
marina[]" as NEPA requires.  Pls.' Mot. (Doc. 150) at 16:8-9
(emphasis omitted).  The Final EA considered three alternatives to
the proposed marina.  The first, the "No Action Alternative," is
self-explanatory: the proposed marina would not be built.  The
second alternative, the "Proposed Action alternative," called for
the development of Scorpion Bay Marina in four phases.  Admin. R.,
Vol. 3 (Final EA[14]) at 8-9.  "[A]t total build-out," that proposed
marina complex would consist of, among other things, a "200 boat

---

     [14]     Hereinafter, unless otherwise stated, all references to the
administrative record shall be read as referring to volume three, and the Final EA
more particularly.

capacity," and "an 800-slip wet dock[.]"  Id. at 9.   "Alternative

A" was a slightly scaled down version of the Proposed Action,

entailing only three phases of construction and resulting in a

"storage capacity for 804 watercraft at full build-out."  Id.

(FONSI) at 3.

Plaintiffs argue that Reclamation violated NEPA because:

(1) it eliminated the No Action Alternative "based upon

speculation[;]" (2) Alternative A is "not sufficiently different

from the proposed marina to constitute a meaningful alternative[;]"

and (3) it "improperly eliminated from consideration the

alternative of allowing" expansion of the existing marina.  Pls.'

Mot. Summ. J. (Doc. 150) at 16:19-20; 17:16-17; and 18:15-16

(emphasis omitted).

Much like they are now, plaintiffs previously argued that the

"BOR did not give meaningful consideration to alternatives to the

proposed marina."  Lake Pleasant I, 2007 WL 1486869, at *12 (citing

Mot. (Doc. 12) at 17-20).   Therefore, to determine whether the law

of the case bars any of plaintiffs' current arguments regarding

alternatives, the court must carefully examine plaintiffs' earlier

arguments as to alternatives, as well as the court's prior

decisions – an analytical step which neither LPMP nor plaintiffs

undertook.

### a.  "No Action Alternative"

Plaintiffs proffer three reasons why Reclamation's elimination

of the No Action Alternative was, in their view, "based upon

speculation[.]"  See Pls.' Mot. (Doc. 150) at 16:19-20.  The first

is that Reclamation improperly "abdicate[d] its "NEPA-imposed

obligation to consider and evaluate alternatives to [the] proposed

action[]" by relying upon the County's determination of need for a new marina in the first place. Id. at 16:23-24 (citation and internal quotation mark omitted).  Second, plaintiffs assert that the Final EA's elimination of the No Action Alternative is "based on [the] incorrect premise[,]" that "water-based recreational opportunities appear to be limited to those that presently exist." Id. at 17:2-3 (citation and internal quotation marks omitted). Third, according to plaintiffs, the Final EA contains baseless "speculation" that "taking no action will leave demand for water recreation unmet because, allegedly, the existing . . . Marina will not maintain the quality of its facilities." Id. at 17:8-10.

As LPMP is quick to point out, and as mentioned earlier, this court has already found "that the EA sufficiently consider[ed] the 'no action' alternative." Lake Pleasant I, 2007 WL 1486869, at *13.  As already discussed however, and what LPMP overlooks, is that this court's finding as to the No Action Alternative was made in the specific context of waiting times at public boat ramps, and visitor satisfaction with those times. See id. at *12 - *13. Therefore, the law of the case doctrine does not preclude consideration of plaintiffs' arguments, enumerated above and made for the first time in this motion, regarding Reclamation's other alleged improprieties in rejecting the No Action Alternative.

The court is well aware, as LPMP also notes, of the Ninth Circuit's finding that this "court . . . properly concluded that [BOR] gave adequate consideration to other alternatives in its EA." Lake Pleasant III, 252 Fed. Appx. at 859.  That general finding does not change this court's law of the case analysis as to the No Action Alternative.  As just stated, plaintiffs' arguments as to

the "No Action" arguments are new. They were not a basis for

plaintiffs' preliminary injunction motion. Likewise, these

arguments certainly were not a basis for plaintiffs' Ninth Circuit

appeal or grounds for affirmance by that Court. See Rivera v.

National R.R. Passenger Corp., 2004 WL 603587, at *5 (N.D.Cal. Mar.

22, 2004) (citation omitted) (refusing to apply law of the case to

arguments "made somewhere in the record before the appellate

court[]" because "[a]n appellate court is not presumed to have

decided issues not presented and argued before it, of issues that

were not addressed in its opinion[]").

### b.  *"Action Alternative A "*

In their summary judgment motion, plaintiffs are challenging

the Final EA's treatment of "Action Alternative A" on two grounds.

First, plaintiffs assert that that Alternative "is not sufficiently

different from the proposed marina to constitute a meaningful

alternative." Pls.' Mot. (Doc. 150) at 17:16-17. Second,

plaintiffs charge Reclamation with violating NEPA by "narrowly

defin[ing]" the "purpose and need" of the proposed marina "so as to

winnow down the alternatives until only the desired one

survives[,]" *i.e.* the proposed marina. Id. at 18:7-8 (citation and

internal quotation marks omitted).[15] A close reading of Lake

Pleasant I establishes that the law of the case doctrine forecloses

the latter argument, but not the former.

In Lake Pleasant I, plaintiffs "argue[d] that BOR . . .

impermissibly identified the project objectives in unreasonably

narrow terms by deferring to the County and concessionaire's

determination of economic feasibility[.]" Id. at *12; see also

---

[15]    Reclamation did not specifically address either of these arguments.

Pls.' Mot. (Doc. 12) at 18:21-28 - 19:1-2.  Rejecting that
argument, in Lake Pleasant I, this court "s[aw] nothing arbitrary
and capricious in BOR's . . . eliminat[ing] other alternatives
[including Alternative A] from further consideration by relying on
the County's statement of need and economic viability."  Lake
Pleasant I, 2007 WL 1486869, at *13.  The court emphasized that
"the EA makes clear that the proposed marina and associated revenue
stream is necessary to assist the County in its management of the
park."  Id. (citations omitted).

Plaintiffs are making a nearly identical argument in seeking
summary judgment.  They posit that "[b]y delegating to the County
and LPMP authority to determine the need for, and appropriate size
of, the proposed marina," Reclamation so narrowly defined the
purpose and scope of that projection that it violated NEPA.  See
Pls.' Mot. (Doc. 150) at 18:10-11.  As just explained, this court
has previously decided that narrowness of purpose issue; hence, the
law of the case doctrine precludes reconsideration of that issue.

Turning to the issue of whether Alternative A is a "meaningful
alternative[,]"  plaintiffs note that there are "few differences"
between that Alternative and the proposed marina. Pls.' Mot. (Doc.
150) at 17:25.  Alternative A "would consist of three of the four
phases of the proposed marina," resulting in roughly 200 fewer
spaces for watercraft than the proposed marina.  Id. at 17: 24-25.
Plaintiffs also stress that, according to the EA, the potential
environmental impact between Alternative A and the proposed marina
is "essentially the same, if not identical[.]" Id. at 17:27-28 -
18:1.

Plaintiffs made this same argument in Lake Pleasant I.  See

Lake Pleasant I, 2007 WL 1486869, at *12 (emphases added)
("Plaintiffs *maintain* that [] – a marina adding 196 fewer boats and
deemed to have essentially the same environmental impact as the
proposed marina – does not constitute a meaningful alternative.");
and (Plaintiffs "*argue* that BOR's resulting consideration of a
nearly identical marina plan with the essentially same
environmental impact as the proposed marina is inadequate.")
Further, then, as now, Muckleshoot Indian Tribe v. U.S. Forest
Serv., 177 F.3d 800, 813 (9th Cir. 1999), was the primary legal
support for this argument. See Pls.' Mot. (Doc. 12) at 18:8-11;
and Pls.' Mot. (Doc. 150) at 18:2-7.

Significantly, though, the court did not address that
argument. As quoted above, the court merely reiterated plaintiffs'
position as set forth in their preliminary injunction motion.
Instead, in Lake Pleasant I, the court focused on the economic
viability arguments to the exclusion of plaintiffs' argument that
Alternative A was not a meaningful alternative. Thus, because this
court has not previously resolved that discrete issue, either
explicitly or implicitly, the law of the case doctrine does not
"limit[] the court's ability to consider th[at] issue now." See
Orantes-Hernandez v. Gonzales, 504 F.Supp.2d 825, 836-37 (C.D.Cal.
2007) ("Because the government's argument regarding the relevance
of conditions in El Salvador was not addressed in Orantes III,
either explicitly or implicitly, the court cannot accept
plaintiffs' argument that . . . the 'law of the case' doctrine
limits the court's ability to consider the issue now."), aff'd
without pub'd opinion, 321 Fed.Appx. 625 (9th Cir. 2009). And, as
explained in the preceding section, the Ninth Circuit's finding

that this court "properly concluded that [Reclamation] gave adequate consideration to other alternatives in its EA[,]" Lake Pleasant III, 252 Fed.Appx. at 859, likewise does not alter the law of the case analysis as to Alternative A.

In sum, as to Alternative A, the law of the case doctrine precludes reconsideration of plaintiffs' argument that Reclamation so narrowly defined the scope and purpose of the proposed marina as to violate NEPA. By the same token, though, that doctrine does not preclude this court from addressing plaintiffs' argument that Alternative A was not a meaningful alternative.

### c. Expansion of Existing Marina

Plaintiffs' last argument regarding alternatives is that the Final EA gave "virtually no consideration at all" to allowing expansion of the existing Pleasant Harbor Marina; and thus, Reclamation "improperly eliminated" that alternative. Pls.' Mot. (Doc. 150) at 18:15-16 (emphasis omitted). Plaintiffs declare that "[w]ithout explanation, the Final EA simply asserts, . . . that '[a]lternative marina proposals not associated with the County would not satisfy the purpose and need for the project.'" Id. at 18:18-21 (quoting Admin. R., at 17).

Plaintiffs made this same argument in Lake Pleasant I. There, also relying upon the just quoted sentence from the Final EA, plaintiffs argued that Reclamation "flat ignored" the expansion alternative. Pls.' Mot. (Doc. 12) at 18:13-14; and at 18:21-23. In Lake Pleasant I, 2007 WL 1486869, at *13, this court found it "apparent that BOR did not find th[at] [expansion] option[] feasible in light of the EA's statement of purpose and need for the marina." Lake Pleasant I, 2007 WL 1486869, at *13. This court

- 37 -

also found, as discussed above, that Reclamation did not act arbitrarily or capriciously in "relying on the County's statement of need and economic viability[]" when "eliminat[ing] other alternatives from further consideration[.]" _Id._  The court reasoned that "the [Final] EA makes clear that the proposed marina and associated revenue stream is necessary to assist the County in its management of the park."  _Id._ (citation omitted).  In deciding that Reclamation properly relied upon the County's statement of need and economic viability, by necessary implication, the court decided that Reclamation's reasoning for eliminating the expansion alternative was sufficient.

Noting "that Plaintiffs have not demonstrated _at this stage_ any reasonable probability of success on the merits of their claim that Reclamation did not adequately consider alternatives to the proposed marina[,]" this court did leave open the possibility that plaintiffs could prevail on such a claim later in this litigation. _See_ _id._ (emphasis added).  Renewal of a previously unsuccessful argument is not a sufficient reason for the court to deviate from its prior findings, however.  Therefore, for the reasons set forth above, the law of the case precludes reconsideration of the issue of whether Reclamation improperly eliminated from consideration the expansion alternative.

Since moving for a preliminary injunction, plaintiffs have painstakingly "scour[ed] the record" to identify what they deem to be other NEPA violations beyond "BOR's most glaring failures[,]" which were the basis for that unsuccessful motion.  _See_ _Lake Pleasant II_, 2007 WL 2177327, at *4 and at *3 (citation and internal quotation marks omitted).  Not all of these recently

identified NEPA violations are new, however.  For the reasons

discussed above, despite plaintiffs' stubborn insistence, the law

of the case forecloses consideration of the following alleged NEPA

violations: (1) Reclamation's failure to conduct a carry capacity

study; (2) Reclamation's failure to conduct a pre-construction

capacity study; (3) Reclamation's narrow definition of the scope

and purpose of the proposed marina; and (4) Reclamation's

elimination of the expansion alternative.  Consequently,

Reclamation and LPMP are entitled to summary judgment in that

regard.

### III.  NEPA

Next, the court will address the NEPA claims not foreclosed

by the law of the case doctrine.  The first such claim is that

Reclamation violated NEPA by failing to complete a SEIS.[16]

### A.  New or Supplemental EIS

Count Two of the FAC broadly alleges, *inter alia*, that "BOR

violated NEPA by failing to prepare an EIS for the proposed

[marina]."  FAC (Doc. 4) at 22, ¶ 103:19-20.  Plaintiffs are taking

a different tack on summary judgment though.  Claiming that because

"conditions at the Lake have changed dramatically in the [25] years

since" issuance of the 1984 EIS, plaintiffs argue that Reclamation

had a duty under NEPA, which it did not fulfill, to issue a SEIS.

Pls.' Mot. (Doc. 150) at 10:2-3 (citation and footnote omitted).

 Purportedly, those changes are an increase in the Lake's size and

volume, and that the Lake and its environs have "become one of the

most productive breeding grounds for eagles in the state."  Id. at

---

[16]     LPMP joins in and incorporates by reference Reclamation's arguments.
LPMP's Cross-mot. (Doc. 157) at 11:5-8.  Therefore, all references to Reclamation
in this section shall be read to include LPMP as well.

11:1 (citations omitted).  Recognizing that the Final EA is tiered[17]

to the 1984 EIS,[18] plaintiffs further argue that that tiering does

not "excuse" Reclamation from preparing a SEIS.  Id. at 10:2-4

(citation and footnote omitted).

Readily conceding that "[d]ramatic changes have occurred at

Lake Pleasant with the construction of the New Waddell Dam,"

Reclamation responds that because those were "not new or

unanticipated[,]" it had no obligation under NEPA to issue a SEIS.

BOR's Cross-mot. (Doc. 154) at 11:21-22; and 12:1.  Moreover,

according to Reclamation, those changes "were anticipated and

implemented in each document utilized in preparing the Final EA[.]"

Id. at 11:24.  Essentially, Reclamation contends that it did not

act arbitrarily or capriciously by not issuing a SEIS.

### 1. Scope

Preliminarily the court must clarify the scope of plaintiffs'

"changed circumstances" argument.  As discussed in conjunction with

the law of the case, from plaintiffs' standpoint, one of the

purported changed circumstances is that since 1984 the Lake and its

environs have "become one of the most productive breeding grounds

for eagles in the state."  Pls.' Mot. (Doc. 150) at 10:25-11:1

(citations omitted).  Elaborating, plaintiffs claim that "a

substantial question has arisen in recent years about whether the

desert nesting bald eagle, . . . , should be considered a separate

---

[17]    Broadly defined, "[t]iering refers to the coverage of general matters
in broader [EISs] . . . with subsequent narrower statements or environmental
analyses." 40 C.F.R. § 1508.28.

[18]    See Lake Pleasant III, 252 Fed. Appx. at 858 ("Final EA was tiered to
an . . . EIS"); and Lake Pleasant I, 2007 WL 1486869, at *8 (citation omitted)
("Final EA . . . is tiered to the 1984 EIS[]"); and Pls.' Mot. (Doc. 150) at 10:1
("[T]he Final EA is 'tiered' to the 1984 EIS[.]")

1 species . . . [u]nder the Endangered Species Act ("ESA")[.]" Pls.'

2 Reply (Doc. 162) at 4:10-15 (citations omitted). Plaintiffs

3 further note that during the course of this litigation, the United

4 States Forest Service has "re-listed the desert nesting bald eagle

5 as threatened effective May 1, 2008."[19]  Id. at 4-5, n. 1 (citation

6 and internal quotation marks omitted). Indeed, plaintiffs devote

7 the bulk of their changed conditions argument to bald eagles.

8      Reclamation astutely retorts that the FAC does not "claim or

9 mention the [ESA] or potential failure to consider the impacts of

10 the project on the bald eagle[.]" BOR's Reply (Doc. 164) at 6:6-8.

11 Reclamation, therefore, argues that the court should "dismiss[]"

12 plaintiffs' claim, raised for the first time in their summary

13 judgment motion, that NEPA mandated the issuance of a SEIS because

14 of changes effecting the "bald eagle population in the Lake

15 Pleasant area."  Id. at 6:5-8.

16      An examination of the FAC readily shows the validity of

17 Reclamation's position. Nowhere in the FAC is there any mention of

18 bald eagles or the ESA. Thus, to the extent plaintiffs are arguing

19 a NEPA violation because Reclamation did not issue a SEIS after

20 supposedly the Lake Pleasant environs became a breeding ground for

21 bald eagles, Reclamation and LPMP are entitled to summary judgment

22 on that narrow claim. See Richter v. Mutual of Omaha Ins. Co.,

23 2007 WL 6723708, at *6 n.5 (C.D.Cal. Feb. 1, 2007) (citation

24 omitted) (granting defendant summary judgment on alleged Health

25 Insurance Portability and Accountability Act ("HIPPA") violations

26 because such violations could not "form the basis of Plain[tiffs']

27

28      [19]    That "delist[ing]" did not occur until after the issuance of the 2007 Final EA in this matter, as Reclamation is quick to note. BOR's Reply (Doc. 164) at 7:4 (citations omitted).

unfair business practices claim because [they] never raised HIPPA in the Complaint[]"); see also Rastelli Brothers Inc. v. Netherlands Ins. Co. T/A Peerless Inc., 68 F.Supp.2d 440, 447 (D.N.J. 1999) (footnote omitted) (rejecting plaintiff's argument for summary judgment on an insurance coverage issue because it could not "seek summary judgment on an issue . . . never raised in the Complaint[]"). Accordingly, the court will limit its discussion of assertedly "changed circumstances" to the Lake's increase in size and volume and expansion of the size of the proposed marina.

### 2. Governing Legal Standards

"[A]n agency that has prepared an EIS cannot simply rest on the original document." Friends of Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000). That is because "NEPA . . . imposes on federal agencies an ongoing duty to issue supplemental environmental analyses." Cold Mountain v. Garber, 375 F.3d 884, 892 (9th Cir. 2004) (citation omitted). That ongoing duty demands that an agency "be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" Friends of Clearwater, 222 F.3d at 557 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

The duty to supplement under NEPA is not without limits. "[A]n agency need not start the environmental process anew with every change in the project." Price Rd. Neighborhood Ass'n v. U.S. Dept' of Transp., 113 F.3d 1505, 1509 (9th Cir. 1997) (citing Marsh,

490 U.S. at 373, 109 S.Ct. at 1859).  The Supreme Court in  Marsh
soundly reasoned that there is no need to "supplement an EIS every
time new information comes to light after the EIS is finalized.  To
require otherwise would render agency decisionmaking intractable,
always awaiting updated information only to find the new
information outdated by the time a decision is made."  Marsh, 490
U.S. at 373, 109 S.Ct. 1851 (footnote omitted).

On the other hand, "[i]f there remains major Federal action to
occur, and the new information is sufficient to show that the
remaining action will affect the quality of the human environment
in a significant manner or to a significant extent not already
considered, a supplemental EIS must be prepared."  Id. at 374, 109
S.Ct. 1851 (citations and quotations omitted) (emphasis added).
That same obligation to supplement exists where, as here, "[a]n
agency has prepared an EA and issued a FONSI[.]"  See Oregon Natural
Resources Council Action v. U. S. Forest Serv., 445 F.Supp.2d 1211,
1219 (D.Or. 2006) ("ONRC") (quoting 40 C.F.R. § 1502.9(c)(1)(ii))
(other citation omitted).  Further, "[t]he decision whether to
supplement is governed by the same standard which applies to
preparing an EIS[.]" Tri-Valley Cares v. U.S. Dept. of Energy, 2009
WL 347744, at *24 (N.D.Cal. Feb. 9, 2009).  As with other NEPA
mandates, "[a]n agency's decision not to prepare an EIS or other
supplemental NEPA analysis may be overturned only if it was
arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law."  Cold Mountain, 375 F.3d at 892 (citations
omitted).

### a.  "Major Federal Action"

As just alluded to, an agency's obligation to supplement its

- 43 -

NEPA analysis is predicated upon the existence of a "*major federal action*[] 'significantly affecting the quality of the human environment.'" Cold Mountain, 375 F.3d at 892 (quoting 42 U.S.C. § 4332(2)(C)) (emphasis added). In other words, "supplementation is necessary *only* if "there remains 'major federal actio[n]' to occur,' as that term is used in § 4332(2)(C)." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 73, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("SUWA") (quoting Marsh, 490 U.S. at 374, 109 S.Ct. 1851) (emphasis added).

Reclamation does not suggest, much less argue, that it need not supplement the 1984 EIS because no "'major Federal actio[n]' [remains] to occur[.]" See Marsh, 490 U.S. at 374, 109 S.Ct. at 1859 (quoting 42 U.S.C. § 4333(2)(C)). Assuming, as did Reclamation, that the "major federal action" element is met here,[20]

---

[20] The court observes that it is debatable whether a major federal action remains to occur here. If, as plaintiffs state in their reply, the Scorpion Bay Marina was merely a "*proposed* marina . . . *to be* constructed on land owned by the [BOR], and its construction [still] require[d] BOR approval[,]" Pls.' Reply (Doc. 162) at 1:27-28 - 2:1 (citation omitted) (emphasis added), then, almost certainly, there would be a major federal action within the meaning of section 4333(2)(C). See, e.g., Marsh, 490 U.S. at 385, 109 S.Ct. 1851 (major federal action remained to occur where dam construction project giving rise to environmental review was only a third complete).

Despite plaintiffs' depiction of the Scorpion Bay Marina, it is not "proposed[,]" awaiting construction. That Marina is and has been a reality for some time. In accordance with Fed. R. Evid. 201, the court takes judicial notice that that marina has been constructed and is operational. On that basis, arguably, there is no major federal action remaining to occur so as to trigger a duty by Reclamation to supplement the 1984 EIS. See, e.g., SUWA, 542 U.S. at 73, 124 S.Ct. 2373 (citation and emphasis omitted) ("no ongoing 'major Federal action' . . . requir[ing] supplementation" where agency had already finally approved programmatic land use plan); Cold Mountain, 375 F.3d at 894 (holding, with no analysis, that given the Forest Service's issuance and approval of a special use permit, there was "no ongoing 'major Federal action' requiring supplementation[,]" although the permit arguably required the Forest Service's oversight); Envtl. Prot. Info. Ctr. v. U.S. Fish & Wildlife Serv., 2005 WL 3021939, at *6 (N.D.Cal. Nov. 10, 2005) (no "major federal action" implicating the duty to supplement an EIS where adoption of the Conservation Plan and issuance of the Take Permit were "all complete[,]" and all that remained was federal defendants' "'adaptive management'" thereunder); but see Sierra Club v. Bosworth, 465 F.Supp.2d 931, 939 (N.D.Cal. 2006) ("timber sales contract . . . approved by the Forest Service and awarded to a third party remain[ed] a 'proposed action' . . . requir[ing] supplementation [of EIS] if new significant information emerges[]" because contracts: (1) were "akin to the site-specific dam construction at issue in Marsh[;]" (2) permitted unilateral

1  the court will confine its analysis of the supplementation issue to

2  whether, as plaintiffs argue, Reclamation had a duty to supplement

3  in accordance with 40 C.F.R. § 1502.9(c)(1)(I) or (ii).

4        "Under NEPA, agencies must not only perform EISs prior to

5  taking federal action, but agencies must perform *supplemental* EISs

6  whenever

7        '(I) The agency makes substantial changes in the proposed
           action that are relevant to environmental concerns; *or*

8
        (ii) There are significant new circumstances or information
9        relevant to environmental concerns and bearing on the
         proposed action or its impacts.'

10

11 Klamath Siskiyou Wildlands Center v. Boody, 468 F.3d 549, 560 (9th

12 Cir. 2006) (quoting 40 C.F.R. § 1502.9(c)(1)) (bold emphasis

13 added).   The Supreme Court, as earlier noted, has interpreted these

14 regulations to require preparation of a SEIS "if the new

15 information is sufficient to show that the remaining [major federal

16 action] will affec[t] the quality of the human environment in a

17 significant manner or to a significant extent not already

18 considered[]" by the federal agency.   Marsh, 490 U.S. at 374, 109

19 S.Ct. 1851) (citation, footnote and internal quotation marks

20 omitted).

21 . . .

22 ────────────────────

23 termination by Forest Service "if its original environmental analysis has been
   altered[;]" and (3) "required . . . Forest Service's written approval of the
24 operating plan prior to the commencement of logging[]"); ONRC, 445 F.Supp.2d at
   1222 (major federal action remaining to occur where "agency's original decision to
25 award the [timber sale] contracts were set aside, and the logging of . . . timber
   sales [were] permanent[ly]" enjoined "until the Forest Service . . . ma[k]e[s] a
26 fully-informed decision, in compliance with NEPA, that is should proceed with the
   logging[]").
        Courts have taken a somewhat nuanced approach to the issue of whether a
27 federal action remains to occur, as can be seen.  Further, the resolution of that
   issue also is highly fact-intensive.  Neither plaintiffs nor Reclamation engaged
28 in that critical analysis.   Thus, as indicated above, the court declines to
   speculate and instead assumes *arguendo* that a major federal action remains to occur
   here.

                                    - 45 -

### *b.* **"Substantial Change" in Proposed Marina**

Plaintiffs advance a new theory of changed circumstances in their reply.[21] They assert that "[t]he 1984 EIS contemplated a "'relatively small (12-acre) marina[,]" but it was later "substantially expanded." Pls.' Reply (Doc. 162) at 3:20-22 (citing PSOF (Doc. 151) at ¶ 64). Referring to paragraph 64 of PSOF shows that plaintiffs believe that "the proposed *marina* will encompass about 164 acres." PSOF (Doc. 151) at 18:5-6, ¶ 64 (citation omitted) (emphasis added). That is an inaccurate statement of the record. The 164 acres refers to the total acreage for the "project[]" – not just for the marina. Admin. R., at 9. Conveniently overlooking that discrepancy, plaintiffs argue that the increase in marina size constitutes a "substantial change in the proposed action after issuance of the 1984 EIS[,]" thus warranting preparation of a SEIS. Pls.' Reply (Doc. 162) at 22-24 (citing Cold Mountain, 375 F.3d at 892).

In response, Reclamation simply declares that because "[t]he increase in size of the proposed marina was considered and addressed[,]" it was not required to prepare a SEIS. BOR's Reply (Doc. 164) at 5:22. Reclamation further responds that that change was "not of sufficient . . . character to require preparation of an EIS." Id. at 5:23 (citation omitted). Both contentions are valid.

It is readily apparent from the administrative record that during the protracted environmental review process, from the 1984 EIS through the Final 2007 EA, the acreage for the proposed marina

---

[21] Ordinarily the court would not consider a new argument made for the first time in a reply. However, where, as here, the opposing party, *i.e.* Reclamation, has had an opportunity to respond in its reply, there is no resultant prejudice.

fluctuated.  The 1984 EIS took into account that as a result of
increasing the height of the Waddell Dam, most of the recreational
facilities then-existing at Lake Pleasant would be submerged.  See
Admin. R., at 1-2.  That EIS therefore included a "conceptual
recreation plan for LPRP[.]" Id. at 3.  That Plan mentioned a
"ranger station/marina complex . . . *anticipated* to be about 12
acres[,] . . . based upon *estimated* acreages identified for other
features[.]"  Id. (emphases added).

At one point "[d]uring the [County's] Master Recreation Plan
["MRP"] planning process, a 200-acre marina was envisioned[.]" Id.
at 17.  Based upon the 1984 EIS, however, the County's 1995 MRP
"indicated[,]" that "there would be a 400-acre marina which
conceptually[]" would include a variety of amenities.  Id.; see
also id., Vol. 6 at 13.  Indeed, "[t]he 1997 EA recognized [that]
the MRP included greatly expanded marina facilities from what was
envisioned in the Plan 6[22] conceptual recreation plan[.]" Id., Vol.
3 at 3 (footnote added).  Because of that, although Reclamation
"determined a [FONSI] was appropriate for approval of the MRP," the
"1997 EA indicated that development of a marina would require
separate Reclamation review and approval" to ensure "site-specific
NEPA compliance . . . prior to Reclamation's approval of the marina
plans."  Id.  Ultimately, the Final EA reflected that the proposed
"project would encompass about 164 acres total[.]" Id. at 9.  "Of
the 71 acres located above elevation 1702 feet, approximately 37
acres would be permanently affected by the construction of marina
facilities.  The area within the [L]ake that would be taken up by

---

[22]     That Plan, in turn, was part of the 1984 EIS and is the "Agency
Proposed Action" in the EIS.  Admin. R., at 2.

1   the marina facilities would be about 33 acres." Id.

2       On this record, the court is not convinced that the difference
3   between the "anticipated" 12 acre marina and marina acreage just
4   described is "substantial" so as to require a SEIS pursuant to 40
5   C.F.R. § 1502.9(c)(1)(I). This is especially so given that the
6   1997 EA contemplated a vastly larger 400 acre marina. See Admin.
7   R., at H-98 ("The 1997 EA analyzed a 400-acre marina at the
8   Scorpion Bay site.") Therefore, it can hardly be said that the
9   marina acreage in the Final EA was a "substantial change"
10  necessitating a SEIS.

11      Additionally, even if the court were to find that increased
12  marina size is tantamount to a "substantial change," plaintiffs
13  have not shown that such a change would "significantly impact the
14  environment in a way not previously considered[.]" N. Idaho Cmty.
15  Action Network v. U.S. DOT, 545 F.3d 1147, 1158 (9th Cir. 2008)
16  (citing, inter alia, Marsh, 490 U.S. at 373-74, 109 S.Ct. 1851).
17  There is no requirement that an agency "start the environmental
18  assessment process anew with every change in a project." Price
19  Road, 113 F.3d at 1509 (citation omitted). "[S]upplemental
20  documentation is only required when the environmental impacts reach
21  a certain threshold – i.e. significant (defined at 40 C.F.R.
22  § 1508.27) or uncertain." Id. at 1509. Plaintiffs have made no
23  such showing here. For these reasons, the court finds that
24  Reclamation did not have an obligation to issue a SEIS based upon
25  40 C.F.R. § 1502.9(c)(1)(I).

26          *c. "Significant New Information or Circumstances"*
27      Plaintiffs' reliance upon the second prong of section
28  1502.9(c)(1) is similarly unavailing. Plaintiffs declare that

1 since preparation of the 1984 EIS, "the Lake has dramatically

2 increased in size and volume." Pls.' Mot. (Doc. 150) at 10:16-17

3 (citing PSOF (Doc. 151) at ¶ 14). Plaintiffs add, "[t]he maximum

4 volume has more than quadrupled, while the surface area has almost

5 tripled[,]" id. at 10:17-18 (citation omitted), which Reclamation

6 does not dispute. BOR's Resp. PSOF (Doc. 156) at 4-5, ¶ 14.

7 Plaintiffs believe that that increase in size and volume

8 constitutes a "significant new circumstance[] or information"

9 within the meaning of section 1502.9(c)(1)(ii), in turn, compelling

10 the issuance of a SEIS.

11     Reclamation agrees that the Lake's size has increased, but it

12 disagrees that that information is "new." See id. This position

13 is well-taken. That increase in the Lake's size is hardly a

14 "significant new circumstance[] or information" given that at least

15 since the 1984 EIS it was known that the Lake would become larger

16 due to the construction of the New Waddell dam. As this court

17 previously explained:

18         Because water levels were to increase significantly
        with the construction of the New Waddell Dam,

19         submerging the then existing public marina, the 1984
        EIS included a recreational development plan for the

20         enlarged lake resulting from the new dam.

21 Lake Pleasant I, 2007 WL 1486869, at *1 (emphasis added); see also

22 Admin. R., at 1-2. Moreover, even if plaintiffs had shown that an

23 increase in the size of the Lake was a "significant new

24 circumstance [or] information," again, they have not shown that

25 that increase "will affec[t] the quality of the human environment

26 in a significant manner or to a significant extent not already

27 considered[.]" See Marsh, 490 U.S. at 347, 109 S.Ct. 1851

28 (citations, footnote and internal quotation marks omitted)

(emphasis added).  Plaintiffs therefore cannot prevail on their claim that Reclamation violated NEPA by not issuing a SEIS pursuant to 40 C.F.R. § 1502.9(c)(1)(ii).

Lastly, the court notes that plaintiffs' reliance upon <u>Cold Mountain</u>, as a basis for requiring a SEIS here, is misplaced. Hence, <u>Cold Mountain</u> does not alter this court's analysis of the duty to supplement.  There, the Ninth Circuit held that the Forest Service did not have an obligation to supplement its NEPA analysis under 40 C.F.R. § 1502.9(c)(1)(I) and (ii), due to the lack of an "ongoing major Federal action requiring supplementation."  <u>Cold Mountain</u>, 375 F.3d at 894 (citation and internal quotation marks omitted).  Thus, the Court had no reason to and, indeed, did not consider what constitutes "substantial changes" or "significant new . . . information" as those phrases are used in section 1502.9(c)(1).

"Particularly considering its limited role in determining whether [Reclamation] acted arbitrarily or capriciously" by not "prepar[ing] a[] SEIS," the court is satisfied that Reclamation did not have an obligation to prepare a SEIS pursuant to 40 C.F.R. § 1502.9(c)(1)(I) or (ii).  <u>See</u> <u>Friends of Canyon Lake v. Brownlee</u>, 2004 WL 2239243, at *14 (W.D.Tex. Sept. 30, 2004).  The change in Lake Pleasant's size and volume and the expansion of the marina are not "substantial changes" or "significant new circumstances or information" that have not already been considered "sufficient to trigger the need for [Reclamation] to take another 'hard look' at the [marina project]."  <u>See id.</u>  Based upon plaintiffs' arguments, the court cannot find that they have "present[ed] a seriously different picture of the environmental landscape of [Lake

- 50 -

Pleasant], requiring a[] SEIS."  See id. (footnote omitted).  In

sum, Reclamation is not in derogation of its NEPA duties for not

preparing a SEIS because plaintiffs have not shown that either the

increase in the Lake's size or the expansion of the marina

"result[ed] in significant environmental impacts in a manner not

previously evaluated and considered."  See N. Idaho Cmty. Action

Network, 545 F.3d at 1157 (citation and internal quotation marks

omitted).

### B. "Deficiencies" in Final EA

Plaintiffs' next NEPA claim pertains to alleged deficiencies

in the Final EA.  Plaintiffs argue that that EA "is deficient

because it overlooked a number of potential environmental impacts

and other considerations which, at a minimum, could have influenced

BOR's decision whether to issue a FONSI."  Pls.' Mot. (Doc. 150) at

11:17-19.  Given the law of the case rulings herein, plaintiffs'

remaining challenges to the Final EA pertain to: (1) the watercraft

usage rate calculation; (2) the pump-out system response;

(3) elimination of the No Action Alternative; and (4) whether

Alternative A is a meaningful alternative.

Addressing each challenge in turn, the court is mindful of its

modest task and the limited scope of its review.  In accordance

with the APA, the court will engage in a "'searching and careful'"

review of the Final EA[.]"  Ctr. for Biological Diversity v.

Kempthorne, 588 F.3d 701, 707 (9th Cir. 2010) (quoting Marsh, 490

U.S. at 378, 109 S.Ct. 1851).  At the same time, this review must

be "'narrow'" given that the court cannot "substitute [its]

judgment for that of the agency."  Id. (quoting Marsh, 490 U.S. at

378, 109 S.Ct. 1851).

### 1. *Standards of Review*

"NEPA exists to ensure a process, not to mandate particular results." Native Ecosystems Council v. Tidwell, 599 F.3d 926, 936 (9th Cir. 2010) (citation and internal quotation marks omitted). "NEPA requires a federal agency to the fullest extent possible, to prepare a detailed statement on the environmental impact of major Federal actions significantly affecting the quality of the human environment." Id. (citation and internal quotation marks omitted). In the NEPA process, preliminary to an agency's preparation of an EIS it may prepare an EA "to determine whether a proposed action may significantly affect the environment." Id. at 936-37 (citations and internal quotation marks omitted). "If the agency concludes in the [EA] that there is no significant effect from the proposed project, the federal agency may," as Reclamation did here, "issue a [FONSI] in lieu of preparing an EIS." Id. (citation and internal quotation marks omitted). However, "[i]f an agency decides not to prepare an EIS," which also occurred here, "it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." Id. at 937 (citation and internal quotation marks omitted). "Th[at] statement . . . is crucial to determining whether the agency took a hard look at the potential environmental impact of a project." Id. (citations and internal quotation marks omitted).

NEPA does not include standards for judicial review. Therefore, plaintiffs' NEPA challenges to the Final EA are subject to review under the APA. See Tidwell, 599 F.3d at 932 (citation omitted) ("review[ing] agency decisions for compliance with . . . NEPA under the . . . APA[]"). The APA directs reviewing courts to

"hold unlawful and set aside agency action, findings, and conclusions" only if they are "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"The court may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation and internal quotation marks omitted). Courts accord deference to "agency environmental determinations not because the agency possesses substantive expertise, but because the agency's decisionmaking process is accorded a 'presumption of regularity.'" Akiak Native Comty. v. U.S. Postal Serv., 213 F.3d 1140, 1146 (9th Cir. 2000) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 401, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); see also Ctr. for Biological Diversity, 588 F.3d at 707 (citation and internal quotation marks omitted) (Courts "are highly deferential [to the agency and] presume[] the agency action to be valid.")

This court cannot emphasize enough the deferential nature of this APA standard of review. "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about the environmental impact." River Runners, 593 F.3d at 1070 (citing, inter alia, Vt. Yankee Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). As the Ninth Circuit recently reiterated:

> In conducting an APA review, the court must determine whether the agency's decision is founded on a rational connection between the facts found and the choices made and whether

- 53 -

[the agency] has committed a clear error of judgment.

Id. (citation and internal quotation marks omitted).  Simply put, "[t]he [agency's] action . . . need only be *a* reasonable, *not the best or most* reasonable decision."  Id. (citation and internal quotation marks omitted) (emphasis added).

Finally, before discussing the merits, the court notes that because these NEPA claims involve review of an agency decision under the APA, summary judgment is "an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  City & County of San Francisco v. U.S., 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks and citation omitted); see also Border Power Plant v. Dep't of Energy, 467 F.Supp.2d 1040, 1054 (S.D.Cal. 2006) (citation and internal quotation marks omitted) ("In the absence of fact finding, summary judgment is an appropriate vehicle for disposing of the legal issues [under NEPA and the CAA].")  "The court's role in such cases is not to resolve contested fact questions which may exist in the underlying administrative record, but rather the court must determine the legal question of whether the agency's action was arbitrary and capricious."  Natural Resources Defense Council, Inc. v. U.S. Forest Serv., 634 F.Supp.2d 1045, 1054 (E.D.Cal. 2007) (citation and internal quotation marks omitted).

### *2.  Watercraft Usage Rate Calculation*

Plaintiffs argue that because the Final EA "acknowledges *uncertainty* as to current, actual *Lake usage figures*[,] . . . preparation of an EIS [is] warrant[ed][.]"  See Pls.' Reply (Doc. 162) at 15:23 - 16:1 (emphasis added) (citation omitted).  This

claimed uncertainty is based upon three discrete factual

underpinnings. First, plaintiffs perceive an inconsistency because

the Final EA states that the watercraft calculation was "'based

upon the entry fees collected at the Park entry stations[,]'" while

at the same time "admit[ting] that the actual number of watercraft

may be higher[23] 'due to noncompliance at self-pay stations and

alternative access points.'" Pls.' Mot. (Doc. 150) at 14:25-57

(quoting PSOF (Doc. 151) at ¶ 69 (quoting in turn Admin. R., at H-

_____

[23] In reality, the Final EA states that "the actual number of watercraft entering from LPRP may be *slightly* higher." Admin. R. at H-31 (emphasis added). Perhaps plaintiffs' omission of the word "slightly" was an oversight. All of the parties at times seem to have mischaracterized the evidence – either by selectively quoting from the record or by citing to a part of the record which did not support their contention.

The parties' submissions are replete with such instances too numerous to count. To illustrate, in discussing CO emissions, LPMP argued that Reclamation "has no authority to address the increasing amount of traffic and visitors to the Maricopa County Park – it cannot control where they come from, what they drive or emit, or whether they travel through a non-attainment or maintenance area." LPMP's Reply (Doc. 166) at 18:14-17 (citing ACSOF ¶ 4)). The cited paragraph reads as follows:

The Final EA states,

> Under the No Action alternative, it is expected that
> visitation to LPRP and use of Lake Pleasant would
> continue to increase. As the northern portion of
> Maricopa County continues to become urbanized the rural
> nature of the LPRP experience will become more like that
> of a suburban park.

ACSOF (Doc. 167) at 6, ¶ 4:24-28 (citation omitted). It is readily apparent that the just quoted statement is not germane to the issue of Reclamation's authority, or lack thereof, to control increasing traffic and visitors to LPRP.

In its Response to PSOF, Reclamation similarly misstates the record. Reclamation "assert[s] that the [MCAQ] reviewed the air quality sections of the Draft [EA] and noted that an analysis of CO emissions from watercraft and *vehicles* should be estimated in the [EA]." BOR's Resp. PSOF (Doc. 156) at 8, ¶ 34:6-10 (citing at pp. D-9 - D-10.) (emphasis added). Conspicuously absent from the cited pages is any mention of vehicles. The subject line of that letter is "*Nonroad* engines emission estimates for proposed Scorpion Bay Marina[.]" Admin. R., at D-9 (emphasis added). Given that subject line, it is not surprising that vehicles are not discussed therein. Whether such statements of all the parties are due to oversight or adversarial overzealousness, they are not helpful in resolving the complex issues raised in these motions.

31) (footnote omitted). The court observes that to the extent
plaintiffs are suggesting that collection of entry fees was the
sole basis for Reclamation's calculation of watercraft usage, they
are wrong. The Final EA, and particularly the appendix entitled
"Methodology for Estimating Current and Anticipated Future
Watercraft Use at Lake Pleasant," thoroughly explains the manner in
which watercraft usage was calculated. Entry fee collection was
just one part of the calculation. When read as a whole, there is
nothing arbitrary and capricious about the Final EA's candid
recognition that "the actual number of watercraft entering from
LPRP may be *slightly* higher[,]" taking into account "non-compliance
at self-pay stations and alternative access points."

Second, plaintiffs strenuously disagree with the Final EA's
assumption of a 20% daily watercraft usage rate. Plaintiffs
denounce that percentage as "nothing more than an arbitrary figure
plucked out of thin air." Id. at 15:10. Third, in plaintiffs'
view, the alleged uncertainty as to watercraft usage rates arises
from the Final EA's "fail[ure] to give any consideration to the
increased Lake usage that will result from watercraft that are
stored at the proposed marina's 5-acre storage yard[.]" Id. at
15:13-14.

Plaintiffs, with no analysis, cite only to Nat'l Parks &
Conservation Ass'n v. Babbitt, 241 F.3d 722 (9th Cir. 2001), as the
basis for their assertion that due to the "uncertainty" as to the
factors listed above, Reclamation violated NEPA by not preparing a
SEIS. Plaintiffs' reliance upon National Parks demonstrates a
fundamental misunderstanding of that decision, however. There, the
Court did not address uncertainty in EAs generally. Nor did it

- 56 -

address uncertainty as to the factual basis for a given conclusion. Rather the focus of the Court's uncertainty analysis in Nat'l Parks was more narrow – "the environmental effects of a proposed agency action[.]" Id. at 731 (citation omitted).

In National Parks, the EA upon which the FONSI was based catalogued a number of "special effects" that an increase in cruise ship traffic entering Glacier Bay National Park would have on the environment. Id. at 732. Significantly, however, the EA "describe[d] the intensity or practical consequences of these effects, individually and collectively, as unknown." Id. at 732 (citation and internal quotation marks omitted). The EA repeatedly stated "unknown" as to variety of environmental impacts, such as the effects of cruise ship disturbance upon wildlife; "the effect[s] of noise and air pollution" upon wildlife; and "the degree of increase [in oil spills as a result of increased traffic][.]" Id. (internal quotation marks omitted). The Ninth Circuit thus held that National Park Service "made a clear error of judgment" by, inter alia, not preparing an EIS before allowing an increase in the number of cruise ship entries into Glacier Bay. Id. at 739 (citation and internal quotation marks omitted).

In so holding, the Ninth Circuit reiterated that "[a]n agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain." Id. at 731 (emphasis added) (citation omitted). "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, . . . , or where the collection of such data may prevent speculation on potential [environmental] effects." Id. at 732 (emphasis added) (internal citation and quotation marks omitted).

The EA at issue in <u>National Parks</u> established both criteria.  <u>Id.</u>
at 733.  As the foregoing amply demonstrates, it is not the mere
existence of some uncertainty which implicates a duty to prepare a
SEIS.  Rather, that uncertainty must pertain to environmental
impacts *and* be "highly uncertain." <u>See</u> <u>Envtl. Prot. Info. Ctr. v.</u>
<u>U.S. Forest Serv.</u>, 451 F.3d 1005, 1011 (9th Cir. 2006) (citations
and internal quotation marks omitted) ("[T]he regulations do not
anticipate the need for an EIS anytime there is *some* uncertainty,
but only if the effects of the project are highly uncertain.")

        Here, as outlined above, plaintiffs stress the purported
uncertainty of some of the data used in calculating the watercraft
usage rate.  They do not argue, nor have they shown, that the
environmental impacts of the proposed marina are highly uncertain
as <u>National Park</u> requires.  That omission is fatal to plaintiffs'
assertion that due to uncertainty in the EA, Reclamation violated
NEPA by not preparing a SEIS.  Consequently, the court finds that
plaintiffs have not met their burden of showing that the
environmental impacts of the proposed marina are highly uncertain
so as to warrant preparation of a SEIS.

                    ***3.  "Pump-out System"***

         After issuance of the Draft EA, there was public comment that
Reclamation had "overlooked" certain "water quality issues on the
Lake[,]" such as "human fecal waste[.]"  Admin. R. at H-87, at
¶ XIV(A).  As part of its broader argument that "[t]he Final EA is
based on inaccurate and incomplete data[,]" plaintiffs take issue
with Reclamation's response to that particular water quality issue.

        Plaintiffs underscore that the "Final EA . . . acknowledges,
'[t]he concessionaire would have no control over what boaters do

out in the [L]ake.'" Pls'. Mot. Summ. J. (Doc. 150) at 15:25 - 16:1
(quoting Admin R., at H-104).  That is true, but plaintiffs are
ignoring the broader context of that quote.  Following that candid
admission, the EA adds that "[a]*ll concession-run activities such
as* maintenance and repair activities, *operation of boat pump-out
stations*, fueling operations, etc., would comply with all
applicable regulations and follow generally accepted best
management practices to avoid runoff into the lake."  Admin. R., at
H-104 (emphasis added).  The court fails to see how Reclamation's
candid nod to reality equates to arbitrary or capricious conduct.
This is especially so given the Final EA's recognition that the
concessionaire must operate its boat pump-out stations in
conformity with applicable regulations and accepted best practices.
Notably, the Final EA also explains that the "boat pump-out system
would be constructed in cooperation with the Arizona Game & Fish
Department . . . in response to the Clean Vessel Act of 1992[]" -
an Act "passed to help reduce pollution from vessel sewage
discharges."  Id. at 14.

Further, the FONSI states that "[t]he [p]roposed Marina would
be equipped with a 'state-of-the-art' boat pump-out system to
remove and transport waste from boats to the marina's lift
station."  Id., Vol. 3 (FONSI) at 5.  From plaintiffs' perspective,
this too was an inadequate response to the human waste issue,
because the Use Management Agreement ("UMA") between the County and
LPMP does not require LPMP do provide such a system.  See Admin R.,
Vol. 1 (UMA) at 000171-000172.  To comport with NEPA, the source of
LPMP's obligation to provide a pump-out system does not necessarily
have to be contractual, however.

Moreover, in responding to concerns about water quality due to human waste, the FONSI explains:

> The existing marina has been in operation for ten years. As indicated in the EA, there has been no detection of human or animal fecal waste in Lake Pleasant water in the 3 years that CAWCD [Central Arizona Water Conservation District] has been testing for cryptosporidium and giardia.

Id., Vol. 3 (FONSI) at 5; see also id., (Final EA) at 23. In light of the foregoing, combined with Reclamation's discussion and analyses of water quality standards and the proposed marina's wastewater system, see, e.g., Admin. R. at 23; and at H-109, Reclamation's response to public comment as to water quality was not "arbitrary, capricious, an abuse of discretion" or "otherwise not in accordance with the law." See 5 U.S.C. § 760(2)(A).

### 4. Alternatives

"NEPA requires [an] agenc[y] to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" N. Idaho Cmty. Action Network, 545 F.3d at 1153 (quoting 42 U.S.C. § 4332(2)(E)). "This 'alternatives provision' applies whether an agency is preparing an . . . EIS" or[,]" as here, "an . . . EA, and requires the agency to give full and meaningful consideration to all reasonable alternatives." Id. (citation omitted); see also Te-Moak Tribe v. U.S. Dept. of the Interior, 2010 WL 2431001, at *6 (9th Cir. June 18, 2010) (citations omitted) ("Agencies are required to consider alternatives in both EISs and Eas and must give full and meaningful consideration to all reasonable alternatives.") Significantly though, "an agency's obligation to consider alternatives under an EA is a lesser one

- 60 -

than under an EIS." <u>N. Idaho Cmty. Action Network</u>, 545 F.3d at 1153 (citation and internal quotation marks omitted). "[W]ith an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives[.]'" <u>Id.</u> (citing 40 C.F.R. § 1502.14(a)). Conversely, "with an EA, an agency only is required to include a *brief* discussion of reasonable alternatives." <u>Id.</u> (citing 40 C.F.R. § 1508.9(b)) (emphasis added).[24] As will soon become evident, plaintiffs are conveniently overlooking this distinction. They are attempting to hold Reclamation to the more stringent standard which applies when discussing alternatives in an EIS, as opposed to in an EA.

### a. "No Action Alternative"

Plaintiffs fault Reclamation's elimination of the No Action Alternative on three separate grounds, which the court will discuss in turn.

### I. Need Determination

Again selectively quoting from the Final EA, plaintiffs contend that Reclamation improperly "dismissed the 'No Action' alternative by asserting that the County 'has determined there is a

---

[24] Plaintiffs insinuate that because the Final EA contains only two alternatives – "No Action" and "Action Alternative A," it does not comply with NEPA. <u>See</u> Pls.' Mot. (Doc. 150) at 16:18-19. This Circuit has recognized, however, that NEPA regulations "do[] not impose a numerical floor on alternatives to be considered." <u>Native Ecosystems Council v. U.S. Forest Serv.</u>, 428 F.3d 1233, 1246 (9th Cir. 2005) (footnote omitted). Nor does this Circuit "require an agency to discuss a minimum number of alternatives[]" under NEPA. <u>Natural Resources Defense Council</u>, 634 F.Supp.2d at 1059 (citing, *inter alia*, <u>Native Ecosystems</u>, 428 F.3d at 1246). Moreover, because agencies have a lesser obligation to consider alternatives in an EA, "consideration of only two . . . (a no action and a preferred alternative) may suffice." <u>Hamilton v. U.S. Dep't of Transp.</u>, 2010 WL 889964, at *6 (E.D.Wash. March 8, 2010) (citing <u>N. Idaho Cmty. Action Network</u>, 545 F.3d at 1153). Thus, to the extent plaintiffs are arguing that Reclamation did not comply with NEPA's alternatives provision because it considered only two alternatives, that argument is without merit. <u>See</u> <u>Te-Moak Tribe</u>, 2010 WL 2431001, at *7 n. 11 (no merit to plaintiffs' suggestion that the agency violated NEPA "by considering only two actions-the proposed plan and the No Action Alternative[]").

need for a [new] marina and its associated amenities as part of'
the Park." Pls.' Mot. (Doc. 150) at 16:21-23 (quoting [P]SOF [Doc.
151] at ¶ 86). Based upon that snippet, plaintiffs assert that the
County's need determination amounts to an impermissible
"abdicat[tion]" of Reclamation's "NEPA-imposed obligation to
consider and evaluate alternatives to a proposed action." Id. at
16:23-24 (citations omitted).

There are legal and factual flaws with plaintiffs' argument.
Factually, despite what plaintiffs imply, the County did not act
alone in making the need determination. As Reclamation counters,
and the EA states, "[r]ecreational planning associated with the New
Waddell Dam feature of the Regulatory Storage Division of CAP has
consistently envisioned a marina as one of the developments to be
included in the park to be operated and maintained by the local
sponsor; this was even before the County became the local operating
entity of the park." Admin. R. at 17 (emphasis added). Further,
as detailed in the "background" section of the Final EA,
Reclamation had a long history of involvement with the recreational
development at Lake Pleasant. See id. at 1-3.

Not only that, Reclamation was the "lead agency responsible
for prepar[ing]" the EA, and the County was "the cooperating agency
due to its expertise in and responsibility for managing LPRP for
recreation." Id. at 1. Consistent with the foregoing, "[a]s the
responsible recreation land management agency for LPRP, [the
County] reconfirmed there is a need for a marina and its associated
amenities on the western shore of Lake Pleasant[.]" Id. at 17,
§ 2.4 (emphasis added). Viewing the administrative record as a
whole, it is readily apparent that the County did not act alone in

assessing the need for a marina at LPRP.  Indeed, the record shows just the opposite: Reclamation and the County were jointly involved in the NEPA process at nearly every step of the way.

To support its "abdication" argument, plaintiffs rely upon 40 C.F.R. § 1506.5(b), stating in relevant part that "[if] an agency permits *an applicant* to prepare an [EA], the agency, . . . , shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."  40 C.F.R. § 1506.5(b) (emphasis added).  Plaintiffs' reliance upon that regulation is misplaced.  First, the EA was "prepared by" Reclamation as "Lead Agency" and the County as "Cooperating Agency[.]" Admin. R. at Title Page) (emphasis omitted).  Therefore, on its face, it is questionable whether that regulation applies.  Assuming *arguendo* that the County is the "applicant" for purposes of section 1056.5(b), it did not prepare the EA alone as that regulation presupposes.  Second, nothing on the face of that regulation mandates that an agency must make a needs determination alone.  In short, the court does not find persuasive plaintiffs' argument that Reclamation improperly delegated to the County the decision as to the need for a new marina.

### *ii. Availability of Water Recreational Opportunities*

Plaintiffs' next argument is similarly unavailing.  They contend that the "EA's assessment of the No Action Alternative is based on [the] incorrect premise[,]" that "'water-based recreational opportunities *appear to be* limited to those that presently exist.'"  Pls.' Mot. (Doc. 150) at 17:1-2 (quoting [P]SOF

¶ 87) (emphasis added).  Despite the equivocal nature of that
statement, plaintiffs assert that it is "false[]" because their
"existing Pleasant Harbor Marina is not yet fully built out, and is
planning an expansion that would add 'another 160 wet slips and 400
dry stack storage spaces' for watercraft."  Id. at 17:3-5 (quoting
[P]SOF ¶ 89, quoting in turn Admin. R. at 8, § 2.1).  Plaintiffs
thus reason that "[c]ontrary to the . . . EA's premise,
recreational opportunities at the Lake will continue to increase
even if no action were taken[.]"  Id. at 17:6-7.

     At the risk of repetition, again, plaintiffs are selectively
quoting from the EA to create one impression.  Read in context and
in accordance with the record as a whole, however, that quote
creates a different and more accurate impression of the Final EA's
evaluation of "water-based recreational opportunities."  Plaintiffs
ignore that in discussing the No Action Alternative, the Final EA
factors that expansion into its analysis by explicitly "assum[ing]
. . . complet[ion] [of that] expansion[.]"  Admin. R. at 8, § 2.1;
see also id. (FONSI) at 3 (emphasis added) ("Given the recent and
ongoing rapid development in this portion of Maricopa County, and
Lake Pleasant being the only large water body serving this growing
population, at some point demand for marina slips could exceed
available supply, with or without Pleasant Harbor Marina's planned
expansion[.]") Thus, in considering future water-based recreational
opportunities, Reclamation did not take the overly restrictive
position which plaintiffs attribute to it.  Instead, Reclamation
assumed expansion of Pleasant Harbor Marina but, nonetheless,
eliminated the No Action Alternative because it "would not satisfy
the purpose and need for the project."  Id. (FONSI) at 4, ¶ 2.

### iii. *"Quality of Recreation Experience"*

Third, plaintiffs claim that in eliminating the No Action Alternative the Final "EA speculated that taking no action will leave demand for water recreation at the Lake unmet because, allegedly, the existing Pleasant Harbor Marina will not maintain the quality of its facilities." Pls.' Mot. Summ. J. (Doc. 150) at 17:8-10 (emphasis added). Plaintiffs actually misread the Final EA which states:

> As visitation increases for all recreation activities, and existing facilities reach their capacity limits, available recreation sites and facilities would likely deteriorate over time from overuse and the *quality* of the recreation experience for most users would decline.

Admin. R. at 34, § 3.4.2.1 (emphasis added). That statement does not correlate an unmet demand for water recreation with deterioration of existing facilities. That statement focuses on the overall "quality of the recreation experience[,]" as opposed to the availability of that experience in the first place. Further, that statement was made in discussing the "[e]nvironmental [c]onsequences" of the No Action Alternative. <u>See</u> <u>id.</u> The Final EA does not suggest elimination of the No Action Alternative due to deterioration of existing facilities from overuse. It is self-evident that the primary basis for eliminating the No Action Alternative is because it did not satisfy the project's stated purpose and need - development of marina facilities on the western shore of Lake Pleasant. As is readily apparent from the foregoing discussion, plaintiffs fail in their attempt to show that the Final EA's elimination of the No Action Alternative violated NEPA. It did not.

### b. "Action Alternative A"

Given the law of the case, as to Alternative A, plaintiffs are left with their argument that that Alternative is "not sufficiently different from the proposed marina to constitute a meaningful alternative[.]" Pls.' Mot. Summ. J. (Doc. 150) at 17:16-17 (emphasis omitted). Alternative A is not a meaningful alternative, plaintiffs contend, because there are "few differences" between it and the project as proposed. Id. at 17:24. Alternative A "would consist of three of the four phases of the proposed marina," resulting in spaces for roughly 200 watercraft less than the proposed marina. Id. at 17:24-26. Additionally, plaintiffs point out that the Final EA "repeatedly notes" that the potential environmental impacts of Alternative A "will be essentially the same as, if not identical to, those of the proposed marina." Id. at 17:27-18:1 (citation omitted). Hence, plaintiffs assert that Reclamation violated NEPA's alternatives provision, 42 U.S.C. § 4332(2)(E), because Alternative A and the proposed action are substantially similar.

Reclamation did not respond to this narrow argument. Reclamation instead stresses the purpose and need for the proposed action. Concisely put, it is Reclamation's position that it "reasonably defined the purpose and need of the project to include some funding for the County's management of the Lake[;]" and that "[o]nly projects associated with the county would do so." BOR's Cross-mot. (Doc. 154) at 20:8-9. Reclamation thus argues that it "rightly rejected any alternative [including Alternative A] that did not further the purpose and need for the project[.]" BOR's Cross-mot. (Doc. 154) at 21:4.

1    "In judging whether [Reclamation] considered appropriate and

2    reasonable alternatives, [the court's] focus [is] first on the

3    stated purpose for the . . . Project." See Native Ecosystems, 428

4    F.3d at 1246 (citation omitted).  Here, the "Purpose and Need"

5    section of the Final EA states in relevant part:

6              The purpose of the project is to provide expanded
               boating access, additional boat storage capacity,
7              and associated recreational facilities in a manner
               that will address the increasing demand for these
8              services, *provide financial resources for the
               maintenance of LPRP*, and maintain consistency with
9              the MPR.

10   Admin. R. at 4 (emphasis added).  The FONSI explained that "[t]he

11   proposed marina would operate with oversight by MCPRD [Maricopa

12   County Parks and Recreation Department], a public entity, and would

13   offer the public a choice in the type of setting and conditions

14   under which to store or rent their watercraft."  Id. (FONSI) at 4.

15   Moreover, as proposed, the new marina would result in MCPRD

16   "receiv[ing] additional resources for managing LPRP overall[]" in

17   the form of "a percentage of the annual revenue generated by the

18   [marina] concession."  Id. at 8.  Alternative A would not advance

19   the purpose and need of this project as it is not associated with

20   the County.  See id. (Final EA) at 17.  Thus, arguably Alternative

21   A was not a reasonable and appropriate alternative which

22   Reclamation had to consider in the first place.

23        In any event, Muckleshoot Indian Tribe v. U.S. Forest Serv.,

24   177 F.3d 800 (9th Cir. 1999), is plaintiffs' only legal support for

25   their argument that Alternative A is not a "meaningful" alternative

26   because purportedly it is too similar to the project as proposed.

27   As plaintiffs read Muckleshoot, "[t]he Ninth Circuit . . . *held

28   that an agency cannot satisfy NEPA's mandate to consider

alternatives by considering 'only a no action alternative along with two virtually identical alternatives.'" Pls.' Mot. (Doc. 150) at 18:2-4 (quoting _Muckleshoot_, 177 F.3d at 813) (emphasis added). A close reading of _Muckleshoot_ shows that it does not stand for that broad proposition. Moreover, Reclamation's consideration of alternatives herein is readily distinguishable from that of the Forest Service's in _Muckleshoot_. So, at the end of the day, _Muckleshoot_ does nothing to advance plaintiffs' argument that Reclamation violated NEPA because Alternative A is not a "meaningful alternative."

The first and perhaps the most critical distinction between _Muckleshoot_ and the present case is that the Court there was reviewing the adequacy of the range of alternatives in an EIS, whereas here the court is reviewing an EA. That is a critical distinction because, as mentioned earlier, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." _N. Idaho Cmty. Action Network_, 545 F.3d at 1153 (citation and internal quotation marks omitted). An EA need only "include a brief discussion of reasonable alternatives." _Id._ (citing 40 C.F.R. § 1508.9(b)). On the other hand, the preparation of an EIS obligates an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives[.]" _Id._ (quoting 40 C.F.R. § 1502.14(a)). _Muckleshoot_, therefore, "provides little support for requiring similar rigor" when, as here, the court is reviewing an EA. _See_ _Shasta Resources Council v. U.S. Dep't of the Interior_, 629 F.Supp.2d 1045, 1055 (E.D.Cal. 2009)(footnote omitted).

Second, despite plaintiffs' characterization of _Muckleshoot_, that Court did not hold that the Forest Service failed to consider

an adequate range of alternatives because "[t]he EIS considered only a no action alternative along with two virtually identical alternatives." Muckleshoot, 177 F.3d at 813. What occurred in Muckleshoot is that "initially" the Forest Service "considered five action alternatives and a no action alternative for the project." Id. After eliminating three alternatives from "detailed study[,]" the Forest Service performed analyses on the remaining two alternatives and the No Action Alternative. Id. The Ninth Circuit found "troubling" the Forest Service's failure to consider one of those "*preliminarily eliminated*" alternatives "that was more consistent with [the agency's] basic policy objectives than the alternatives that were the subject of final consideration." Id. (emphasis added). The Ninth Circuit's holding was not based upon the scant number of alternatives or the similarities between two of them.

Moreover, to reach that conclusion, the Muckleshoot Court "deviated" from the "deferential approach" typically afforded to an agency's consideration of alternatives. See Shasta Resources Council, 629 F.Supp.2d at 1055. The court agrees that "*Muckleshoot*'s rationale . . . suggests that the obligations imposed upon the Forest Service were the product of unique circumstances." See id. No such "unique circumstances" exist here. Plaintiffs are not arguing, and would be hard-pressed to do so, that Alternative A, a slightly smaller scale marina, is "*demonstrably* more consistent with [BOR's] 'basic policy objectives' or in the public interest[.]" See id. at 1056 (emphasis added).

One final distinction between Muckleshoot and the present case

is that there the corporate defendant conceded that the preliminarily eliminated alternative was a "viable alternative[.]" Muckleshoot, 177 F.3d at 814.  And, under applicable Ninth Circuit precedent, "[a] viable but unexamined alternative renders [the] [EIS] inadequate."  Id. (citation and internal quotation marks omitted).  In the present case, the viability of Alternative A is far from clear, especially taking into account the County's statement of need and economic viability.  Given the many distinctions between Muckleshoot and the present case, the former has no bearing on the issue of whether, as plaintiffs urge, Reclamation ran afoul of NEPA because purportedly Alternative A is not a meaningful alternative.

Viewing the administrative record as a whole demonstrates that Reclamation fulfilled its obligation under NEPA's alternatives provision.  It provided the requisite "brief discussion of reasonable alternatives" by considering the No Action Alternative, Alternative A, and the proposed marina.  See 40 C.F.R. § 1508.9(b). Moreover, plaintiffs have not met their burden of showing that Reclamation's decision to eliminate the No Action Alternative and Alternative A was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

To summarize with respect to the NEPA claims in Count Two, after carefully considering each of plaintiffs' arguments in that regard, the court finds none of them to be convincing.  There is a critical difference between an EA and an EIS.  "EAs are by definition simpler documents not subject to the same rigorous scrutiny as an EIS."  Sierra Nevada Forest Protection Campaign v. Rey, 573 F.Supp.2d 1316, 1349 (E.D.Cal. 2008) (citation omitted);

see also Grand Canyon Trust v. U.S. Bureau of Reclamation, 623 F.Supp.2d 1015, 1026 (D.Ariz. 2009) (an EA "need not be extensive[]"). "They are designed to reduce government costs, paperwork and delay through a "concise" public document." Sierra Nevada Forest, 573 F.Supp.2d at 1349 (citing 40 C.F.R. § 1508.9).

Plaintiffs' summary judgment motion seems to be little more than an attempt to hold Reclamation to NEPA's more stringent standards governing an EIS. Logically, an "'EA cannot be both concise and brief and provide detailed answers for every question.'" Id. (quoting Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 809 (8th Cir. 1998)." Yet, that seems to be precisely what plaintiffs are seeking – "detailed answers for every question" or issue, regardless of how inconsequential, but NEPA does not demand that, at least in the context of an EA. Thus, for the reasons delineated above, the court denies plaintiffs' motion for summary judgment as to Count Two. Conversely, the court grants the cross-motions for summary judgment by Reclamation and LPMP as to that Count. This relief is proper because plaintiffs did not meet their burden of showing that Reclamation violated NEPA by not preparing a SEIS. Further, plaintiffs did not meet their burden of showing that Reclamation acted arbitrarily, capriciously or abused its discretion with respect to the Final EA's: (1) calculation of the watercraft usage rate; (2) pump-out system response to public comment; and (3) consideration of the No Action Alternative and Alternative A.

### III. Clean Air Act

Plaintiffs style Count Three of their FAC as a claim for "failure to conduct [a] conformity determination[.]" FAC (Doc. 4)

at 23:5 (emphasis omitted).  As part of their relief, plaintiffs

are seeking a declaration that Reclamation "*violated* the *CAA* by

approving construction of the proposed Scorpion Bay Facility

without conducting a conformity determination[.]"  Id. at 27,

¶ 6:4-6 (emphasis added).  Plaintiffs reframe this count in their

summary judgment motion, claiming that the Final EA "violates NEPA"

because it "considers only certain ozone and $PM_{10}$ emissions sources,

and ignores motor vehicles altogether as a source of CO emissions."

Pls.' Mot. (Doc. 150) at 23:7-9.

### A.  *Standard of Review*

"[C]hallenges to conformity determinations may be not brought

under the citizen suit provision[]" of the CAA, 42 U.S.C.

§ 7604(a)(1), as LPMP and Reclamation are quick to note.[25]  See City

of Yakima v. Surface Transportation Board, 46 F.Supp.2d 1092, 1098

(E.D.Wash. 1999) (citing, *inter alia*, Conservation Law Found.,

Inc., v. Busey, 79 F.3d 1250 (1st Cir. 1996)).  Plaintiffs do not

dispute that, most likely because they are not relying upon that

CAA provision as a basis for Count Three.  Instead, plaintiffs

respond that their CAA claims, like their NEPA claims, are subject

to review under the APA.  See Pls.' Reply (Doc. 162) at 19:2-3

(citations omitted).  Plaintiffs' position is well-taken.  As the

court stated in Environmental Council of Sacramento v. Slater, 184

F.Supp.2d 1016 (E.D.Cal. 2000), "[i]t [is] well established that

challenges to agency determinations under the general provisions of

the [CAA] are properly analyzed under the APA rather than the

citizen provision of the [CAA]."  Id. at 1023 (citing, *inter alia*,

---

[25]     BOR's Cross-mot. (Doc. 154) at 21:14-15; and LPMP's Cross-mot. (Doc.
157) at 11 n.4:28.

*Conservation Law Foundation v. Busey*, 79 F.3d 1250, 1260 (1st Cir. 1996)).

So, once again, the court's review is narrowly circumscribed. It must apply the "familiar default standard of the [APA]," set forth earlier, "and ask whether [Reclamation's] action was 'arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law.'" See *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496, 124 S.Ct. 983, 157 L.Ed.2d (2004). Arbitrary and capricious review under the APA focuses on "the reasonableness of [the [agency's] decision-making processes[.]" *MacClarence v. U.S. E.P.A.*, 596 F.3d 1123, 1129 (9th Cir. 2010) (internal quotation marks and citation omitted).

To reiterate, this review entails "determin[ing] whether the agency's decision is founded on a rational connection between the facts found and the choices made and whether [the agency] has committed a clear error of judgment." *River Runners*, 593 F.3d at 1070 (citation and internal quotation marks omitted). "One example provided by the [Supreme] Court of such a 'clear error of judgment' sufficient to constitute arbitrary and capricious agency action is when the agency offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir.) (citation and internal quotation marks omitted), *amended*, 352 F.3d 1186 (9th Cir. 2003). By the same token, "where, as here, a court reviews an agency action involv[ing] primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise, [the court] must defer to the informed

- 73 -

discretion of the responsible federal agenc[y]."  <u>Latino Issues</u>
<u>Forum</u>, 558 F.3d at 941 (citations and internal quotation marks
omitted).  Likewise, "[e]ven when an agency explains its decision
with less than ideal clarity, a reviewing court will not upset the
decision on that account if the agency's path may reasonably be
discerned."  <u>Alaska Dep't of Envtl. Conservation</u>, 540 U.S. at 497,
125 S.Ct. 983.

Agency deference notwithstanding, this court's overarching
task is to "ensure that [Reclamation] has taken the requisite hard
look at the environmental consequences of [the] proposed [marina],
carefully reviewing the record to ascertain whether [Reclamation's]
decision is founded on a reasoned evaluation of the relevant
factors."  <u>Te-Moak Tribe</u>, 2010 WL 2431001, at *4 (citation
omitted).  Finally it bears repeating that plaintiffs have the
burden of proof, as the party challenging Reclamation's action as
arbitrary and capricious.  <u>See</u> <u>Overton Park</u>, 401 U.S. at 416, 91
S.Ct. 814.  "'Indeed, even assuming the [agency] made missteps
. . . the burden is on petitioners to demonstrate that the
[agency's] ultimate conclusions are unreasonable.'"  <u>George v. Bay</u>
<u>Area Rapid Transit</u>, 577 F.3d 1005, 1001 (9th Cir. 2009) (alterations
and ellipses in original) (quoting <u>City of Olmsted Falls, Ohio v.</u>
<u>FAA</u>, 292 F.3d 261, 271 (D.C.Cir. 2002)).  This is a heavy, although
not insurmountable, burden.

### B.  *Statutory and Regulatory Framework*

The CAA "establishes a comprehensive program for controlling
and improving the United States' air quality through state and
federal regulation."  <u>Latino Issues Forum</u>, 558 F.3d at 938.
Pursuant to that Act, the EPA must set national ambient air quality

standards ("NAAQS") for air pollutants.  42 U.S.C. § 7409 (West 2003).  States, in turn, "are responsible for ensuring that their air quality meets the NAAQS."  Latino Issues Forum, 558 F.3d at 938 (citing 42 U.S.C. § 7407(a)).  States maintain the NAAQs in part through the development of a "State Implementation Plan" or "SIP".  42 U.S.C. § 7410(a)(1).

"For planning purposes, EPA has divided each state into separate "air quality control regions."  Natural Resources Defense Council, Inc. v. South Coast Air Quality Management District, 2010 WL 939990, at *1 (C.D.Cal. Jan. 7, 2010) (citing 42 U.S.C. § 7407).  "EPA classifies each region based on whether the region meets the NAAQS."  Id. (citing 42 U.S.C. § 7407(d)); 40 C.F.R. Part 81, Subpart C).  "[E]ach region is designated as being either in attainment or nonattainment, or as unclassifiable with respect to each of the NAAQS."  Latino Issues Forum, 558 F.3d at 938 (citing 42 U.S.C. § 7407(d)).  Pursuant to the CAA, "federal projects" must "'conform' to emissions limits on six criteria pollutants established in the [SIP]."  City of Las Vegas, Nev. v. F.A.A., 570 F.3d 1109, 1117 (9th Cir. 2009) (citing 42 U.S.C. § 7506(c)(1)).  "A federal agency must conduct a 'conformity determination' analysis for each criteria pollutant where the proposed federal action would cause the total of direct and indirect emissions of the pollutant in a nonattainment or maintenance area to equal or exceed certain rates."  City of Las Vegas, 570 F.3d at 1117 (citing 40 C.F.R. § 93.13(b)).

### C.  Summary of Arguments

The three criteria pollutants at issue here are carbon

monoxide ("CO"); $PM_{10}$; and ozone.[26]  As the Final EA describes it,
"[a] portion of the project area lies within an area designated as
'maintenance' for CO[.]" Admin. R. at 50.  Additionally, "the
project area is located within an area designated as being in [a]
serious nonattainment for $PM_{10}$[.]" Id. at 48.  Lastly, "a portion of
the project area falls within an area designated as being in
nonattainment for the 8-hour ozone standard[.]" Id. at 49.  Based
upon the foregoing, the parties agree that the governing de minimis
rates are: (1) 100 tons per year for CO; (2) 100 tons per year for
ozone; and (3) 70 tons per year for $PM_{10}$.  See 40 C.F.R. § 93.153[27];
and Arizona Administrative Code R18-2-1438.

There is a fundamental disagreement though arising from
Reclamation's determination that:

> Air emissions attributable to the proposed
> project for carbon monoxide, ozone, and [$PM_{10}$],
> would not exceed the de minimis thresholds which
> would require that a conformity determination be
> conducted, in accordance with the [EPA's] General
> Conformity Rule.

Admin. R., Vol. 3 (FONSI) at 8.  Plaintiffs contend that that
determination was "based on incomplete information[,]"  Pls.' Mot.
Summ. J. (Doc. 150) at 21:2, whereas emphasizing the process that
the Final EA used to reach that conclusion, defendants respond that
Reclamation "properly considered air quality issues."  LPMP's
Cross-mot. (Doc. 157) at 11:13; and BOR's Reply (Doc. 164) at 14:9.

---

[26]     "Because ozone is not produced directly, EPA focuses on emission of its
precursors: nitrogen oxides ('NOX emissions') and volatile organic compounds ('VOC
emissions')."  Border Power Plant Working Group v. Dep't of Energy, 467 F.Supp.2d
1040, 1054 (S.D.Cal. 2006) (citing 40 C.F.R. § 51.852).  There is no need to
distinguish between those precursors here.  Thus, hereinafter the court will refer
generically to ozone emissions.

[27]     Although, as will be seen, EPA recently revised the General Conformity
regulations, including section 93.153, those revisions left intact these particular
rates.

Somewhat tellingly, although the project at issue is a marina, the primary thrust of plaintiffs' argument is that the Final EA improperly calculated vehicular emissions.  Plaintiffs argue that by assuming "the average trip per vehicle into/out from [the Park] is about 10 miles[,]" the Final EA "clearly understates $PM_{10}$ and ozone emissions" from vehicular traffic.  Pls.' Mot. Summ. J (Doc. 150) at 21:17-18 (citation and internal quotation marks omitted). Plaintiffs further claim that the Final EA "ignores motor vehicles altogether as a source of CO emissions."  Id. at 23:8-9.  Turning to other potential sources of CO emissions, which will be more fully discussed below, plaintiffs argue that such emissions are "indirect emissions" within the meaning of 40 C.F.R. § 93.152. Hence, plaintiffs maintain that the Final EA should have included those emissions, but it did not.

Plaintiffs only disagreement with the Final EA's calculation of watercraft emissions is that it improperly "ignore[d]" diesel engine emissions "because the proposed marina will not sell diesel fuel."  Id. at 21:12-13 (footnote omitted).  For all of these reasons, plaintiffs charge Reclamation with "taking a myopic view of the proposed marina by failing to consider all of the ozone, $PM_{10}$ and CO emissions it will produce," in "violat[ion] [of] NEPA."  Id. at 23:6-8.

Concentrating primarily upon watercraft emissions, Reclamation emphasizes the process in which it engaged in calculating potential air emissions for $PM_{10}$, ozone and CO emissions.  In their comment letters as to the Draft EA and the RDEA, plaintiffs claimed that "Reclamation's methodology[] used to calculate *de minimis* thresholds for CO, ozone, and $PM_{10}$ was flawed."  Admin. R., at 47.

Turning to MCAQ staff for their "guidance and expertise," that staff explained the methodology used in EPA models "and how the default values used in those models are applied" locally. Id. "For calculating emissions for nonroad engines, such as watercraft, EPA's guidance recommends that default equipment population and activity levels be changed if local data are available[.]" Id. Local data were then derived from a survey "of engines located at Pleasant Harbor Marina." Id. That "partial inventory" was "conducted by [LPMP] staff[.]" Id. at D-2. Reclamation "reviewed and modified [those] estimates[;]" id.; independently analyzed the emissions data it received; revised the calculations; and explained those adjustments in the Final EA and a 19 page appendix thereto entitled, "Assumptions and Calculations Used for General Conformity Rule Determination[.]" Id. at 45-15; and App. D thereto. These actions, Reclamation maintains satisfy NEPA's "hard look" requirement.

LPMP's cross-motion echoes Reclamation's process argument, stressing Reclamation's overall "conservative" approach in finding that a conformity rule determination was not required. See, e.g., LPMP's Cross-mot. (Doc. 157) at 15:20 and 16:7 and 16. Then LPMP takes a different approach. It contends that Reclamation "made a reasoned decision to *exclude emissions* from vehicles outside the Park in its conformity determination *because* they are *not indirect emissions* required under the CAA." LPMP's Cross-mot. (Doc. 157) at 16:9-11 (emphasis added); see also id. at 18:9-11 (same). LPMP further asserts that Reclamation "reasonably excluded" CO emissions from vehicles outside LPRP because "such emissions are not indirect

emissions under 40 CFR § 51.852[28]."  Id. at 16:24-26 (emphasis

added).  As to other potential sources of CO emissions, LPMP

contends that because such emissions will occur outside the CO

maintenance area, Reclamation did not have to include those

emissions in its air quality impact assessment.  Basically, it is

LPMP's position that plaintiffs have not met their burden of

showing that Reclamation "abused its discretion or otherwise acted

arbitrarily or capriciously with respect to air quality issues."

Id. at 19:24-25.

Insofar as $PM_{10}$ and ozone emissions are concerned, in their

responses to defendants' cross-motions, plaintiffs reiterate that

the Final EA "grossly understates" those emissions because of the

ten-mile round trip assumption.  Pls.' Reply (Doc. 161) at 13:2;

see also Pls.' Reply (Doc. 162) at 22:13 (that assumption

"drastically understates" vehicle mileage).  Unlike their summary

judgment motion, however, in their replies plaintiffs do not

mention the other possible sources of $PM_{10}$ and ozone.  In sharp

contrast, as explained in section 3(c) below, in their replies

plaintiffs greatly expand the scope of their initial arguments

pertaining to CO emissions  - but to no avail.

**_D.  Analysis_**

**_1.  Drifting Emissions_**

The court first will address plaintiffs' argument common to

all three pollutants - the Final EA improperly failed to consider

---

[28]    On April 5, 2010, the EPA revised the General Conformity Regulations.
75 Fed. Reg. 17254.  Those revisions became effective on July 6, 2010.  Id.  As
part of those revisions, One of those revisions was to delete this particular
section of the C.F.R., among others, because it "merely repeated the language in
40 C.F.R. . . . § 93.152." 75 Fed. Reg. 17254, § VI(A).  Accordingly, hereinafter
the court will refer only to  section 93.152.

drifting emissions from vehicular traffic.  As to ozone and $PM_{10}$

vehicular emissions, plaintiffs maintain that the Final EA should

have taken into account such emissions occurring outside the LPRP

boundaries.  Similarly, plaintiffs contend that the Final EA should

have considered CO emissions even if they did not originate in the

CO maintenance area, because they could have drifted from an

adjacent area into the maintenance area.  These potentially

drifting emissions "will not respect . . . boundaries[,]" as

plaintiffs put it.  Pls.' Reply (Doc. 162) at 20:16-17 (citation

omitted); and Pls.' Reply (Doc. 161) at 13:15 (citation omitted).

While having some superficial appeal, there is no legal basis

for this argument.  Morever, plaintiffs have waived their right to

challenge the Final EA as to drifting emissions because they did

not raise that issue during the administrative process.  As the

Supreme Court has explained, "[p]ersons challenging an agency's

compliance with NEPA must 'structure their participation so that it

. . . alerts the agency to the [parties'] position and

contentions,' in order to allow the agency to give the issue

meaningful consideration."  Dep't of Transp. v. Pub. Citizen, 541

U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (quoting Vt.

Yankee Power, 435 U.S. at 553, 98 S.Ct. 1197).

Much like Public Citizen, although plaintiffs submitted three

comment letters during the NEPA process,[29] they never criticized the

Final EA's conformity determination for not including drifting

_____

[29]     During the administrative process, written comments were prepared by
the Washington, D.C. office of Steptoe & Johnson, LLP, the lawyers at the time for
plaintiffs Maule-Ffinch and the Pensus Group.  With that clarification, for the
sake of brevity, hereinafter this decision will not make that distinction.  It will
simply refer to the comments as having been made on behalf of all plaintiffs.

emissions.  See id. ("None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the EA, and none urged the [agency] to consider alternatives.") In those comment letters, plaintiffs detailed what they perceived to be a number of flaws in Reclamation's conclusion that a conformity determination was not required.  Until now, however, plaintiffs have not mentioned a failure to account for drifting emissions. Reclamation therefore did not have an opportunity to address that issue during the administrative process.  Consequently, plaintiffs have waived any objection to the Final EA on the ground that it did not consider drifting emissions when arriving at its conformity determination.[30]  See id.

        Assuming *arguendo* that plaintiffs did not waive their argument as to drifting emissions, this argument lacks merit.  Neither of the two cases to which plaintiffs cite have any bearing whatsoever on the present case.  In League of Wilderness Defenders v. Forsgren, 309 F.3d 1181 (9th Cir. 2002), "the Forest Service prepared an EIS to identify and analyze the potential impacts" of a "program of annual aerial insecticide spraying over 628,000 acres of national forest lands" in two states.  Id. at 1191 and 1182. The Ninth Circuit held that the EIS did not "adequately analyze the issue of pesticide drift[]" where it did "not discuss . . . mitigation measures with respect to drift into adjacent areas . . .

---

        [30]  The court is well aware that Reclamation "bears the primary responsibility to ensure that it complies with NEPA, . . . , and an EA's . . . flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge the proposed action." Public Citizen, 541 U.S. at 765, 124 S.Ct. 2204.  That is not the situation here though.  A failure to consider drifting *vehicular* emissions in the context of this particular *marina* project is not "so obvious [a] flaw[]" that plaintiffs were not required to point it out specifically during the NEPA process.  See id. (emphasis added).

- 81 -

outside the target spray area.  _Id._ at 1191-92.

   _Forsgren_ is distinguishable both factually and legally.  The
drift at issue in _Forsgren_ is on a scale exponentially greater than
the potential drifting emissions herein.  There is a vast
difference between not taking into account pesticide drift from
aerial spraying occurring over half a million acres of national
forest, and not taking into account vehicular emissions in
connection with a marina.  Further, in _Forsgren_ the issue was
whether the EIS included a "reasonably complete discussion of
possible mitigation measures" which the Supreme Court requires.
_Id._ at 1192 (citation and internal quotation marks omitted).  The
General Conformity Rule and its attendant analysis were not at
issue in _Forsgren_, as they are here.

   Plaintiffs' reliance upon _North Carolina v. Tenn. Valley_
_Auth._, 593 F.Supp.2d 812, 829-34 (W.D.N.C. 2009), [_stay denied_,
2009 WL 2497934 (W.D.N.C. Aug. 14, 2009)]) is, if possible, even
more attenuated than their reliance upon _Forsgren_.  The former is
not in any way relevant to the issues now before this court.  _North_
_Carolina_ involved an adjudication of a state law public nuisance
claim against TVA for environmental and health effects allegedly
caused by coal-fired power plants.  It had nothing to do with the
EPA's General Conformity Rule and analyzing pollutants in
accordance therewith.

   Partially quoting from _North Carolina_, plaintiffs state that
"'emissions from a source located outside a state[,] . . . can
still have significant impact on that state's air quality[.]]"
Pls.' Reply (Doc. 162) at 20:19-21) (quoting _North Carolina_, 593
F.Supp.2d at 825.  The omitted phrase was "particularly an upwind

source." <u>North Carolina</u>, 593 F.Supp.2d at 825, ¶ 53 (citation

omitted). Regardless, that was one of the court's many factual

findings therein unique to that case. It certainly does suggest,

as plaintiffs mistakenly believe, because emissions can drift, they

must be included in making a conformity rule determination.

Having found no merit to plaintiffs' argument that the Final

EA improperly failed to consider drifting ozone, CO and $PM_{10}$

vehicular emissions, the court will turn to plaintiffs' remaining

arguments.

## 2. *$PM_{10}$ and Ozone Vehicle Emissions*

In arriving at "Total Recurring[31] $PM_{10}$ Emissions" of 16.03 tons

per year and "Total Recurring Ozone Emissions" of 37.69 tons per

year, Admin. R. at D-15 and D-17, the Final EA employs several

variables and assumptions. The Final EA also takes into account

these emissions from several different sources. Having cherry

picked the administrative record, plaintiffs disagree with only a

single assumption. They dispute the Final EA's use of a ten mile

round trip assumption to calculate vehicular $PM_{10}$ and ozone

emissions.

The Final EA states that $PM_{10}$ and ozone emissions "from

increased traffic resulting from the proposed project" were

"calculated conservatively," and based upon three assumptions. <u>Id.</u>

at 48 and 49. First, "the average trip per vehicle into/out from

LPRP is about 10 miles[.]" <u>Id.</u> Second, "every slip and dry storage

---

[31]     For each pollutant, the Final EA contains two broad classifications of
emissions – those from construction activities and those deemed to be "recurring."
Presumably the former are essentially one-time emissions. Plaintiffs are not
disputing any of the findings as to construction emissions. Further, they disagree
with only a few discrete aspects of the Final EA's calculations as to recurring
emissions.

area is rented (1,000 boats)," that is, 100% occupancy.  <u>Id.</u>
Third, "20 percent of boat owners visit every day[]" of the year.
<u>Id.</u>  Based upon those assumptions, the Final EA "[e]stimate[s] $PM_{10}$
emissions from onroad mobile sources [to] be about 2 tons per
year."  <u>Id.</u> at 48.  Relying upon those same assumptions, the Final
EA projects "approximately three tons per year of . . . ozone . . .
would be emitted annually."  <u>Id.</u> at 49.

Plaintiffs disagree with only one of the three assumptions in
that hypothesis.  They do not challenge the 100% occupancy
assumption, or the assumption that every single day of the year 20%
of boat owners will visit the marina.  Nonetheless, plaintiffs
assert that that assumption "clearly understates $PM_{10}$ and ozone
emissions, because it is obvious that the average visitor to the
Lake will drive more than five miles one-way from home to reach the
Lake."  Pls.' Mot. Summ. J. (Doc. 150) at 21:18 - 22:1-2.

Reclamation's response is silent as to plaintiffs'
disagreement with the ten mile round trip assumption.  With no
rationale, LPMP merely asserts that among other decisions by
Reclamation, use of the that assumption was "a 'conservative'
decision regarding the distance to the park boundary.'" LPMP's
Cross-mot. (Doc. 157) at 16:16.

Regardless, the fact remains that the burden is on plaintiffs
to show that the Final EA's use of the ten mile round trip
assumption was arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law.  Plaintiffs have not met that
burden.  Because plaintiffs' arguments in their memoranda on this
particular issue were brief, the court looked elsewhere for
elucidation.  PSOF does provide some insight, albeit not much. PSOF

asserts that "the evidence in the ["Administrative Record] suggests that assuming 10-miles-round-trip per vehicle visiting the Lake would grossly understate the vehicular traffic that will be generated by the proposed marina."  PSOF (Doc. 151) at 27, ¶ 105:18-20.  Overlooking the fact that this argument is procedurally improper,[32] based upon the just quoted language, the court gleans that plaintiffs are arguing that the $PM_{10}$ and ozone vehicular calculations "run[] counter to the evidence" before Reclamation due to use of the ten-mile assumption.  <u>See</u> <u>Sierra</u> <u>Club</u>, 346 F.3d at 961 (citation and internal quotation marks omitted).  This argument is unavailing.

In faulting the Final EA's use of a ten mile round trip assumption, plaintiffs state that "[t]here is no residential population for eight miles to the east of the Lake and five miles to the south, with 'minimal population for many miles to the west and the north.'" Pls' Mot. Summ. J. (Doc. 150) at 22:2-4 (quoting PSOF (Doc. 151) at ¶ 106).  That statement is taken almost verbatim from plaintiffs' August 2006 comment letter to Reclamation regarding the Draft EA.  <u>See</u> Admin. R. at H-83.  There is nothing in that comment letter substantiating plaintiffs' view, however. Plaintiffs do not, for example, rely upon or cite to any maps or census figures or other pertinent figures from governmental agencies.  Plaintiffs' unsupported and unsubstantiated views are not tantamount to record evidence.  Plaintiffs do not designate any

---

[32]     This argument is in direct contravention of LRCiv 56.1, which "does not permit explanation and argument supporting the party's position to be included in the . . . statement of facts." <u>Marceau v. Int'l Broth. of Elec. Workers</u>, 618 F.Supp.2d 1127, 1141 (D.Ariz. 2009) (citation and internal quotation marks omitted).  This is not the only such legal argument in PSOF, but the court is disregarding all others.

other part of the administrative record to support their argument as to the existence of residential population areas *vis-a-vis* the proposed marina. Thus, they have not shown that the ten mile round trip assumption runs counter to the evidence before Reclamation.

Apparently realizing the futility of disputing the ten mile assumption based upon the record evidence, as an afterthought plaintiffs note that "[i]n discussing the allegedly unmet demand for water recreation, the [f]inal EA mentions the population growth of Peoria, Surprise, and Buckeye." Pls.' Mot. Summ. J. (Doc. 150) at 21, n. 12. Yet, the Final EA did not consider driving distances from those locations when calculating vehicular $PM_{10}$ and ozone emissions. Plaintiffs thus ask this court to take judicial notice of the location of the "main post office branches" in those municipalities, <u>id.</u>, as well as of "the distances from th[os]e . . . post offices" to LPRP. Pls.' Reply (Doc. 162) at 22:22-23 (citation omitted).

This request is problematic on several levels. First, these post office locations and claimed mileages are not in the administrative record. Thus, plaintiffs' request is nothing more than a transparent attempt to expand the administrative record – something upon which this court has previously looked with disfavor. <u>See</u> <u>Protect Lake Pleasant IV</u>, (Doc. 97) (May 6, 2008) (denying plaintiffs' motion for extra-record discovery). Second, the references in the Final EA to the growth rates for Peoria, Surprise and Buckeye were used as "example[s]" of the "exponential growth[]" of "several communities in the northern and western portions of Maricopa County[.]" Admin. R., at 4. They were not mentioned for any other reason.

Third, to be sure, plaintiffs did cite authority supporting the proposition that a court may take judicial notice of the location of a federal building, such as United States Post Office. Pls.' Mot. Summ. J. (Doc. 150) at 21, n. 21 (citing Myers Investigative & Sec. Servs. v. United States, 47 Fed. Cl. 288, 297 (2000)). In paragraph 108 of their statement of facts, plaintiffs cite to the United States Post Office website for post office locations, but they omit any sources for corresponding mileage. See PSOF (Doc. 151) at 28, ¶ 108. Therefore, plaintiffs did not provide any basis for taking judicial notice of the mileage from those post offices to LPRP.

Fourth, even if the court were to take judicial notice of these Post Office mileages, their relevance is tangential at best. The court would be purely speculating if it were to try and correlate those distances to the number of vehicles that would be traveling from those areas to LPRP due to the new marina. So in its discretion, the court declines to take judicial notice of the distances between the Peoria, Surprise and Buckeye United States Post Offices and LPRP. Necessarily then, it will not take those distances into account in determining whether the Final EA's use of a ten mile round-trip assumption was arbitrary or capricious. In short, plaintiffs have not met their burden of showing that the Final EA's use of a ten mile round-trip assumption constitutes clear error of judgment.

Assuming arguendo that use of that ten-mile assumption was improper, still, plaintiffs have not shown that the Final EA violated NEPA because it underestimated vehicular $PM_{10}$ and ozone emissions. According to the Final EA, total recurring vehicular

PM$_{10}$ emissions are 42.82 *pounds* per year, or, in the relevant metric, 0.02141 tons per year. Admin. R. at D-15. The Final EA indicates 3.07 tons per year of recurring vehicular ozone emissions. Id. at D-16. Keeping in mind that here the *de minimis* levels are 100 tons per year for ozone and 70 tons per year for PM$_{10}$, even in the abstract, the 3.07 tons per year of ozone and 0.0214 tons per year of PM$_{10}$ are relatively inconsequential figures.

Putting these numbers in context makes them analytically more meaningful, and further demonstrates that plaintiffs have not met their burden of showing that Reclamation "committed a 'clear error of judgment sufficient' to constitute arbitrary and capricious agency action[]" in calculating vehicular PM$_{10}$ and ozone emissions. See Sierra Club, 346 F.3d at 961. With respect to PM$_{10}$, the Final EA attributes 18.61 tons of such emissions from construction and 16.03 tons per year for recurring emissions, yielding 34.64 tons. Id. at D-13 and D-15. So even assuming the construction emissions are not one-time, the total PM$_{10}$ emissions still are roughly 50% below the allowable level of 70 tons per year for a nonattainment area. Additionally, as calculated, PM$_{10}$ vehicular emissions are only 1.15% of PM$_{10}$ emissions from "Onroad Mobile Sources[,]" and only 0.13% of the total recurring PM$_{10}$ emissions. Vehicular PM$_{10}$ emissions, therefore, are a minuscule part of the total recurring PM$_{10}$ emissions. Because of that, even significantly increasing the ten mile round trip assumption would not impact the final PM$_{10}$ vehicular emissions so as to render the overall PM$_{10}$ emissions calculations arbitrary or capricious.

To illustrate, quadrupling the round trip assumption to forty miles, would yield a total of 171.26 pounds per year of recurring

vehicular $PM_{10}$ emissions.  Replacing that number with the 42.82
pounds per year in the Final EA would result in an increase from
1.86 tons per year to 1.92 tons per year for total recurring $PM_{10}$
emissions from all three onroad mobile sources.  See id. at D-15.
So even with that increase, $PM_{10}$ recurring emissions from vehicles
are negligible in terms of total $PM_{10}$ recurring emissions.

The same is true of vehicular ozone emissions.  The de minimis
limit here is 100 tons per year, as mentioned at the outset.  The
Final EA specifies .02 tons for construction emissions, and 37.69
tons per year for recurring ozone emissions, for a total of 37.71
tons.  Id. at D-16 - D-17.  Not surprisingly, the dominant source
of recurring ozone emissions is "Pleasure Craft" - 34.08 tons per
year.  Id. at D-16.  Recurring vehicular ozone emissions
represented in the Final EA, in contrast, account for a relatively
minor 3.07 tons per year, or nine percent of the total recurring
ozone emissions.  See id. at D-16.  So again, quadrupling the ten
mile round trip assumption would mean a corresponding quadrupling
from 3.07 tons per year of vehicular ozone emissions to 12.28 tons
per year.  Importantly though, even adding 12.28 tons per year to
the other sources of recurring ozone emissions, the end result
would be 46.90 tons per year  - still less than half of the 100
tons per year de minimus level for ozone in a nonattainment area.
This holds true even adding the meager .02 tons for construction
emissions.

As the foregoing shows, especially examining vehicular $PM_{10}$
and ozone emissions in the context of the entire administrative
record, plaintiffs have not met their burden of "demonstrat[ing]
that [Reclamation's] ultimate conclusions" as to those emissions

"are unreasonable." See George, 577 F.3d at 1001 (9th Cir. 2009)

(citation and internal quotation marks omitted).

Lastly, although not dispositive, the court cannot overlook

the APA's equivalent of the sporting maxim, "no harm, no foul."

Even assuming *arguendo* that Reclamation improperly used a ten mile

round-trip assumption for calculating vehicular $PM_{10}$ and ozone

emissions, as discussed above, plaintiffs have not shown that the

Final EA's estimations of those emissions would equal or exceed *de*

*minimis* threshold levels, so as to require a conformity

determination. As the Court reasoned in County of Rockland v.

F.A.A., 335 Fed.Appx. 52 (D.C.Cir. 2009)[33], cert. denied, ___ U.S.

___, 130 S.Ct. 1168, 78 USLW 3322 (2010), "[a]ssuming the agency

erred when it failed to inventory emissions, the petitioners still

have failed to identify any way in which the error was or might

have been harmful." Id. at 57 (citing 5 U.S.C. § 706 ("due account

shall be taken of the rule of prejudicial error" when court reviews

agency action).

### *3. Carbon Monoxide Emissions*

"Pleasure Craft" are the sole source of recurring CO emissions

in the Final EA, at 63.60 tons per year. See Admin. R. at D-18.

The Final EA concluded that "none will occur in the maintenance

area[.]" Id. The justification for excluding vehicular CO

emissions was "because the [CO] maintenance area within the

Maricopa County portion of the lake extends from the middle of the

lake eastward, and *vehicular traffic related to the new marina*

*would occur* on the western portion of the LPRP, *outside* the [CO]

---

[33]    The court may cite this unpublished opinion because it was issued after
January 1, 2007.  Fed. R. App. P. 32.1(a); U.S.Ct. of App. D.C.Cir. Rule 36(e)(2).

maintenance area." <u>Id.</u> at 50 (emphasis added). "For this same reason," the Final EA also excluded CO "emissions from equipment used to haul boats between the dry stack storage building and boat ramp . . . , since these facilities would be located *west of* the CO maintenance area." <u>Id.</u> (emphasis added). For a host of reasons, plaintiffs contest the Final EA's exclusion of these sources of CO emissions, as well as the exclusion of CO emissions from cars idling at the boat ramps and cars driving on the marina's unpaved parking lots.

### a. *"Indirect Emissions"*

Before addressing plaintiffs' arguments, the court is compelled to address LPMP's contention that Reclamation "made a reasoned decision to *exclude emissions* from vehicles outside the Park in its conformity determination *because* they are *not indirect emissions* required under the CAA." LPMP's Cross-mot. (Doc. 157) at 16:9-11 (footnote and emphasis added); <u>see</u> <u>also</u> <u>id.</u> at 18:9-11 (same). The pertinent EPA regulation provides that "[f]or Federal actions . . . , a conformity determination is required for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment or maintenance area caused by a federal action would equal or exceed" the stated emission rates. 40 C.F.R. § 91.153(b). "Indirect emissions" and "direct emissions" are regulatory terms of art. "Indirect emissions" are:

> (1) [c]aused by the Federal action, but may occur later in time and/or may be farther removed in distance from the action itself but are still reasonably foreseeable; and
>
> (2) The Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency.

1   40 C.F.R. § 93.152.[34] "Direct emissions . . . are caused or

2   initiated by the Federal action and occur at the same time and

3   place as the action." Id.

4        Relatively, LPMP devotes a significant part of its cross-

5   motion as to Count Three arguing that Reclamation "properly

6   excluded" CO vehicular emissions from the Final EA because they are

7   "not indirect emissions[.]"  LPMP's Cross-mot. (Doc. 157) at 18:10-

8   11.  More specifically, LPMP argues that Reclamation "does not have

9   any practicable control over future vehicle emissions outside the

10  Park."  Id. at 18:1-2.  Critically, that is not the Final EA's

11  stated rationale for excluding certain CO emissions.

12       LPMP gives the impression that the Final EA refers to "direct"

13  or "indirect" emissions, but it does not.  LPMP relies upon pages

14  47-51 of the Final EA and Appendix D thereto, but those pages are

15  silent as to "indirect" or "direct" emissions.  Further, it cannot

16  _____

17       [34]    In its recent revisions to the General Conformity regulations, the EPA
    did modify this definition, among others.  Effective July 6, 2010, 40 C.F.R. §
18  93.152 defines "indirect emissions to "mean[] those emissions of a criteria
    pollutant or its precursors:

19           (1) That are caused or initiated by the Federal action
                and originate in the same nonattainment or maintenance area
20              but occur at a different time or place as the action;

21           (2) That are reasonably foreseeable;

22           (3) That the agency can practically control; and

23           (4) For which the agency has continuing program responsibility.

24           For the purposes of this definition, even if a Federal licensing,
                rulemaking or other approving action is a required initial step for a
                subsequent activity that causes emissions, such initial steps do not
25              mean that a Federal agency can practically control any resulting
                emissions."

26  40 C.F.R. § 40 C.F.R. § 93.152.  Nonetheless, the court will apply the General
    Conformity regulations in place at the time of this action.  See Salazar-Paucar v.
27  I.N.S., 281 F.3d 1069, 1074 n. 3 (9th Cir.), amended by 290 F.3d 964 (9th Cir. 2002);
    see also Bohrmann v. Maine Yankee Atomic Power Co., 926 F.Supp. 211, 218 (D.Me.
28  1996) (applying regulations in effect at time of incident that gave rise to action,
    rather than revised regulations that took effect while action was pending).

be inferred from the cited portions of the record that Reclamation excluded vehicular CO emissions because ostensibly they were "indirect." There is no suggestion, for example, that those types of emissions were excluded because Reclamation could not "practicably control" them – an essential element of "indirect emissions." See 40 C.F.R. § 93.152. The Final EA also does not justify excluding CO emissions on the basis that Reclamation "can practicably control and will maintain control over [such emissions] due to a continuing program responsibility of [Reclamation]." See id. Nor does the Final EA exclude CO vehicular emissions because they are not "reasonably foreseeable[.]" See 40 C.F.R. § 93.152. There is simply no way to read the Final EA as excluding CO emissions because they are not "indirect emissions" within the meaning of 40 C.F.R. §93.152.

Moreover, as will be more fully discussed herein, the stated rationale for excluding vehicular CO emissions was because they were "outside the maintenance area[]" – not because they were "indirect emissions." See Admin. R. at 50. For these reasons, the rationale which LPMP is advancing in its cross-motion, *i.e.*, that vehicular emissions are "indirect," and hence excludable from the conformity rule determination, is an impermissible "*post hoc*" rationalization. See Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1164 (9th Cir. 1998) (citation omitted) ("The Supreme Court has forbidden district courts from relying upon . . . '*post hoc*' rationalizations for agency action."); Soda Mountain Wilderness Council v. Norton, 424 F.Supp.2d 1241, 1263 (E.D.Cal. 2006) (citations omitted) ("It is established that the court is not permitted to accept post-hoc rationalizations.") As such, the

1   court cannot accept this rationalization for Reclamation's decision
2   to exclude vehicle emissions when calculating CO emissions for the
3   proposed marina.  There is no valid reason for departing from the
4   general prohibition against *post hoc* rationalization where, as
5   here, it is being offered by the defendant-intervenor rather than
6   by the agency.

7               **b.  *Purported "Zero Increase" in CO Emissions***

8           Shifting to plaintiffs' CO emissions arguments, plaintiffs
9   charge Reclamation with excluding vehicular CO emissions based upon
10  the "obviously wrong . . . assumption that the proposed marina will
11  result in zero increase in CO emissions from motor vehicles."
12  Pls.' Mot. Summ. J. (Doc. 150) at 22:7-8; see also Pls.' Reply
13  (Doc. 162) at 19:26-28 (The "FONSI should be set aside because it
14  is based on the unsupportable premise that motor vehicles driving
15  to or from the proposed marina will generate no CO emissions.").
16  The court does not read the Final EA in the same way as do
17  plaintiffs.  If, as plaintiffs posit, the Final EA excluded
18  vehicular CO emissions because "the proposed marina will result in
19  zero increase in CO emissions from motor vehicles[,]" that would be
20  illogical.  See id. at 22:8.  That was not the Final EA's
21  justification though.

22          The Final EA excludes vehicular CO emissions because of *where*
23  they will occur – not because they will not occur at all.
24  Vehicular CO emissions were excluded because "none will occur in
25  the maintenance area[.]"  See Admin. R. at D-18.  Those emissions
26  will not occur in the CO maintenance area because that area "does
27  not include Castle Hot Springs Road which is on the west boundary
28  of the lake and is the primary entrance road into the west side of

the lake[,]" where the new marina is located.  BOR's Cross-mot.

(Doc. 154) at 22:29-21; <u>see</u> <u>also</u> Admin. R. at D-18; and 7.

Excluding vehicular CO emissions because they will occur outside

the maintenance area is quite different than excluding those

emissions because vehicles will not generate them in the first

place.  Accordingly, there is no credence to plaintiffs' assertion

that the FONSI "should be set aside because it is based on the

unsupportable premise that *motor vehicles* driving to or from the

proposed marina *will generate no CO emissions*."  <u>See</u> Pls.' Reply

(Doc. 162) at 19:26-28 (emphasis added).

### c. Plaintiffs' Catch-all CO Arguments

In arguing that "[t]he Final EA's carbon monoxide emissions[']

calculations are entirely unreasonable[,] Pls.' Reply (Doc. 162) at

19:12 (emphasis omitted), as previously alluded to, in their

replies plaintiffs have resorted to "an approach aptly described by

the Tenth Circuit in another context as 'throw - as - much - mud -

against - the - wall - as - you - can - and - hope - some - of - it

- sticks.'"  <u>See</u> <u>Cook v. Rockwell Int'l Corp.</u>, 580 F.Supp.2d 1071,

1086 (D.Col. 2006) (quoting <u>Dodd Ins. Servs., Inc. v. Royal Ins.</u>

<u>Co.</u>, 935 F.2d 1152, 1158 (10th Cir. 1991)).  This approach is

rarely, if ever, effective.  Here, the result is undeveloped and

ultimately unpersuasive arguments.[35]

First, plaintiffs point to a County e-mail to Reclamation

written after MCAQ "staff had reviewed [the] air quality related

sections" of the Draft EA.  Admin. R., Vol. 2 at 000374.  In the

---

[35]     Ordinarily the court would not consider these arguments made for the
first time in a reply, as earlier mentioned.  There is no prejudice to the opposing
parties here though.  They each had an opportunity to respond in their respective
replies filed in connection with their cross-motions for summary judgment.

"General Comments" section, the County states: "Because a portion of the project area is located within the CO maintenance area, an analysis of CO emissions from watercraft and from visitors' vehicles should be estimated in the [EA]." Id. Plaintiffs strongly imply that the Final EA disregarded that comment by "[f]ailing to given any consideration to CO emissions generated by motor vehicles driving to and from the proposed marina[.]" Pls.' Reply (Doc. 161) at 20-21.

That generalization distorts the record. The Final EA does "consider" vehicular CO emissions, finding that "none will occur in the maintenance area[.]" Admin. R. at D-18 and 50. Plaintiffs' disagreement with that finding does not render the decisionmaking process arbitrary and capricious. See Wild Fish Conservancy v. Kempthorne, 613 F.Supp.2d 1209, 1220 (E.D.Wash. 2009) (quoting Greenpeace Action v, Franklin, 14 F.3d 1324, 1336 (9th Cir. 1992) ("The fact that a plaintiff disputes the agency's findings and conclusions 'is not a sufficient basis for [the court] to conclude that [the agency's] action was arbitrary and capricious.'") "If it were, agencies could only act upon achieving a degree of certainty that is ultimately illusory." Greenpeace Action, 14 F.3d at 1336.

Next, plaintiffs insist that "[a]s long as the federal action will generate CO emissions that may enter a CO maintenance area, those CO emissions **must** be considered in the EA or EIS." Pls.' Reply (Doc. 161) at 4:28-5:2 (citations omitted) (emphasis in original); see also Pls.' Reply (Doc. 162) at 20:21-22 (citation omitted). Plaintiffs repeat the just quoted sentence twice and then cite to three cases: Sierra Club, 346 F.3d 955; Ober v. Whitman, 243 F.3d 1190 (9th Cir. 2001); and North Carolina v. EPA,

571 F.3d 1245 (D.C.Cir.), _modified_, 550 F.3d 1176 (D.C.Cir. 2008). This limited analysis is troublesome where the applicability of the cited cases is questionable.

The three cited cases are distinguishable in a variety of ways. There is no reason to recount in detail all of those ways. A few of the most glaring distinctions are more than sufficient to make the point. None of those cases involve conformity rule determinations. They also have nothing to do with the sufficiency of an EA or EIS in terms of assessing whether a conformity determination is required pursuant to 40 C.F.R. § 51.853 and 93.153.

To illustrate, in _Sierra Club_ the Ninth Circuit ordered the EPA to reclassify a southern California county as a serious nonattainment area because the EPA wrongly concluded that that county would have met the $PM_{10}$ NAAQS but for transborder emissions from Mexico. _Sierra Club_, 346 F.3d at 962-963. The Court remanded with instructions to reclassify because the evidence from the State's monitors as to wind patterns and exceedances of $PM_{10}$ NAAQS did not comport with the State's position that emissions were coming from Mexico. _See_ _id._ Particularly without any explanation from plaintiffs, the court declines to speculate as to the purported applicability of _Sierra Club_, as well as _Ober_, 243 F.3d 1190, and _North Carolina_, 531 F.3d 896, to the conformity rule determination at issue herein.

Citing to _Border Power Plant_, 260 F.Supp.2d 997, plaintiffs declare that "[a]ir emissions resulting from a proposed action are properly considered 'direct or indirect _effects_' pursuant to 40 C.F.R. § 1508.8." Pls.' Reply (Doc. 161) at 5:25-27 (emphasis

1  added).  Plaintiffs offer no analysis at all, and LPMP did not

2  address this assertion in their reply.  Without any guidance from

3  the parties, the court infers that plaintiffs' theory is that the

4  vehicular CO emissions are "direct or indirect effects" as section

5  1508.8 defines them.[36]  Hence, those emissions should have been

6  included in the Final EA.

7       Plaintiffs have waived this argument because they did not

8  present it during the administrative process.  In commenting on the

9  Draft EA with respect to CO, plaintiffs state the general

10 proposition that a conformity determination is required in a CO

11 maintenance area "if direct and indirect *emissions* equal or exceed

12 100 tpy [tons per year]."  Admin. R. at H-85 (citing 40 C.F.R.

13 § 93.153).  Significantly, "direct and indirect *emissions*" are not

14 synonymous with "direct or indirect *effects*."  Perhaps the most

15 important distinction, as earlier explained, is that the former has

16 a federal control element, but the latter does not.  Compare 40

17 C.F.R. § 93.152 with 40 C.F.R. § 1508.8.  Moreover, plaintiffs'

18 comments pertained strictly to CO watercraft emissions; they did

19 not mention CO vehicular emissions.  See Admin. R. at H-85

20 ("Emissions from increased watercraft use alone could result in

21 direct and indirect emissions that equal or exceed 100 tpy.") So

22 although plaintiffs informed Reclamation of their opinion that the

23 Final EA should include watercraft CO emissions because they are

24

25       [36]      "Direct effects" are those "which are caused by the action and occur
26 at the same time and place."  40 C.F.R. § 1508.8(a).  Section 1508.8 further
   defines "indirect effects" as "which are caused by the action and are later in time
27 or farther removed in distance, but are still reasonably foreseeable.  Indirect
   effects may include growth inducing effects and other effects related to induced
28 changes in the pattern of land use, population density or growth rate, and related
   effects on air and water and other natural systems, including ecosystems."  40
   C.F.R. § 1508.8(b).

"direct or indirect *emissions*," they did not opine that CO vehicular emissions also should be included on the theory that they are "direct or indirect *effects*."

Plaintiffs' comments pertaining to the RDEA also are directed only at watercraft CO emissions – not to CO vehicular emissions. See id. at H-174. Plaintiffs' "Supplemental Comments" do not mention CO emissions at all, regardless of source; they are aimed primarily at estimated $PM_{10}$ emissions from construction activities. See id. at H-193 – H-194. Thus, because plaintiffs did not inform Reclamation during the NEPA process as to their view that the EA should have included vehicular CO emissions because they are "direct or indirect effects" of the project, Reclamation did not have a chance for meaningful consideration of that issue. See Pub. Citizen, 541 U.S. at 764, 124 S.Ct. 2204. Accordingly, this argument is waived.

Even absent a finding of waiver, this argument is not persuasive. As is self-evident from the regulatory definition, whether something is "direct or indirect effect" is a question of causation. See 40 C.F.R. §§ 1508.8(a) and 1508.8(b); see also Border Power Plant, 260 F.Supp.2d at 1016 ("Ninth Circuit precedent makes clear that effects must be causally linked to the proposed federal action to require consideration of those effects in an EA or EIS."). Here, the plaintiffs made no attempt whatsoever to show that CO vehicular emissions are a "direct or indirect effect" of this marina project.

Plaintiffs' "cumulative impact" argument is no more persuasive. They recite the statutory definition of a "cumulative impact" found in 40 C.F.R. § 1508.7. Then again, simply citing to

<u>Border Power</u> <u>Plant</u>, 260 F.Supp.2d 997, plaintiffs declare that "[a]ir emissions from a proposed action are properly considered 'cumulative impacts' requiring NEPA analysis." Pls.' Reply (Doc. 161) at 6:11-12 (citation omitted). Although this assertion is made in plaintiffs' reply to LPMP, LPMP's reply does not address cumulative impacts.

Plaintiffs' perfunctory argument and LPMP's lack of response leaves the court to speculate on both sides of the equation. The court declines to do so because, as it has previously remarked, "to do so would mean that it would be impermissibly taking on the role of advocate, rather than impartial decision-maker." <u>See</u> <u>Mann v.</u> <u>GTCR Golder Raunder, L.L.C.</u>, 483 F.Supp.2d 884, 891 (D.Ariz. 2007). Consequently, the court finds unpersuasive plaintiffs' cumulative impact argument.

In a last-ditch attempt to prevail on their argument that the Final EA did not properly calculate vehicular CO emissions, plaintiffs contend that "[b]ecause attracting paying customers is an admitted purpose of the proposed marina, the CO emissions those customers will generate should have been considered in the Final EA." Pls.' Reply (Doc. 161) at 6:21-23 (citations omitted). At the risk of repetition, plaintiffs merely cite to two cases and provide no analysis.

In the cited portion of <u>Florida Wildlife Federation v. U.S.</u> <u>Army Corps of Engineers</u>, 401 F.Supp.2d 1298 (S.D.Fla. 2005), in addressing the sufficiency of the EA as to the Corps' "benefits analysis" under the Clean Water Act ("CWA"),[37] the Court held that

---

[37] "Under the CWA, the Corps must balance 'benefits which reasonably may be expected to accrue from the proposal' against the proposal's 'reasonably foreseeable detriments'" <u>Florida Wildlife Federation</u>, 401 F.Supp.2d at 1332 n.

that analysis "exceeded the scope of the impacts analysis as required by" the Corps' "own regulations and by regulations under [CWA]." Id. at 1332 (footnote omitted). Plainly neither the CWA and its regulations, nor regulations governing the Army Corps of Engineers are applicable here. Regardless of those obvious factual distinctions, as a district court decision outside this Circuit, Florida Wildlife would have little if any precedential value here.

Western Land Exch. Project v. U.S. Bureau of Land Management, 315 F.Supp.2d 1068 (D.Nev. 2004), the other case to which plaintiffs cite, likewise does not support their broad assertion that because "attracting paying customers is an admitted purpose of the [project]," the Final EA "should have considered. . . the CO emissions those customers will generate[.]" Pls.' Reply (Doc. 161) at 6:22-23 (citations omitted). Plaintiffs quote from that portion of Western Land wherein the court held that the agency did not comply with 40 C.F.R. § 1508.8 because it did not adequately consider the "direct and indirect effects" of the sale of land to private developers. So presumably, this is just another variation on plaintiffs' argument that the Final EA improperly excluded indirect and direct effects. Plaintiffs have waived any argument that the Final EA should have included vehicular CO emissions because they are "direct or indirect effects" of the marina project, as already explained. Further, plaintiffs have not attempted to establish the requisite causal connection. See id. So despite the slight shift in focus - paying customers as a purpose of the project – this argument is untenable nonetheless.

There is one final aspect of plaintiffs' arguments as to CO

34.

emissions which the court cannot overlook. There are three other potential sources of CO emissions, as mentioned earlier, that the Final EA did not include. Those are emissions emanating from: (1) equipment used to transport boats from dry storage; (2) "vehicles idling in line at boat ramps[;]" and (3) vehicles driving in the proposed marina's unpaved parking lots." Pls.' Mot. Summ. J. (Doc. 150) at 22:13-14 (citation omitted). Plaintiffs argue that the CO emissions from these three sources are "indirect emissions" as 40 C.F.R. § 93.152 defines them, and thus should have been "considered" in the Final EA. See id. at 22:15.

Reclamation did not respond to this argument, but LPMP did. Again stressing that the applicable NEPA regulations pertain, *inter alia*, to "indirect emissions . . . in a . . . maintenance area[,]" LPMP asserts that because all emissions from the transport equipment would occur "outside the CO maintenance areas[,]" Reclamation did not have to consider those emissions in the Final EA. LPMP's Cross-mot. (Doc. 157) at 18:23-24 (citation omitted). Plaintiffs' reply to LPMP's cross-motion discusses vehicular CO emissions at some length. It makes no mention, though, of the other potential sources of CO emissions listed above. The court construes that silence to mean that plaintiffs are abandoning their argument that those sources are "indirect emissions."

Assuming to the contrary, *i.e.*, no abandonment, still, this argument is groundless. The phrase "indirect emissions," as previously discussed, is a regulatory term of art. For an emission to be "indirect" within the meaning of section 93.152, it must have several components, including "reasonabl[e] foreseeab[ility][,]" and an element of control by the Federal agency. See id..

Plaintiffs have not shown that any potential CO emissions from transport equipment, idling vehicles or driving on unpaved parking lots, have any of the attributes of an "indirect emission" in accordance with 40 C.F.R. § 93.152.

#### 4. Diesel Engines

Having addressed all of plaintiffs' contentions with respect to how the Final EA calculated $PM_{10}$, ozone and CO emissions, plaintiffs are left with their dispute as to how the Final EA dealt with diesel engines. Undisputably, in providing emissions "estimates" to MCAQ, LPMP "did not include any diesel engines since [it] w[ould] not [be] sell[ing] diesel fuel at [its] facility." Admin. R. at D-4. Plaintiffs fault Reclamation for "accepting LPMP's *non sequitur* that the Final EA could *ignore* diesel engines in its emissions calculations because the proposed marina will not sell diesel fuel." Pls.' Mot. Summ. J. (Doc. 150) at 21:9-13 (footnote omitted) (emphasis added). Plaintiffs do not expand upon this argument at all in their motion.

Even though LPMP did not include diesel engines in its estimates for calculating watercraft emissions, Reclamation did. After receiving LPMP's estimates, Reclamation revised its emissions calculations in several ways. Although the estimate for sailboats at the existing marina was 110, ultimately Reclamation ran the NONROAD2005 model using 138 sailboats with diesel engines. See Admin. R. at D-2 and D-8. Also, because EPA had "caution[ed] that when modifying population numbers in the NONROAD2005 model, activity levels should also be examined to reflect local data[,]" Reclamation adjusted "auxiliary diesel sailboat engines['] activity levels to reflect local conditions." Id. at D-9. So even though

- 103 -

the proposed marina would not be selling diesel fuel, contrary to
what plaintiffs assert, Reclamation's watercraft emissions
calculations did include diesel engines.

As an afterthought, in their reply to LPMP's cross-motion,
plaintiffs mention that "[t]he final EA . . . assumes that no
motorboats at the proposed marina will have diesel engines[]" – an
assumption they label "absurd[.]" Pls.' Reply (Doc. 161) at 14:10-
11 (emphasis omitted). LPMP did not respond to this argument in
their reply. Regardless, plaintiffs once again are choosing to
ignore the broader context in which the watercraft emissions
calculations were made.

Looking at the Final EA as a whole, including Appendix D, it
cannot be said that Reclamation acted arbitrarily, capriciously, or
committed a clear error of judgment in its consideration of diesel
engine emissions. Overall, Reclamation's approach to watercraft
emissions was relatively conservative. Starting from the
assumption of 100 percent occupancy, Reclamation "redistributed"
LPMP's counts with respect to 100-175 horsepower engines and 175-
300 horsepower engines. Admin. R. at D-2. Rather than a fifty-
fifty distribution, Reclamation opted to "favor the higher-power
motors[.]" Id. Reclamation also added 70 jet skis or personal
watercraft into the model,[38] which LPMP did not identify in its
inventory. Id. Consequently, despite plaintiffs' assertion to
the contrary, the Final EA does not completely ignore diesel
engines. Moreover, its overall approach to watercraft emissions

_____

[38] Reclamation later discovered that that number should have been 88.
Admin. R. at D-3 n.1. But rather than running the model again, as MCAQ suggested,
Reclamation used MCAQ data "to recalculate the emissions for th[o]se additional 18
personal watercraft." Id.

was, as just noted, relatively conservative.

Summarizing the various rulings herein as to Count Three, plaintiffs simply have not met their burden of "demonstrat[ing] that [Reclamation's] ultimate conclusions" as to the $PM_{10}$, ozone and CO emission calculations for the proposed marina were "unreasonable." See George, 577 F.3d at 1001 (citation and internal quotation marks omitted). Somewhat ironically, plaintiffs claim that the Final EA impermissibly takes a "myopic view of the proposed marina by failing to consider all of the ozone, $PM_{10}$ and CO emissions it will produce." Pls.' Mot. Summ. J. (Doc. 150) at 23:6-7. On the contrary, it is plaintiffs who selectively and narrowly read that document so as to see NEPA violations at nearly every turn of that document's emissions analysis. Taking into account as it must, however, "the reasonableness of [Reclamation's] decision-making processes[]" with respect to $PM_{10}$, ozone and CO emissions associated with the proposed marina, the court finds that Reclamation did not act arbitrarily, capriciously, abuse its discretion, or otherwise act not in accordance with law. See MacClarence, 596 F.3d at 1129 (citation and internal quotation marks omitted). Accordingly, the court denies plaintiffs' motion for summary judgment as to Count Three, and grants the cross-motions for summary judgment as to that Count by Reclamation and LPMP.

## IV. *Public Notice and Comment*

The fourth and final count of the FAC alleges that, in violation of NEPA, Reclamation did not "provide meaningful opportunity for public comment" prior to issuing the FONSI and Final EA. FAC (Doc. 4) at 25 (emphasis omitted). The thrust of

plaintiffs' argument on summary judgment is that Reclamation did
not comply with NEPA because it "wait[ed] until after the [close of
the] public comment period . . . before substituting a new
methodology for calculating air emissions in place of the one that
was disclosed in the Draft EA and the Revised Draft EA[.]" Pls.'
Mot. Summ. J. (Doc. 150) at 24:26-25:1 (citation omitted). By
waiting until issuance of the Final EA to "replace" that
methodology, plaintiffs contend that they, and the public at large,
were deprived "of an opportunity to scrutinize and comment" on that
"new" methodology. Id. at 25:6-7 (citation omitted).

LPMP, but not Reclamation, counters that Reclamation had no
obligation in the first instance to disclose its updated
methodology for calculating its air quality conformity
determination "because the de minimis levels were not exceeded."
LPMP's Cross-mot. (Doc. 157) at 21:4-5 (citations omitted). The
court will address this argument at the outset because if LPMP
prevails, LPMP's and Reclamation's arguments on substantive grounds
become moot.

The source of LPMP's argument is a document dated July
13, 1994,[39] entitled "General Conformity Guidance: Questions
and Answers[,]" and issued by the U.S. Environmental Protection
Agency's ("EPA") Office of Air Quality Planning and Standards
("General Conformity Guidance"), available at

---

[39]    Since then, in light of 1995 CAA amendments, that Guidance Document has
been revised, but not with respect to "Q&A #1," which is the basis for LPMP's
argument at this juncture. See William T. Harnett, Memorandum, *Revision to General
Conformity   Applicability   Questions   and   Answers*,
http://www.epa.gov/air/genconform/documents/Jun06/Rev_to_GC_App_QandAs.pdf (last
visited June 8, 2010); see also *New General Conformity Q's & A's (October 19,
1994)*, http://www.epa.gov/air/genconform/documents/gcgqa_941019.pdf (last visited
June 9, 2010).

http://epa.gov/ttn/oarpg/conform/gcgqa_71394.pdf.  In particular,
LPMP relies upon the following question and partial answer:

> 1.  Must the applicability analysis be made public?
>
> A: If the proposed action was found to result in
> emissions below *de minimis* levels or if a conformity
> determination is not required, then **it is not obligatory
> to make the applicability analysis public under this
> rule**. . . .  In any case, the public is free to request
> and the Federal agency is obligated to provide the
> applicability analysis under the Freedom of Information
> Act.

LPMP's Cross-mot. (Doc. 157) at 20:24-27 (quoting General
Conformity Guidance at 26) (emphasis added by LPMP).  LPMP omitted
the last sentence of that answer, however, as plaintiffs note.
That sentence expressly provides:

> *NEPA's disclosure requirements may* also *require
> publication* of the information supporting the
> applicability analysis *even if* the conformity rule
> does not.

General Conformity Guidance at 26 (emphasis added).  This is a
crucial omission because the just quoted sentence clearly manifests
EPA's recognition that NEPA may impose more stringent public
disclosure requirements than EPA's guidance document.  LPMP also
fails to take into account the nature of this guidance document, as
plaintiffs further note.  The purpose of that document is to
"represent[] EPA's interpretation of the general conformity rule."
Id.  This EPA-drafted interpretive guidance document was not in any
way intended to supplant Reclamation's obligation to comply with
NEPA's public participation procedures, which "are at the heart of
the NEPA review process."  See California v. Block, 690 F.2d 753,
770 (9th Cir. 1982).  There is simply no credence to LPMP's argument
that a selective quote from a 1994 EPA-prepared interpretive

guidance document, obviates NEPA's public comment procedures.

Having found that the 1994 guidance document did not relieve Reclamation from complying with NEPA's public comment procedures, the next issue is whether Reclamation fulfilled that obligation. Because they serve differing purposes, "NEPA does not require federal agencies to assess . . . consider [and] respond to public comments on an EA to the same degree as it does for an EIS[.]" California Trout v. F.E.R.C., 572 F.3d 1003, 1016 (9th Cir. 2009) (citing 40 C.F.R. § 1503.4). For example, NEPA regulations require circulation of a draft EIS, but those regulations are silent as to the "necessity of a draft EA[,]" and in fact do "not expressly require the circulation of a draft EA." See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 952 (9th Cir. 2008). Nonetheless, even when it issues an EA, "an agency must permit some public participation[.]" Id. The pertinent NEPA regulations provide that an "agency must 'involve environmental agencies, applicants, and the public, to the extent practicable, [40 C.F.R.] § 1501.4(b), and '[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures,' [40 C.F.R.] § 1506.6(a)." California Trout, 572 F.3d at 1016.

The Ninth Circuit has not "unequivocally defined what sort of public participation is required to meet NEPA's amorphous standards[.]" Id. at 1017. It "has recognized that the level of participation required by NEPA's implementing regulations is *not* substantial[,]" however. Id. at 1017 (emphasis added). Not surprisingly, "a complete failure to involve or even inform the public about an agency's preparation of an EA would violate NEPA's

regulations[.]"  Id. (citation and internal quotation marks

omitted).  Yet, the Ninth Circuit has "also concluded that 'the

circulation of a draft EA is not required in every case.'"  Id.

(quoting Bering Strait Citizens, 524 F.3d at 952).

     The Bering Strait Court confronted the issue of "what level of

public disclosure" NEPA "require[s] . . . before issuance of a

final EA[.]" Bering Strait, 524 F.3d at 953.  Recognizing that

"[e]ach EA will be prepared under different circumstances[;] . . .

the regulations [do] not specif[y] a formal practice for affected

agencies[;]" and "practices have not been uniform," the Ninth

Circuit "elaborate[d] the factors that should guide the agency."

Id.  Borrowing heavily from Sierra Nevada Forest Protection

Campaign v. Weingardt, 376 F.Supp.2d 984 (E.D.Cal. 2005), the Ninth

Circuit concurred that the pertinent NEPA regulations:

> "'require that the public be given as much environmental
> information as is practicable, prior to completion
> of the EA, so that the public has a sufficient basis
> to address those subject areas that the agency must
> consider in preparing the EA. Depending on the
> circumstances, the agency could provide adequate
> information through public meetings or by a reasonably
> thorough scoping notice.'"

Bering Strait, 524 F.3d at 953 (quoting Weingardt, 376 F.Supp.2d at

991).

     Focusing on the sufficiency of the environmental information,

and "commend[ing]" the approach in Weingardt, the Ninth Circuit in

Bering Strait adopted the following rule:

> An agency, when preparing an EA, must provide the
> public with *sufficient environmental information,
> considering the totality of the circumstances*, to
> permit members of the public to weigh in with their
> views and thus inform the agency decision-making process.

Id. (emphasis added).  The Bering Strait Court found that the

"quality of the [agency's] dissemination of environmental
information to the public and its consideration of public comment,
before issuing its EA, was reasonable and adequate[,]"
notwithstanding that the agency did not circulate a Draft EA at all
before issuing the Final EA.  See id.

The Ninth Circuit based that holding on several factors.
"Information about the project was widely disseminated throughout
the community and environmental information was reasonably and
thoroughly tendered to the public."  Id.  Dissemination occurred by
the agency's posting on its website of a notice of a public
meeting, and description of the proposed project.  See id. at 944.
Distribution of the notice in electronic or hard-copy format was
made to a vast cross-section of potentially interested
stakeholders, such as federal, state and local agencies,
neighboring communities and adjacent property owners, as well as
"any member of the community who requested a copy."  Id.
Additionally, the agency "received a high level of public comment
from the . . . community, most of it favoring the project."  Id. at
953.  The Court also found significant the agency's public outreach
efforts through various media outlets, along with the agency's
"joint efforts with state agencies to explain the permitting
process."  Id.  For all of these reasons, in Bering Strait, the
Ninth Circuit held that "[t]he quality of the Corp's dissemination
of environmental information to the public and its consideration of
public comment, before issuing its EA, was reasonable and
adequate."  Id.

Based upon Weingardt, plaintiffs argue that Reclamation
violated NEPA because it "did not offer significant pre-decisional

opportunities for informed public involvement in the environmental review process."  See Weingardt, 376 F.Supp.2d at 992.  Reclamation vigorously maintains that it did offer such opportunities. Reclamation emphasizes that it prepared not one, but two Draft EAs and submitted both for public comment.  Moreover, based upon those public comments Reclamation "revised its analysis of certain issues related to the environmental impacts" of the proposed marina and "included all comments and responses to comments in the Final EA." BOR's Cross-mot. (Doc. 154) at 25:10-12.  LPMP echoes this response, adding that Reclamation distributed a scoping memorandum "to about 70 interested agencies[,] organizations and individuals, which initiated a 23-day public scoping period."  LPMP's Cross-mot. (Doc. 157) at 22:14-15 (citation omitted).  LPMP thus contends that "BOR provided sufficient information to foster informed public participation."  Id.

        "Determining whether the public was adequately involved [for NEPA purposes] is a fact-intensive inquiry made on a case-by-case basis."  Natural Resources Defense Council 634 F.Supp.2d at 1067 (citation and internal quotation marks omitted).  Engaging in that fact-intensive inquiry here shows, as detailed below, that "considering the totality of the circumstances," prior to issuing the Final EA, Reclamation "provide[d] the public with sufficient environmental information, . . . to permit members of the public to weigh in with their views and thus inform the agency decision-making process."  See Bering Strait, 524 F.3d at 953.  NEPA, as the Ninth Circuit interprets its implementing regulations, requires nothing more.

        In arguing that Reclamation did not comply with NEPA's public

notice and comment provisions, plaintiffs partially quote from the
EA as follows:

> [BOR] chose to replace the methodology used
> for calculating potential watercraft-related
> emissions from the proposed project described
> in the Draft EA and the Revised Draft EA.

Pls.' Mot. (Doc. 150) at 150 (citation omitted).  Rather than
viewing that statement in the framework of the entire EA process,
plaintiffs are reading it in isolation.  As will soon become
evident, regardless of whether the focus is on the EA process
generally or the more narrow issue of air quality emissions
methodology, Reclamation complied with NEPA's public participation
requirements for an EA.

On March 1, 2006, Reclamation sent out a scoping memorandum "to
about 70 interested agencies, organizations and individuals,
requesting input regarding any issues or concerns that should be
addressed in the EA[.]"  Admin. R. at 5 (citation omitted).  During
that 23-day public scoping period, Reclamation received five scoping
comment letters, including one from plaintiffs.  Id. at 5; see also
id. at H-61.  The "relevant issues and concerns identified during
scoping[,]" and "addressed in the [Final] EA include[d] . . . air
quality[.]" Id. at 5.

On July 28, 2006, Reclamation instituted "a 21-day public
review and comment period[]" regarding "[a]n initial draft [EA] for
the proposed" marina project.  Id. at Preface.  As part of that
initial review process two articles were published in The Arizona
Republic.  Id. at 2.  The first article advised the public about how
to obtain a copy of that Draft EA.  See id.  In total, Reclamation
received 65 comments during that first comment period, including 21

public comment letters.  <u>Id.</u>; and at H-1.  Of the 53 "short e-mail
statements[,]" the vast majority supported the project.  <u>Id.</u>

Plaintiffs submitted a comprehensive public comment letter
during that first review period.  <u>See</u> <u>id.</u> at H-61- H-91.  That
letter included a detailed review of the "air quality impacts" that
plaintiffs claimed had "not been adequately addressed" in the Draft
EA.  <u>Id.</u> at H-82 - H-86 (emphasis omitted).  Reclamation responded
in writing, as it did to all public comment letters.  All comment
letters, along with Reclamation's responses thereto regarding both
the Draft EA and the Revised Draft EA ("RDEA"), are appended to the
Final EA.  <u>See</u> <u>id.</u>, App. H.

On October 24, 2006, Reclamation issued a RDEA allowing for a
second public comment and review period; this one was for 24 days.
<u>Id.</u> (FONSI) at 2.  Reclamation issued that RDEA "[d]ue to the
discrepancy between the estimated current watercraft use identified
in the [initial] draft EA, and the estimated current watercraft use
based upon corrected data[.]"  <u>Id.</u>  The Draft EA also was "revised
where appropriate in response to comments that had been received
during the initial public review and comment period."  <u>Id.</u>

During this second comment period, Reclamation received nine
comment letters, including another one from plaintiffs.  <u>Id.</u> at H-2;
and H-162 - H-181.  Plaintiffs, among other things, challenged the
methodology used in the RDEA for calculating air quality emissions.
<u>See</u> <u>id.</u> at H-174 - H-176.  The thrust of plaintiffs' comments was to
fault Reclamation for "rel[ying] on outdated data[,]" such as 2002
$PM_{10}$ emission assumptions.  <u>Id.</u> at H-176.  As to "ozone precursor
emissions from watercraft[,]" according to plaintiffs, "[a] better
approach" would be to "estimate" those emissions by "us[ing] the

most current county-wide emission estimate available as a starting

point." <u>Id.</u> at H-175.

The FONSI acknowledges that one unidentified commentator,

presumably plaintiffs, "indicated [BOR'S] methodology for

calculating air emissions that would result from the proposed

project was flawed." <u>Id.</u> at 8 (footnote added). Consequently, as

the FONSI further explains:

> Reclamation sought guidance from . . . MCAQD . . .
> to determine a more suitable approach for calculating
> potential emissions. As a result, Reclamation *revised*
> its methodology to be consistent with that used by MCAQD
> in compiling the County's own emission inventory reports.
> Appendix D to the final EA provides a detailed explanation
> of the revised methodology, as well as the recalculated
> emissions.

<u>Id.</u> (emphasis added). Reclamation's written response to

plaintiffs' comment letter sets forth the efforts Reclamation

undertook, primarily in conjunction with MCAQD, to address

plaintiffs' "concerns" regarding Reclamation's methodology for

"estimat[ing] potential air pollutant emissions that could be

generated by th[e] proposed project." <u>Id.</u> at H-185. In that

response, Reclamation advised plaintiffs that "the emission

calculations for most of the nonroad sources, including pleasure

craft, were derived from use of U.S. [EPA's] NONROAD**2002** model."

<u>Id.</u> (emphasis added). As Reclamation further explained, however,

that "model has since been superceded by the NONROAD**2005** model."

<u>Id.</u> (emphasis added).

Reclamation's response also includes a fairly expansive

discussion of an EPA "technical report on the methodology and data

it uses in its NONROAD model, to allocate nonroad mobile equipment

populations from the national to State and county levels (EPA

1  2005).” <u>See</u> <u>id.</u>  In further explaining its rationale for

2  "choos[ing] to utilize EPA's NONROAD2005 model[]" in the RDEA,

3  Reclamation explained that "MCAQD staff [had] reiterated EPA's

4  recommendation that default NONROAD model values be adjusted where

5  local data are available, and stress that local data are preferred

6  whenever they are available." <u>Id.</u> at H-186.

7      On February 12, 2007, about a week and a half before

8  Reclamation issued the FONSI and Final EA, plaintiffs submitted

9  "supplemental comments[,]" again pertaining to the RDEA. <u>Id.</u> at H-

10  193.  The purpose of those comments was to make Reclamation aware of

11  the MCAQD's then-recent release of its "2005 Emissions Inventory[,]"

12  and to seek a review by Reclamation of that inventory. <u>Id.</u>  As

13  part of that review, plaintiffs stated their "belie[f]" that

14  Reclamation should "update its emissions estimates for the proposed

15  marina, prior to determining whether [that] . . . marina would have

16  a 'significant impact' on the environment." <u>Id.</u>  Plaintiffs then

17  contrasted three assumptions in the 2005 Emissions Inventory with

18  those in the RDEA, concluding, *inter alia*, that "the total project

19  emissions clearly exceed the conformity threshold of 70 tons." <u>Id.</u>

20  at H-194.

21      Directly responding to those supplemental comments, Reclamation

22  explained its contrary view.  Reclamation opined, *inter alia*, that

23  plaintiffs "either misunderstood or misinterpreted information

24  presented in the public review draft" of the County's 2005 Emissions

25  $PM_{10}$ Inventory. <u>Id.</u> at H-197.  Next, Reclamation clarified the

26  various sources used in calculating emissions factors, focusing

27  specifically on $PM_{10}.$ <u>See</u> <u>id.</u>  Reclamation further explained:

28          Appendix D [Assumptions and Calculations Uses
          for General Conformity Rule Determinations] has

been revised to more clearly identify the sources
of each emission factor that were used.

Id.

Moreover, even before plaintiffs submitted their supplemental comments, on February 7, 2007, Reclamation sent plaintiffs' then-counsel a letter. In that letter Reclamation offered what it "hope[d]" was a "concise and easy to understand description of the future steps [Reclamation] would like to take as it continues its EA comment response on th[e] issue[]" of air quality emissions methodology. Admin. R., Vol. 2 at 000450. Reclamation repeated that "the basic idea is to gather local data that would serve as a more accurate input into the EPA emissions modeler." Id. Reclamation then explained:

> [c]urrently, the estimates are based on
> the default EPA engine data that is gathered
> nationally by EPA. While the defaults are
> certainly usable, local data is preferred
> if available.

Id. Specifically "respon[ding] to [plaintiffs'] comments questioning some of the underlying methodology assumptions," Reclamation wrote that it was "open to gathering better local data." Id. Evincing a willingness to coordinate and cooperate with plaintiffs, Reclamation proposed a "walking survey at [plaintiffs'] Marina" as "the simplest way to get some good data." Id. That February, 2007 letter included the following attachments: (1) a "Lake Pleasant Air Emissions Estimate," addressing the "Proposed Methodology Change[;]" (2) a list of various engine types; and (3) an EPA "User's Guide for the Final NONROAD2005 Model[.]" Admin. Rec., Vol. 2 at 000451-000471.

As can be seen, Reclamation sought and received active engagement in the EA process from the March 1, 2006 issuance of the

scoping memorandum to a wide cross-section of the community, through the issuance of the FONSI and Final EA nearly a year later, on February 23, 2007. Through a newspaper article the public was advised of the issuance of a Draft EA, and how to obtain a copy of that document. Admin. R. (FONSI) at 2. Further, "[t]he public was afforded not one, but two distinct comment periods in this case." Natural Resources Defense Council, 634 F.Supp.2d at 1067. Plaintiffs took full advantage of both comment periods, each time submitting quite extensive comment letters. See Admin. R. at H-61 – H-91; and at H-162 – H-181. Both times Reclamation reciprocated with similarly detailed written responses. See id. at H-95 – H-110; and at H-183 – H-190. Other members of the public also engaged in this process by providing their own written comments. See id. (FONSI) at 2; and at H-1 – H-2 (list of those who submitted comment letters to the July 2006 Draft EA).

As to the air quality emissions methodology in particular, again, at each step in the EA process Reclamation took into account plaintiffs' comments, among others. Denouncing Reclamation for "junk[ing] the air emissions calculations disclosed in the [Draft EA and RDEA] and proceed[ing] behind closed doors with an entirely new methodology for calculating [air quality] emissions[,]" plaintiffs accuse Reclamation of engaging in improper "'bait and switch' tactics[,]" as to those calculations. Pls.' Reply (Doc. 162) at 23:25-28 (emphasis added). This is nothing more than inflammatory rhetoric unsupported by the administrative record.

Reclamation's decision to use an updated nonroad model for assessing air quality emissions was not "bait and switch," but rather a result of the fact that the NONROAD2002 model was

"superceded by the NONROAD2005 model." Admin. R. at H-185.
Moreover, the EA process, including formulation of the air quality
emissions methodology was, as the record reflects, not "behind
closed doors." Furthermore, the court cannot ignore the fact that
"plaintiffs have not identified any additional relevant information
that they would have provided to the [BOR] had there been another
round of public review." See Natural Resources Defense Council, 634
F.Supp.2d at 1068 (citations omitted).

Notwithstanding Reclamation's public involvement efforts
outlined above, plaintiffs assert that Weingardt governs the present
case. There, the court held that the agency did not "give the
public an adequate pre-decisional opportunity to informed comment[]"
where that agency issued an initial scoping notice for comment, but
did not allow comment on the Final EA, prior to releasing the FONSI.
Weingardt, 376 F.Supp.2d at 992. In sharp contrast to the present
case, however, the circulated pre-decisional documents in Weingardt
"contained *no* analysis of the environmental impacts of the
projects[.]" Id. (emphasis added).

Obviously, the same is not true here. The "pre-decisional
documents," such as the Draft EA, did include such analyses.
Moreover, in between the issuance of the Draft EA and the Final EA,
plaintiffs in particular were involved in an active exchange with
Reclamation regarding, *inter alia*, the methodology to be used for
calculating air quality emissions. Finally, although not entirely
dispositive, it is noteworthy that in Weingardt the court "chastised
the [agency] for withholding '*already-prepared* environmental
documents even though the documents were completed before the end of
the public comment period.'" Natural Resources Defense Council, 634

F.Supp.2d at 1067 (quoting Weingardt, 376 F.Supp.2d at 992).  The

Weingardt court expressly found that that "failure to provide

essential information, already in the hands of the agency, d[id] not

comply with the agency's requirement of involving the public 'to the

extent practicable.'"  Weingardt, 376 F.Supp.2d at 993 (quoting 40

C.F.R. § 1501.4).

Here, Reclamation did not withhold any documents.  Not only

that, also in sharp contrast to Weingardt, Reclamation did involve

the public "to the extent practicable."  Reclamation circulated not

one, but two separate EA drafts prior to issuing the Final EA.

Plaintiffs commented on the air emissions methodology at least three

times, and each time Reclamation responded.  As in California Trout,

plaintiffs "were given a full opportunity to review and comment on

the draft EA[s], as NEPA requires, and they took advantage of

th[ose] opportunit[ies]."  California Trout, 572 F.3d at 1017.

Plaintiffs were not the only members of the public participating in

this process, as the comment letters in the record show.  The court

declines to broaden the scope of NEPA's public participation

requirements under these circumstances.  Reclamation did not run

afoul of NEPA by not preparing and circulating another RDEA with the

substituted methodology.  Having found that Reclamation adequately

involved the public in the EA process, the court grants the cross-

motions for summary judgment by Reclamation and LPMP and denies

plaintiffs' summary judgment motion as to Count Four.

## V.  Remedies

Based upon the court's holdings herein, granting summary

judgment in favor of Reclamation and LPMP as to all remaining counts

of the FAC, that is, Counts Two, Three and Four, the arguments as to

remedies are moot. The court's summary judgment rulings also render moot plaintiffs' motion to strike the Pretasky affidavit and Ninth Circuit transcript because, as explained at the outset, those exhibits pertain strictly to the issue of a whether to grant a permanent injunction here. Accordingly, the court denies that motion to strike (Doc. 169). Likewise, the court's summary judgment rulings herein, also render moot all issues pertaining to remedies.

### *Conclusion*

Three fundamental legal tenets have guided this court's searching review of the administrative record, and its consideration of the parties' arguments. First, throughout, the court has been mindful of its limited role and the deferential nature of its review. "The NEPA process involves an almost endless series of judgment calls[,]" as the D.C. Circuit Court of Appeals has so astutely pointed out. <u>Coalition on Sensible Transportation, Inc. v. Dole</u>, 826 F.2d 60, 66 (D.C.Cir. 1987). "The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." <u>Id.</u> Plaintiffs' displeasure with where Reclamation has drawn the lines during this protracted NEPA process is not a basis for this court to overturn the Final EA and FONSI.

The second tenet guiding the court is that NEPA imposes only procedural requirements; it does not mandate any particular substantive outcome. <u>See</u> <u>Tidwell</u>, 599 F.3d at 936. From their March 24, 2006, detailed and extensive written response to the Notice of Public Scoping, prepared by their counsel at the time, plaintiffs were actively involved in the NEPA process at every step of the way. <u>See</u> Admin. R., Vol. 2 at 000298 - 000316. Thereafter, as outlined in discussing Count Four, through their counsel,

plaintiffs availed themselves of every public comment period, including "supplemental comments" roughly a week and a half before issuance of the FONSI and Final EA.  See id. at H-61 - H-91; H-163 - H-181; H-191; and H-193 - H-194.  Plaintiffs appear to be much like those in Spiller v. White, 352 F.3d 235 (5th Cir. 2003), about which the Court opined, "They really don't want more process. . . . What they really desire is a [different] substantive result[.]"  See id. at 245.

The third and equally determinative tenet is that as the party challenging Reclamation's actions as arbitrary and capricious, at all times, the burden of proof was on plaintiffs.  See George, 577 F.3d at 1011.  Plaintiffs did not meet that burden, however.  Instead, plaintiffs engaged in a process which the Ninth Circuit has described in a slightly different context as "cherry pick[ing] information and data out of the administrative record to support their position[.]"  See Native Ecosystems, 428 F. at 1240.  In Native Ecosystems, the Ninth Circuit found that method did not support a finding that the project at issue was "highly controversial or highly uncertain[]" within the meaning of NEPA regulations.  Id. The same is true here.  Cherry picking data and information from the vast administrative record does not satisfy plaintiffs' burden of showing that Reclamation's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  See Alaska Dep't of Envtl. Conservation, 540 U.S. at 496, 124 S.Ct. 938. In sum, because the court is satisfied that Reclamation took the necessary "hard look" at the environmental consequences of the proposed marina, its "review is at an end."  See National Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1073 (9th Cir. 2010)

(citation and internal quotation marks omitted).

For the reasons set forth herein, the court hereby ORDERS that:

(1) "Federal Defendants' Motion to Strike Exhibit One from Plaintiffs' Motion for Summary Judgment" (Doc. 152) is GRANTED;

(2) "Plaintiffs' Motion to Strike Exhibit A to Federal Defendants' Reply in Support of their Cross-Motion for Summary Judgment on Counts Two Through Four of the First Amended Complaint" (Doc. 168) is GRANTED;

(3) Plaintiffs' Motion for Summary Judgment (Doc. 150) is DENIED in its entirety;

(4) Federal Defendants' Cross-Motion for Summary Judgment (Doc. 154) is GRANTED in its entirety:

(5) LPMP's Cross-Motion for Summary Judgment (Doc. 157) is GRANTED in its entirety; and

(6) "Plaintiffs' Motion to Strike Extra-Record Documents Intervenor Lake Pleasant Marina Partners Attached to its Reply in Support of its Cross-Motion for Summary Judgment" (Doc. 169) is DENIED as moot.

(7) The Clerk is directed to enter judgment in favor of the federal defendants and LPMP and terminate this action.

DATED this 29th day of July, 2010.

_____
Robert C. Broomfield
Senior United States District Judge

Copies to counsel of record